**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 CR 00035 |
| | ) | Judge John J. Tharp, Jr. |
| v. | ) | |
| | ) | |
| JAMES VORLEY and | ) | |
| CEDRIC CHANU, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case presents the question of whether a scheme to defraud commodities traders by placing "spoofing" orders—orders that the trader intends to withdraw before they can be filled—can constitute wire fraud. The defendants say no, because wire fraud requires the making of a false statement—an express misrepresentation—and the indictment alleges none. That is not the law. The Seventh Circuit, moreover, has already held that spoofing can constitute a "scheme to defraud" under the commodities fraud statute. As there is no material difference between a scheme to defraud under either statute, the answer to the question presented is, yes: the alleged spoofing scheme alleged in the indictment adequately charges violations of the wire fraud statute. And given that the statute has long been recognized to reach implied misrepresentations, and also requires proof of intent to defraud, the defendants' contention that the statute is unconstitutionally vague as applied to the scheme alleged also fails. The defendants also mount a vigorous challenge to whether the defendants' spoofing orders were, in fact, misleading and material, but those are questions for trial. Accordingly, the defendants' motion to dismiss the indictment is denied.

# I. BACKGROUND[1]

Defendants James Vorley and Cedric Chanu were precious metals traders at Deutsche Bank AB. The indictment alleges that for approximately two years, from December 2009 through November 2011,[2] Vorley and Chanu engaged in a scheme to defraud other traders on the Commodity Exchange Inc. ("COMEX") that involved interstate wire communications.[3] COMEX used an electronic trading system called "Globex," which allowed traders to trade futures contracts from anywhere in the world. During the relevant period, Vorley worked in London; Chanu worked first in London and later Singapore. The Globex servers, however, were located in Chicago and Aurora, Illinois, and that is the basis for venue in this District.

The indictment alleges that the defendants sought "to deceive other traders by creating and communicating materially false and misleading information regarding supply or demand, in order to induce other traders into trading precious metals futures contracts at prices, quantities, and times at which they would not have otherwise traded, in order to make money and avoid losses for the coconspirators." Ind. ¶ 4. The mechanics of the alleged scheme are not the focus of the present dispute, so its operation can be briefly described. The defendants would place one or more orders for precious metals futures contracts on one side of the market (bid or offer), intending to cancel

---

[1] Except as otherwise noted, the facts set forth here are based on the indictment. Allegations of the indictment are taken as true only for purposes of this motion.

[2] The brief of *amicus* Futures Industry Association erroneously states that the conduct at issue is alleged to have occurred between 2007 and 2013. Brief at 7, ECF No. 107.

[3] The indictment charges the defendants with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and charges each of the defendants with one count of wire fraud, in violation of 18 U.S.C. § 1343. The indictment alleges that the conspiracy and scheme also involved David Liew, a third Deutsche Bank precious metals trader. Liew is not charged in this indictment, however, and has pleaded guilty to a related charge. His involvement has no bearing on the issues addressed in this opinion, so there is no need to refer further to his participation in the alleged scheme.

the orders before they could be accepted by other traders. The indictment refers to such orders as "Fraudulent Orders" because the defendants did not intend to execute them; instead, these orders were "intended. . . to deceive other traders" about the true supply or demand for the commodity in question. *Id*. (Since the principal question presented by the defendants motion is whether these orders constituted a scheme to defraud, in lieu of "Fraudulent Orders" this opinion will use the statutory and perhaps somewhat less pejoratively sounding term—"Spoofing Orders"—to refer to these orders; whether they were, in fact, fraudulent will be determined at trial).[4] The indictment alleges that the Spoofing Orders "were material misrepresentations" regarding the defendants' intent to trade those orders. *Id*. ¶ 11. Contemporaneously with placing the Spoofing Orders, the defendants placed what are referred to as "Primary Orders" on the opposite side of the market. Unlike the Spoofing Orders, the defendants intended to execute the Primary Orders, which involved trades that were (at least to the extent that they were visible to the market[5]) of smaller volume.

In theory, at least, the defendants profited from the scheme because the Spoofing Orders would deceive other traders about supply and demand, misleading them about the likely direction of the commodity's price and making the defendants' Primary Orders, on the other side of the market, look attractive. Spoofing Orders to buy (bids), for example, would signal (falsely, because the defendants did not really intend to buy) an increase in demand for the commodity in question,

---

[4] The Commodities Exchange Act defines "spoofing" as "bidding or offering with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(C).

[5] The indictment alleges that Primary Orders were often placed as "iceberg orders," which was a type of order permitted on the COMEX in which only a portion of the order (the tip of the iceberg) was visible to other traders; when the visible portion of an iceberg order is filled, another portion becomes visible to the market, with the remainder again hidden. The process repeats until the entire order is executed or any remaining portion is canceled. Ind. ¶ 1.m.

thereby putting upward pressure on the market price. *Id.* ¶ 7. Having delivered this false signal of increased demand to the market, the defendants would then execute Primary Orders that had been placed to sell the commodity (offers) at a lower price than the Spoofing Order bid price but at a higher price than the prevailing market price had been before placement of the Spoofing Orders. Being smaller (at least, so far as was known to the market), the Primary Order would not wholly counteract the price impact of the Spoofing Orders, allowing the defendants to capture some of the spread between the preexisting market price and the inflated price bid in the Spoofing Orders.

## II. ANALYSIS

The defendants move pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) to dismiss the indictment for failure to state an offense. They also assert, in the alternative, that the wire fraud statute would be unconstitutionally vague if construed to extend to the defendants' trading activity. In addition, several business and industry organizations have filed briefs as *amici curiae* in support of the defendants' arguments that the alleged spoofing scheme does not constitute wire fraud.[6]

### A.    The Indictment Adequately Alleges the Crime of Wire Fraud.

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is adequate if it "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010).

_____

[6] The Bank Policy Institute, joined by the Chamber of Commerce of the United States of America, and the Securities Industry and Financial Markets Association, submitted one brief. ECF No. 96 ("BPI Br."). The Futures Industry Association submitted another. ECF No. 107 ("FIA Br."). The government filed a combined response to both briefs. ECF No. 111 ("USA Resp. to Amici").

Facts alleged in the indictment must be taken as true, *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009), but an indictment need not allege facts sufficient to establish all elements of the offense. "In general, an indictment that tracks the words of a statute to state the elements of the crime is acceptable, provided that the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue. *White*, 610 F.3d at 958-59.[7] And "[w]hen the charge is mail fraud,[8] this court uses a broad rather than a technical standard to determine the sufficiency of an indictment." *United States v. Palumbo Bros.*, 145 F.3d 850, 868 (7th Cir. 1998).

The defendants acknowledge that the indictment provides adequate notice of the conduct alleged to have violated the wire fraud statute. Oral Arg. Tr. at 45, ECF No. 91. Their argument is that the indictment fails because it does not allege facts that show that they made any false statements. The defendants contend that because the indictment alleges (concedes, from the defendants' perspective) that the orders the defendants placed on the COMEX were real, at-risk, offers that the defendants were obligated to, and did, fill if they were accepted before the defendants could withdraw them, their conduct in placing those orders could not have violated the wire fraud statute. Their argument is simple: Wire fraud requires a false statement and in placing

---

[7] The defendants assert that "conclusory allegations of the essential elements of the charged offense cannot save an indictment from dismissal under Rule 12." Def Mem. at 10, ECF No. 76. They cite no authority for that proposition, however, which seems to be lifted from Supreme Court precedent describing pleading standards in civil, not criminal, cases. The Seventh Circuit has expressly rejected the proposition that the sufficiency of an indictment's allegations should be measured by the pleading standards applicable in civil cases. *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013) (declining "to adopt the civil pleading standards articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), to assess the sufficiency of a criminal indictment").

[8] It is undisputed that the mail and wire fraud statutes should be interpreted in same manner. *See Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987). This opinion therefore relies, without further acknowledgement of the distinction, on precedent construing both statutes.

the Spoofing Orders they made no false statements. Their orders communicated no representation beyond the terms of the orders themselves—that the bidding or offering party would fill the order at the stated terms if the order were accepted before it is canceled. As it is undisputed—the complaint does not allege otherwise—that the defendants intended to, and did, fill any of their orders that were accepted while open on the market, their orders were, they insist, bona fide rather than fraudulent.

It's not quite that simple. The defendants' arguments come up short in two respects, one legal and one factual. As a question of law, the defendants' argument that a wire fraud conviction requires proof of a false statement is inconsistent with both the history of the wire fraud statute and Circuit precedent. That the indictment alleges no affirmative misrepresentations by the defendants does not mean that the defendants could not have engaged in a scheme to defraud by means of implied misrepresentations. And whether the defendants' Spoofing Orders carried with them any implied misrepresentations is the central fact question presented by the indictment. The defendants insist that real, at-risk, market orders communicate nothing beyond the offer to trade at the terms stated and that the Spoofing Orders did not deceive other traders about anything material to their trading decisions. That factual assault on the allegations of the indictment, however, must be made at trial.

### 1. *Wire fraud does not require proof of a false statement.*

The defendants maintain that to prove a wire fraud violation, the government must prove that a defendant made a false statement—an affirmative misrepresentation. "Without a false statement or misrepresentation," they declare, "there simply is no wire fraud." Def. Br. at 11, ECF No. 76. And because the government concedes that the indictment alleges no false statements, Oral Arg. Tr. at 36, ECF No. 91, if the defendants are right to say that wire fraud requires proof of an

affirmative misrepresentation, then the allegations fail to set forth the necessary elements of the crime of wire fraud and the indictment must be dismissed.

On this point, however, the defendants are simply wrong. The wire fraud statute proscribes not only false statements and affirmative misrepresentations but also "the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016).[9] And that is precisely what the indictment alleges here: that the defendants did not disclose, at the time they placed their Spoofing Orders, their intent to cancel the orders before they could be executed, inducing by the placement of those orders a false belief about the supply or demand for a commodity, so that the market would move in a direction that favored the Primary Orders, to their benefit and to the detriment of traders in that market who were not privy to the fact that the defendants intended to cancel the Spoofing Orders before they were accepted.

The scheme alleged in this case is materially the same as the commodities fraud scheme charged in *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017). There, as here, the government prosecuted a trader who had executed a scheme to create the illusion of market movement in one direction by placing large spoofing orders that he intended to withdraw from the market before they could be filled while placing orders on the other side of the market that could be filled at a

---

[9] This is but the first of three reasons that the defendants' heavy reliance on *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) is misplaced. See also *infra* notes 23 and 28. The defendants' position that wire fraud requires a false statement cannot be squared with *Weimert*'s acknowledgment that "actionable deception [under the mail and wire fraud statutes] can include false statements of fact, ***misleading half-truths, deceptive omissions,*** and false promises of future action." *Id*. at 357 (emphasis added).

better price as the market reacted to the spoofing orders.[10] *Id*. at 788-89. After the jury convicted Coscia of violating subsection (1) of the commodities fraud statute, 18 U.S.C. § 1348, the Seventh Circuit upheld the conviction against a challenge—the same challenge the defendants make here— that the scheme was not fraudulent because the spoofing orders "were fully executable and subject to legitimate market risk." 866 F.3d at 799. Acknowledging the truth of the contention, however, the Court of Appeals rejected its relevance. Even though the spoofing orders were executable until canceled, the court held that the spoofing scheme was nevertheless "deceitful" because at the time Coscia placed the spoofing orders, he intended to cancel them. *Id.*; *see also id*. at 800 (the deceitful nature of the spoofing scheme derives from the intent to evade execution of the orders).

In the face of the Seventh Circuit's unequivocal holding that futures orders placed with an undisclosed intent to cancel them before they are filled can be fraudulent, the defendants acknowledge that "there is some precedent" that spoofing violates subsection (1) of the commodities fraud statute and therefore assume "for the sake of argument" that a scheme to place orders that one intends not to fill constitutes a species of commodities fraud. Def. Br. at 8, 10, ECF No. 76. But, they urge, the failure to disclose such intent is not fraudulent in the context of this

---

[10] The defendant in *Coscia* was a high-frequency trader and the spoofing scheme for which he was convicted involved programmed trades. *See* 866 F.3d at 786. The indictment in this case does not allege that the defendants engaged in high-frequency programmed trades, and the defendants' briefs refer to the defendants as "manual" traders. *See, e.g.*, Def. Br. at 1 and 7, ECF No. 76. That information lies outside the boundaries of the indictment, but the Court does not understand the government to dispute it. At oral argument, defense counsel argued that *Coscia* could be distinguished on the basis that the orders there were illusory because Coscia's program was able to cancel most of the spoofing orders (all but .08 %) before execution, whereas no such "spoofing machine" was alleged in connection with the defendants' trading. But the speed at which spoofing occurred does not necessarily distinguish the implied misrepresentations in both cases as to the traders' intent, at the time the order is placed, to have the trade executed. And any such arguments will depend on facts to be determined at trial. *See infra* at 29-30. The indictment alleges that the defendants' intended to cancel the Spoofing Orders before they were filled and, for now, that allegation must be taken as true.

case because "mere failure to disclose, absent something more, does not constitute fraud under the mail and wire fraud statutes." *Id*. at 10.

In seeking to limit *Coscia*'s import to commodities fraud charges, the defendants' acknowledgment of the Seventh Circuit's holding is far too grudging. *Coscia* plainly held that a spoofing scheme can constitute a "scheme to defraud." 866 F.3d at 796-97. That holding is controlling authority, binding on this Court, and must be confronted head on: A spoofing scheme like the one the defendants are alleged to have engaged in is a scheme to defraud under the commodities fraud statute. The wire fraud statute, like the commodities fraud statute at issue in *Coscia*, requires proof of a scheme to defraud. Per force, unless a "scheme to defraud" under the commodities fraud statute means something different than a "scheme to defraud" under the wire fraud statute, a spoofing scheme that employs interstate wire communications constitutes wire fraud as well.[11]

The defendants contend that "scheme to defraud" does mean something different under the wire fraud statute. Wire fraud, they maintain, has a "special requirement"—namely, proof of an affirmative misrepresentation. Oral Arg. 1/24/19 Tr. at 11-12, ECF No. 91. To understand the argument, it is necessary to compare the two statutes. Their language is similar, but their structures are different. The defendants seek to exploit that structural distinction in arguing that the meaning of "scheme to defraud" differs between the two.

---

[11] Redundancy between these statutes does not suggest that the scope of either should be limited. As the Supreme Court has explained, "[f]or better or worse, redundancy abounds in both the criminal law." *Marinello v. United States*, 138 S. Ct. 1101, 1114–15 (2018). *See also, e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1096 (2015) ("Overlap—even significant overlap—abounds in the criminal law."); *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014) ("No doubt, the overlap between the two clauses is substantial on our reading, but that is not uncommon in criminal statutes"); *Hubbard v. United States*, 514 U.S. 695, 714, n.14 (1995) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct").

As relevant here, the wire fraud statute, 18 U.S.C. § 1343, makes it a crime to use interstate wire communications to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The commodities fraud statute, 18 U.S.C. § 1348, also proscribes any "scheme or artifice to defraud" or to obtain money or property "by means of false or fraudulent pretenses, representations, or promises," but it separates these prohibitions into two subsections. The first, § 1348(1), makes criminal "a scheme or artifice to defraud any person" in connection with a commodity; the second, § 1348(2), makes criminal "a scheme or artifice to obtain, by means of false or fraudulent pretenses, representations, or promises," money or property in connection with a commodities transaction.

At bottom, the defendants ground the distinction they claim between a commodities fraud violation and a wire fraud violation on the premise that the commodities fraud statute defines two species of commodities fraud, one that does not require a false statement and one that does. Whereas subsection (2) of the commodities fraud statute requires proof of an affirmative misrepresentation ("false or fraudulent pretenses, representations, or promises"), they observe that subsection (1), under which the defendant in *Coscia* was convicted, requires no such proof. The wire fraud statute, they assert, is therefore different; its elements are "distinct from and far more exacting than the elements of subsection 1 of the commodities fraud statute." Def. Br. at 12. That is so, they contend, because the wire fraud statute—which is not divided into two subsections— does not define two species of fraud, but one. And that single species, the insist, "always" requires a false statement or affirmative misrepresentation. Def. Br. at 11-12, ECF No. 76.

There is no dispute that commodities fraud under § 1348(1) requires no proof of an affirmative misstatement while § 1348(2) does. So said the Seventh Circuit in *Coscia*. 866 F.3d at

796.[12] And in arguing that the wire fraud statute, by contrast, sets forth only one offense, the defendants are also on solid ground; the wire fraud statute does not have subparts and neither the government nor the defendants maintain that a violation of § 1343 may be implicitly subdivided into two offenses, one that involves schemes to defraud and another that involves schemes to obtain money or property by means of false or fraudulent pretenses, representations, or promises." Wire fraud, the defendants correctly maintain, makes it one crime to engage in "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" by means of interstate wire communications. Where they go astray, however, is in defining that single offense as one that "always" requires proof of "false or fraudulent pretenses, representations, or promises." That the wire fraud statute does not distinguish between violations predicated on false statements and those that are not—that it does not divide schemes to defraud into two distinct categories as does the commodities fraud statute—does not mean that all wire fraud violations require proof of the former. Rather, it merely means that the wire fraud statute extends to all schemes to defraud involving wire transmissions, ***including*** those in which the scheme is carried out by means of false statements. False statements are not required, however, for liability under the mail and wire fraud statutes.

The somewhat peculiar history of the mail fraud statute reveals the defendants' error. As the Supreme Court explained in *McNally v. United States*, 483 U.S. 350 (1987), as originally enacted in 1872, the mail fraud statute set forth "a general proscription against using the mails . . . in furtherance of 'any scheme or artifice to defraud.'" *Id*. at 356. As such, the statute reached all schemes "to defraud" others of money or property. *Id*. at 358-59. "[T]he words 'to defraud,'" the

---

[12] As noted *infra*, at __ n.__, this is not the equivalent of saying that the Seventh Circuit was "unwilling to conclude" that spoofing involves a false statement.

*McNally* Court further noted, "commonly refer 'to wronging one . . . by dishonest methods of schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id.* at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). The statute included no requirement that the scheme to defraud include false statements.

As such, when enacted the mail fraud statute was consistent with the prevailing meaning of what it meant "to defraud"—a paradigmatic common-law term. *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016) ("*Escobar*"); *Carter v. United States*, 530 U.S. 255, 266 (2000) ("defraud" is a common-law term). And "it is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Escobar*, 136 S. Ct. at 1999; *see also United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992) (citing Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM L. REV. 527, 537 (1947) ("when a term is 'transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it"). Indeed, the Supreme Court has expressly held that "Congress implicitly incorporated [the] common-law meaning" of "defraud" into the mail, wire, and bank fraud statutes. *Neder v. United States*, 527 U.S. 1, 22 (1999).[13] And "when Congress enacted the wire fraud and bank fraud statutes

---

[13] *Neder* did not involve commodities fraud, so the absence of a reference to the commodities fraud statute carries no negative implication. To the contrary, § 1348 had not yet been enacted when *Neder* was decided. Its post-*Neder* enactment of § 1348, employing the same "scheme to defraud" formulation is further evidence that Congress intended no distinction between the meaning of the phrase in the mail and wire fraud statutes on the one hand and the bank and securities/commodities fraud statutes on the other. *See*, *e.g.*, *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 813 (1989) ("When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts.").

. . . the well-settled meaning of 'fraud' required a misrepresentation or concealment of material fact." *Neder*, 527 U.S. at 22 (emphasis added). "Because common-law fraud has long encompassed certain misrepresentations by omission," *Escobar*, 136 S. Ct. at 1999, it is reasonable to infer that in generally proscribing a "scheme or artifice to defraud" in enacting the original mail fraud statute in 1872, Congress intended to incorporate the common law's prohibition on fraud by omission as well as fraud by affirmative misstatement. *Cf. Escobar*, at 1999 (prohibition of false or fraudulent claims under the False Claims Act covers frauds by implied misrepresentations by omission as well as by express falsehoods).

The language on which the defendants premise their argument—"or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises"—was not added to the mail fraud statute until 1909. Contrary to the implication of the defendants' argument, the addition of this phrase was not intended to add a false statement requirement to the elements of mail fraud. As the Supreme Court recounted in *McNally*, the 1909 amendment merely codified the Court's earlier holding in *Durland v. United States*, 161 U.S. 306, 313 (1896), that schemes to defraud include "suggestions and promises as to the future." *See* 483 U.S. at 358-59. Critical to the question at issue in this case, the *McNally* court held that the 1909 amendment worked no change to the meaning of a "scheme to defraud" in the mail fraud statute; it merely "made it unmistakable" that the statute reached the schemes described in the amendment "***as well as other frauds*** involving money or property." *Id*. at 359 (emphasis added).[14] In other words, frauds

---

[14] The *McNally* Court reached this conclusion on its way to holding that the mail fraud statute did not extend to honest services fraud. That holding, of course, was superseded by the enactment of 18 U.S.C. § 1346, which clarified that the phrase "scheme or artifice to defraud" . . . "includes a scheme or artifice to deprive another of the intangible right of honest services." The legislative extension of the mail fraud statute to schemes to deprive others of the intangible right

13

involving false statements are only a subset of frauds actionable under the mail fraud statute; the statute reaches "other frauds," not involving false statements, as well.

The Supreme Court subsequently confirmed this understanding in *Loughrin v. United States*, 573 U.S. 351 (2014), explaining that *McNally* understood the mail fraud statute to define a single offense: using the mails to advance a "scheme to defraud." *Id*. at 359. "The back half" of the wire fraud statute—*i.e.*, the 1909 amendment—the Court held, did not make any substantive change to the meaning of that provision; it merely "clarified that the front [*i.e.*, the "scheme to defraud" provision] *included certain conduct, rather than doing independent work*." *Id.* at 359 (emphasis added). In short, a "scheme to defraud" under the wire statute meant the same thing both before and after the 1909 amendment; the addition of the phrase "by means of false or fraudulent pretenses, representations, or promises" did not limit the crime of mail fraud to schemes accomplished by affirmative misrepresentations. So, yes, the mail fraud statute sets forth "just one offense—using mails to advance a scheme to defraud." But no, a scheme to defraud does not require proof of an affirmative misrepresentation; frauds by omission were actionable under the mail fraud statute when it was enacted and remain so today.

Recognizing that a scheme to defraud under the mail fraud statute does not require a false statement, in *Coscia* the Seventh Circuit expressly approved the district court's use of this Circuit's pattern instructions for mail and wire fraud cases to define the meaning of "scheme to defraud" in the context of a charge of commodities fraud under § 1348(1). As relevant here, the Court of Appeals defined that term as "a plan or course of action intended to deceive or cheat another. *A scheme to defraud need not involve any false statement or misrepresentation of fact*." 866 F.3d

---

of honest services, however, does not implicate the question of whether a "scheme to defraud" under the statute requires a false statement.

at 799 n.70 (emphasis added). Given that the Seventh Circuit borrowed the definition of a "scheme to defraud" from the mail and wire fraud instructions, the defendants' contention that *Coscia*'s holding that a spoofing scheme constitutes a scheme to defraud is "irrelevant" to an assessment of the wire fraud charge in this case is plainly wrong. If spoofing can be a scheme to defraud under § 1348(1)—and it can, the Seventh Circuit has held—it can be a scheme to defraud under the wire fraud statute as well.

*Coscia*, moreover, represents only this Circuit's most recent confirmation of the equivalence of the meaning of "scheme to defraud" across the federal fraud statutes set forth in Chapter 63 of Title 18; it broke no new ground in that respect. The Seventh Circuit expressly confirmed the same point almost thirty years ago, before the commodities fraud statute had even been enacted. In *United States v. Doherty*, 969 F.2d 425 (7th Cir. 1992), the Seventh Circuit held that check-kiting constitutes a scheme to defraud under the bank fraud statute, 18 U.S.C. § 1344. The bank fraud statute plainly served as the model for § 1348, the latter-enacted securities fraud statute, which was in turn subsequently amended in 2002 to include commodities fraud. Addressing subsection (1) of the bank fraud statute, which mirrors subsection (1) of § 1348, the Seventh Circuit held that its plain meaning encompasses check-kiting:

> The plain meaning of "scheme" is a "design or plan formed to accomplish some purpose," or "a plan, design, or program of action to be followed." To "defraud" means "[t]o practice fraud," "to cheat or trick," or "to deprive of a right or property by fraud"; "fraud" means "deceit, trickery, or breach of confidence, used to gain some unfair or dishonest advantage." Check kiting, at root, is a plan designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds. It certainly is encompassed within the ordinary meaning of the term "scheme to defraud."

*Doherty*, 969 F.2d at 428 (internal citations to sources of quoted phrases omitted).

The *Doherty* court then addressed the defendant's argument that check-kiting cannot constitute a scheme to defraud because it does not involve the making of a false statement or

15

representation (the Supreme Court having held in *Williams v. United States*, 458 U.S. 279 (1982), that presentation of a bank check is not a representation that there are sufficient funds in the account to cash the check). The defendant maintained that the term "scheme to defraud" has the same meaning under the § 1344(1) as it has under the mail and wire fraud statutes, and—like the defendants here—argued that one cannot commit mail or wire fraud without making a false statement or misrepresentation of fact. 969 F.2d. at 429. The Seventh Circuit confirmed the first proposition but squarely rejected the second, holding that violation of the mail and wire fraud statutes requires no affirmative misrepresentation:

> *We agree with Doherty that "scheme to defraud" means the same thing under §§ 1341, 1343 and 1344,* but our agreement ends there, for we are not persuaded that the term has as cramped a meaning as he contends. . . . Indeed, we have explicitly recognized . . . that *a course of conduct not involving any factual misrepresentation can be prosecuted as a "scheme to defraud" under the mail and wire fraud statutes.*
>
> This should come as no surprise. *As its ordinary meaning suggests, the term "scheme to defraud" describes a broad range of conduct, some which involve false statements or misrepresentations of fact and others which do not.* This was commonly understood in 1984 when Congress enacted § 1344. In construing § 1344(1), we must presume that Congress was aware of the settled judicial interpretation of "scheme to defraud" under §§ 1341 and 1343, and that it intended to incorporate that interpretation when enacting § 1344. *[O]ne need not make a false representation to execute a scheme to defraud.*

*Id.* (internal case citations and quotations omitted; emphasis added). If, as the Seventh Circuit has instructed, "scheme to defraud means the same thing" under the mail and wire fraud statutes as it does under bank fraud statute, it is difficult to conjure a reason to conclude that it means something different in the context of the commodities fraud statute, which was modeled on, and save for the specific fraud varietal it targets, is substantively

16

identical to, the bank fraud statute.[15] The defendants undertake no such explanation; indeed, neither their briefs, nor those of *amici*, even cite *Doherty*.[16]

The *Doherty* opinion also puts the lie to the defendants' bald contention that there are "no prosecutions brought under the mail and wire fraud act where there is not a false representation." Oral Arg. Tr. at 23, ECF No. 91. As *Doherty* observed, this Circuit has repeatedly recognized "that a course of conduct not involving any factual misrepresentation can be prosecuted as a 'scheme to defraud' under the mail and wire fraud statutes." 969 F.2d at 429. The *Doherty* court identified two bookend exemplars, spanning 60 years, of such cases: *United States v. Richman*, 944 F.2d 323 (7th Cir. 1991) and *Fournier v. United States*, 58 F.2d 3 (7th Cir. 1932). In *Richman*, the Court of appeals affirmed mail and wire fraud convictions while rejecting as "an obvious misstatement of the law" an argument that mail fraud requires the making of a false statement "because 'the mail fraud statute proscribes fraudulent ***schemes***' rather than specific misrepresentations to the party to be defrauded." 944 F.2d at 332 n.10 (quoting *United States v. Keane*, 852 F.2d 199, 205 (7th Cir. 1988) (emphasis in original). Decades earlier, in *Fournier*, the Court of Appeals similarly observed, in affirming a mail fraud conviction, that to establish a scheme to defraud, "it is not necessary that there should be actual misrepresentation of an existing fact. It is sufficient if the

_____

[15] Several circuits have also held that a "scheme to defraud" under the health care fraud statute, 18 U.S.C. § 1347, which also has the same two-part structure as the commodities fraud statute, means the same thing as a "scheme to defraud" under the wire fraud statute. *See United States v. Bertram*, 900 F.3d 743, 748–49 (6th Cir. 2018), cert. denied, 139 S. Ct. 852, 202 L. Ed. 2d 582 (2019); *United States v. Palin*, 874 F.3d 418, 425 (4th Cir. 2017).

[16] To be fair, however, neither does the Government's.

proposed venture be presented in such a way as is calculated to carry out the intent to deceive." 58 F.2d at 5.[17]

Indeed, this is not even the first wire fraud prosecution of precious metals commodities traders that has affirmed that implied misrepresentations violate the statute. In *United States v. Dial*, 757 F.2d 163 (7th Cir. 1985), the Seventh Circuit affirmed mail and wire fraud convictions of two futures brokers who had defrauded their customers and other traders by trading ahead of customer orders without meeting margin requirements. This scheme involved no affirmative misstatements but only nondisclosure: the brokers did not disclose, to their customers or to other traders, that they were trading ahead of customer orders and that they were trading without margin. This conduct, the court said, "was a scheme to defraud in a rather classic sense"—namely, "in the common law sense [that] deceit is committed by deliberately misleading another by words, by acts, or , in some instances . . . by silence." 757 F.2d at 168. Notably, the wire fraud scheme was actionable not only because it deceived the brokers' customers, to whom they owed a fiduciary duty, but also because it deceived other traders, to whom no fiduciary duty was owed, about actual supply and demand by injecting orders that were not backed by margin reserves. "Trading without margin," the *Dial* court explained, "gives a misleading signal, because a signal not backed by any cash." 757 F.2d at 169. Such trades could mislead because they "would lack the stimulus to sober

---

[17] In addition to *Doherty*, other cases have confirmed the principle in analogous contexts. *See, e.g.*, *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 659 (7th Cir. 2015) (denying motion to dismiss RICO claim based on predicate acts of mail fraud and holding that absence of false statements did not matter to validity of mail fraud allegations because "omission or concealment of material information can be sufficient to constitute mail or wire fraud"); *United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994) (like *Doherty*, affirming bank fraud conviction and holding that a "*scheme to defraud* . . . may or may not include conduct involving false statements or misrepresentations of fact. . . . Put another way, the focus of the offense of a 'scheme to defraud' is on the "intended end result, not on whether a false representation was necessary to effect the result.").

18

reflection that comes from having to put one's money where one's mouth is." *Id*. That is the same sort of deception at issue in this case: failing to disclose information about commodities orders that was necessary for other traders to understand whether the orders—and the supply and demand they purported to represent—were bona fide. [18] With respect to its affirmation that trading on the unmargined account constituted a scheme to defraud counterparties, *Dial*, a prosecution under the mail and wire fraud statutes, cannot be meaningfully distinguished from this case.[19]

---

[18] *Dial* also rebuts the FIA's contention (made without apparent irony) that congressional regulation of the commodities markets "implicitly preclude[s]" application of the wire fraud statute. FIA Br. at 8-13 In *Dial*, the court noted that the defendants had not argued "that the Commodity Futures Trading Act supersedes the federal mail or wire fraud statutes" and concluded that they were "wise not to make the argument." 757 F.2d at 167 (citing *United States v. Brien*, 617 F.2d 299, 309–11 (1st Cir.1980)). In *Brien,* the First Circuit rejected the argument that the CEA occupied the entire field of commodities futures regulation in affirming mail and wire fraud convictions of a group of defendants who operated a boiler room operation selling futures contracts, holding that there was no evidence to overcome the strong presumption against implied repeal of statutes. *Id*. at 310.

The passage of time has done nothing to strengthen the argument. To the contrary, the argument that the mail and wire fraud statutes have no role to play in the regulation of the financial markets stands in marked tension with the fact that in the Sarbanes-Oxley Act of 2002, Congress saw fit to increase the maximum statutory penalties for mail and wire fraud from five years to twenty. See Sarbanes-Oxley Act of 2002 § 903, PL 107–204, July 30, 2002, 116 Stat 745. Nor can it be squared with the amendment of the securities fraud law, 18 U.S.C. § 1348, in 2009 to make commodities fraud—whether involving affirmative false statements or not—actionable under the general criminal code. See Fraud and Enforcement and Recovery Act of 2009 (FERA) § 2(e), PL 111-21, May 20, 2009, 123 Stat 1617.

All this explains, perhaps, why the defendants have advanced no such argument in their briefs. Indeed, they appear to disavow it. Reply at 14 ("Defendants do not contend that Dodd-Frank's anti-spoofing provision preempted any other laws.").

[19] Which is not to say that the defendants don't try. *See* Reply Br. at 9 & n.8, ECF No. 85. They argue that *Dial* involved the placement of riskless orders (because the orders were not backed by margin) whereas their Spoofing Orders were "at risk" orders, but that is not a meaningful distinction. Both cases involve orders that misrepresented the risk that prospective counterparties faced—in *Dial* because the orders were not backed by cash and here because the defendants intended to cancel the orders before they could be executed (and therefore placed them without regard to their financial impact if the scheme did not succeed). More broadly, both cases involved the placement of orders that provided false information to the market about supply and demand.

Despite this history and precedent, the defendants attempt to support their contention that wire fraud requires an affirmative misrepresentation by tracing a line of cases, beginning with *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003), in which (they say) the Seventh Circuit has "held repeatedly" that "the making of a false statement or material misrepresentation" is ***always*** "a necessary element of mail or wire fraud." Opening Br. at 2, ECF No. 76 (emphasis in original). In fact, not one of the cases cited has so held and the entire argument is a house of cards that collapses when *Aztar*, its foundation, is removed.[20] In *Aztar*, the Seventh Circuit held that the RICO claim under review, predicated on mail fraud as the racketeering activity, was so frivolous that it failed to invoke federal subject matter jurisdiction because the statements at issue were not remotely misrepresentations. The court did not so much as advert to the question of whether implied misrepresentations may support a wire fraud scheme to defraud required an affirmative misrepresentation and "passing by such a question in silence does not

_____

The Spoofing Orders were deceptive in this regard because they (allegedly) signaled the presence of illusory interest in selling or buying the commodity in question and the failure to disclose that they were trading on an account without margin deceived the defendants' counterparties in *Dial* in the same way—by signaling illusory demand. As the Seventh Circuit explained, the orders unsupported by margin were similarly deceptive because they "confused the market by signaling the presence of big buyers who had not in fact put up any money." 757 F.2d at 170.

The defendants also argue that the defendants in *Dial* actively concealed the fraudulent nature of the trades at issue, but in doing so conflate the scheme to defraud with the defendants' intent to defraud. The court's reference to evidence that the defendants' efforts to actively conceal the scheme came in the context of discussing their intent, not whether their omissions constituted a scheme to defraud (that is, a scheme that, regardless of intent, would deceive their counterparties). *Id*. (the "defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing"); *see also id*. at 169 (contrasting breach of fiduciary duty as to employer by means of active concealment with absence of such duty regarding counterparties, but holding that, as to the counterparties, "trading in an unmargined account was an active misrepresentation and hence actionable even without a breach of fiduciary duty").

[20] "Always" is a word inserted by the defendants; so far as this court has seen, the Seventh Circuit has never employed that term in connection with a discussion of the requirements for mail and wire fraud convictions.

establish a precedent." *United States v. Keane*, 852 F.2d 199, 203 (7th Cir. 1988). To the contrary, even in describing the elements of mail and wire fraud, the *Aztar* court acknowledged that concealment of a material fact also suffices.

*Aztar*, then, is a shaky foundation for the defendants' argument and they do nothing to reinforce it by lifting summary statements of the elements of mail and wire fraud offenses from subsequent cases divorced from the factual context the courts were examining. Next in line is *United States v. Stephens*, 421 F.3d 503 (7th Cir. 2005). Apart from the fact that the opinion quotes *Aztar*, the defendants' reliance on this case is inexplicable because the *Stephens* court expressly affirmed that "***a misleading omission is actionable as fraud***." *Id*. at 507 (emphasis added). The court of appeals then went on to reject the defendant's argument that he was not guilty of wire fraud because he had made no misrepresentations or misleading omissions," holding that the defendant had engaged in "the type of pattern of deceit that properly demonstrates a scheme to defraud." 421 F.3d at 509. *Stephens* also relied on the Seventh Circuit's prior decision in *United States v. Lack*, 129 F.3d 403 (7th Cir. 1997), where the court similarly found that the defendant's "pattern of deceit" constituted a scheme to defraud. 129 F.3d at 406. Notably, in *Lack* there is not even a boilerplate statement to the effect that an affirmative misrepresentation is required for a scheme to defraud; rather, the Court reiterated the Supreme Court's explanation in *McNally*, 483 U.S. 350, 358 (1987), that the words "scheme to defraud" in the mail fraud statute "refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value ***by trick, deceit, chicane or overreaching.***" No false statement required.

*United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007), also invoked by the defendants, similarly fails to shore up their construct. In *Sloan*, the court quoted *Stephens*, quoting *Aztar*, and

the case involved both affirmative misrepresentations and misleading "half-truths." It does not remotely support the proposition that the defendants must have made affirmative misrepresentations to be guilty of wire fraud. The same is true of *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009) (citing *Sloan* and *Stephens*), in which the defendant's liability was premised on "significant" and "material" omissions rather than affirmative misstatements, and of *United States v. Sheneman*, 682 F3d 623, 628-29 (7th Cir. 2012) (quoting *Powell* and *Sloan*), where the court easily dismissed the argument that there was no scheme to defraud as a "non-starter" because "there was an abundance of evidence . . . detailing the numerous false statements and material misrepresentations" of the defendant.

The defendants attempt to put a capstone on this tenuous construct by selectively quoting this Circuit's pattern instructions on mail and wire fraud. The defendants quote the pattern instruction that sets out only the bare elements of the offense for the proposition that "the government must prove . . . . that the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise." Seventh Circuit Patt. Inst. §§ 1341, 1343 at 402 (2017 ed.).[21] Invoking these pattern jury instructions is unavailing for several reasons. First, as a matter of law, in *Doherty* the Seventh Circuit rejected precisely the same attempt to rely on this formulation for the proposition that the mail and wire fraud statutes require an affirmative misrepresentation, noting that this Circuit's pattern instructions "were never intended to have the force of law in this Circuit," and that this particular instruction is at odds with Circuit case law to the extent that it suggests that "scheme to defraud" requires an affirmative misrepresentation. 969 F.2d at 429 ("The

---

[21] This is the citation provided by the defendants. The instruction for the elements of mail and wire fraud appears at page 424 of the current pattern instructions, which include updates made in 2018. *See* http://www.ca7.uscourts.gov/pattern-jury-instructions/7th_criminal_jury_instr.pdf.

aforementioned pattern jury instructions notwithstanding, **one need not make a false representation to execute a scheme to defraud.**") (emphasis added).

Second, even on its own terms, the defendants' invocation of the pattern instructions on mail and wire fraud fails. If one turns to the pattern instruction defining the term "scheme to defraud," as that term is used in the elements instruction, one reads that "A materially false or fraudulent pretense, representation, or promise may be accomplished by an omission or the concealment of material information." Seventh Circuit Patt. Inst. §§ 1341, 1343 at 427 (through 2018 update) at 427. The committee comments to this pattern instruction similarly note that "cases interpreting the statutes hold that omissions or concealment of material information may constitute money/property fraud without proof of a duty to disclose the information pursuant to a specific statute or regulation." And the cases cited for this observation include, among others, several upon which the defendants have built their house of cards—specifically *Powell* and *Stephens*. The Circuit's pattern instructions, then, recognize that a scheme to defraud effected by the nondisclosure of material information can constitute a scheme that involves a "false or fraudulent pretense, representation, or promise."[22]

In light of the foregoing, the defendants' contention that wire fraud requires proof of an affirmative misrepresentation is, as stated at the outset of this opinion, simply wrong: misleading

---

[22] The court acknowledges that the committee comments go on to hedge somewhat on the question, stating that "it is not clear that an omission by itself is sufficient to comprise a scheme to defraud." [428] But the committee's note further explains that the issue providing pause arises in the context of honest services fraud, which is not at issue in this case. And, in any event, the committee's note fails to acknowledge *Coscia*'s express affirmation of an instruction that: "*A scheme to defraud need not involve any false statement or misrepresentation of fact.*" Again, pattern instructions are only authoritative where the court of appeals has expressly affirmed their accuracy—as in *Coscia* and *Doherty*. *United States v. Rainone*, 816 F.3d 490, 495 (7th Cir. 2016) ("pattern jury instructions cannot override precedent"); *Kingsley v. Hendrickson*, 744 F.3d 443, 452 (7th Cir. 2014) (pattern instructions "are persuasive only to the extent that they accurately restate the law of this circuit"), vacated and remanded on other grounds, 135 S. Ct. 2466 (2015).

omissions are actionable under the mail and wire fraud statutes. As a fallback to their untenable absolutist position, however, the defendants maintain that omissions can suffice for liability under the mail fraud statute "only" where the alleged fraudster owes a fiduciary duty to disclose the omitted information. Def. Br. at 19, ECF No. 76. But that contention is equally flawed.

This Circuit has repeatedly stated that the existence of a fiduciary, regulatory, or statutory duty to disclose material information is not required to make an omission actionable under the mail and wire fraud statutes. Consistent with the proposition that a scheme to defraud does not require affirmative misstatements, the Seventh Circuit has repeatedly acknowledged that "the concept of a misrepresentation," as it applies in the context of the mail and wire fraud statutes, includes not only affirmative misstatements but also "the omission or concealment of material information, *even absent an affirmative duty to disclose*, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim." *Weimert*, 819 F.3d at 355 (emphasis added).[23] As the Seventh Circuit observed more than 30 years ago, "[i]t requires no extended discussion of authority to demonstrate that omissions or concealment of material information can constitute fraud . . . cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation." *United States v. Keplinger*, 776 F.2d 678, 697–98 (7th Cir. 1985) (collecting cases). And "while the existence of a

---

[23] *See also id.* at 367 ("[p]roof of a breach of fiduciary duty is neither necessary to nor sufficient proof of mail or wire fraud"). This is the second reason that the defendants' reliance on *Weimert* is misplaced. Their contention that their failure to disclose that they intended to withdraw their orders before they could be executed cannot as a matter of law be deemed fraudulent in the absence of an affirmative duty to disclose arising from a fiduciary relationship simply ignores this clear statement to the contrary by the Seventh Circuit. *See* Def. Br. at 19, citing *Weimert* for the proposition that there is no duty to disclose negotiating positions).

fiduciary duty is relevant and an ingredient in some mail fraud prosecutions, it is not an essential in all such cases." *Id*. at 698 (internal punctuation omitted).[24]

This is not to say, of course, that every omission of material fact in the context of any transaction suffices to support a mail or wire fraud charge. As the Seventh Circuit further explained in *Keplinger*, "we do not imply that all or even most instances of non-disclosure of information that someone might find relevant come within the purview of the mail fraud statute; nevertheless, under some circumstances concealment of material information is fraudulent." *Id*. Whether a failure to disclose is fraudulent depends on context." *Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1347 (7th Cir. 1995). "A half truth, or what is usually the same thing a misleading omission, is actionable as fraud, including mail fraud if the mails are used to further it, if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Id*. at 1348.

Here, the context alleged is a scheme to create the illusion of market movement by placing orders that falsely implied that the defendants intended to trade in the quantities and at the prices reflected by those orders when in fact they intended to cancel the orders before they could be executed. And while it is undisputed that these orders were "real" orders, in the sense that if the defendants failed to cancel them before they were accepted by counterparties the defendants would be required to honor them, they were nevertheless different from other orders on the market because (it is alleged) they supplied the market with inaccurate information about the likelihood

---

[24] *United States v. Dick*, 744 F.2d 546, 550 (7th Cir. 1984), the case the defendants cite for this proposition, involved a fiduciary relationship, and so supports the more limited proposition that the existence of a fiduciary relationship is relevant to the question of whether a nondisclosure is fraudulent, it provides no support whatsoever for the proposition for which the defendants cite it—that nondisclosure is actionable as mail or wire fraud "only" where it occurs in the context of a fiduciary duty.

that the orders would be executed. The indictment alleges a price manipulation scheme that was dependent on communicating inaccurate information about the likelihood that the defendants' Spoofing Orders would be filled.

Viewed in this context, the defendants' argument that they could not have misled anyone about supply and demand because their orders were "real" and "at-risk" is unpersuasive and, indeed, warrants rejection for the same reason that the Seventh Circuit rejected it in *Coscia*: "it confuses [the question of whether the defendants placed] *illusory* orders [not alleged] with [the question of whether those orders created] an ***illusion*** of market movement [which is alleged]." 866 F.3d at 797. Even "real" and "at-risk" orders that create an illusion of market movement can be fraudulent where they inject inaccurate information into the market. And let's not lose sight of the fact (assumed for now to be true) that these orders were not just misleading, but criminal; independent of whether the defendants were committing wire fraud, they were (at least after July 10, 2010) violating the anti-spoofing provision of the Commodities Exchange Act, 7 U.S.C. § 6c(a)(5)(C) and § 13(a)(2). With all this as the background to assess the defendants' conduct, their failures to disclose that the Spoofing Orders were less likely to be filled is no "mere omission" to inform traders about information that they might find relevant to a decision to trade; it is an active misrepresentation of the true supply and demand for the commodities that were the subject of the Spoofing Orders that renders the market price of the commodity less accurate. That is precisely how, in *Dial*, the Seventh Circuit described the defendants' failure to disclose they were trading on an unmargined account: "an active misrepresentation" that could "reduce the accuracy of the market as a device for forecasting price." 757 F.2d at 169.

This case presents an alleged scheme to move the market price of commodities and, in this context, it is reasonable to understand the scheme to rest on the provision of false information to

the market. As such, there is no good reason to exempt failures to disclose misleading information from the ambit of the wire fraud statute and certainly the absence of a fiduciary relationship between futures traders is not one. *Cf. Emery,* 71 F.3d at 1348 ("it is not true that if you are not a fiduciary anything goes, short of false statements"). "Fraud and deceit are not legitimate market forces. Fundamentally, markets are information processing systems. The market price is only as "real" as the data that inform the process of price discovery. By the same token, the market price is "artificial" when the market is misinformed." *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006). As alleged, the Spoofing Orders created artificial prices by injecting misleading information into the market that the defendants "intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." As such, the Spoofing Orders fit comfortably within the ambit of the wire fraud statute's prohibition on false and misleading statements in furtherance of a scheme to defraud, as those statutes have long been understood in this Circuit:

> Under the mail and wire fraud statutes it is unlawful to make false or misleading statements in furtherance of the scheme. ***It is also unlawful to speak half truths or to omit to state facts necessary to make the statements made in light of the circumstances under which they were made not misleading***. Absent such circumstances mere omissions do not constitute fraud under the mail and wire fraud statutes. ***The statements need not be false or fraudulent on their face and the defendant need not misrepresent any fact since all that is necessary is that the scheme be reasonably calculated to deceive those to whom the statements are made***.

*United States v. Biesiadecki,* 933 F.2d 539, 543 (7th Cir.1991) (approved jury instruction).

### 2. *Whether the defendants' trading activity deceived others is a question of fact.*

All of this assumes, of course, that the government will be able to prove that when the defendants placed the Spoofing Orders they did not intend to execute them and that those orders in fact misled other market participants. And, at least for purposes of this motion, the defendants

do not dispute the foundational facts alleged about their trading. They don't contend that the government has mischaracterized the mechanics, or the objectives, of their trading practices, or even their alleged intent, when placing orders, to cancel them before they could be executed (though quick to add that the defendants intended to honor any orders that were executed before they could be canceled. And if those were the only relevant fact issues, there would be no need for a trial and this case could, indeed, be resolved by the court as a matter of law. *See, e.g., United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (distinguishing between an argument that the evidence is insufficient with one based on failure to allege a crime and affirming dismissal of indictment where undisputed facts showed that defendant could not, as a matter of law, be guilty of failing to file currency structuring reports).

But while they do not presently dispute certain subsidiary facts alleged in the indictment to support their argument that they cannot be guilty of wire fraud, the defendants vigorously dispute the central fact question in this case: whether the defendants' orders communicated materially false information to other traders. The Government concedes that the indictment does not allege that either defendant made affirmative false statements in placing the Spoofing Orders. Oral Arg. Tr. at 36, ECF No. 91. But, as discussed in detail in the preceding section, the premise of the indictment is that in placing orders that they did not intend to fill, the defendants deceived and misled other market participants about their trading intentions and, therefore, about the true supply of and demand for the commodity that was the subject of the orders.

The defendants insist that their orders "neither communicated false supply or demand nor implied anything (false or otherwise) about Defendants' subjective hopes or intent." Def. Mem. at 3, ECF No. 76. The *amici* echo the argument. *See, e.g.*, BPI Br. at 8, ECF No. 96 ("When an order is placed on COMEX, the only information conveyed to the market is the commodity to be traded,

the price of the order, and the quantity available to trade at that price."); FIA Br. at 5, ECF No. 107 ("Orders to purchase or sell COMEX-listed futures communicate only the futures contract offered to be traded, the price, whether the order is to buy . . . or sell . . . and the quantity of futures contracts to be bought or sold."). The defendants maintain that the Spoofing Orders could not mislead anyone about supply and demand because supply is simply what we call the amalgamation of offers to sell (supply) and to buy (demand) that are open on the market at any given point in time. If the defendants' offers were real, in the sense that they could be filled, they constituted real components of the supply and demand for the relevant commodities when they were open on the market.

But, as discussed in detail in the preceding section, this argument ignores the central allegation that the information about supply and demand that the Spoofing Orders injected into the market was artificial because it was not based on a genuine intent to execute the orders being placed. Whether there was anything false or misleading about the communications the defendants made when they placed Spoofing Orders will depend on what their bids and offers meant to other market participants. What, if anything, beyond commodity, price, and quantity an order conveys is plainly a question of fact and the defendants' arguments about whether their Spoofing Orders carried any implied misrepresentations are arguments about the sufficiency of the evidence that will be presented in the case and have no place in assessing the adequacy of an indictment. Perhaps the defendants are right, and traders do not, as the government alleges, expect that their counterparts necessarily intend, at the time they place an order, to fill that order. Or, perhaps, understanding that Spoofing Orders are criminal under the Commodities Exchange Act and prohibited on the COMEX, traders do understand that the placement of an order carries with it an implicit statement that the party placing the order intends to fill the order. Perhaps there is no

consensus as to the import of an open order on the market. Perhaps traders recognize that unusually large orders may be outliers that cannot be relied upon as indicators of market forces. Given the permitted use of iceberg orders, perhaps traders routinely assume that order volumes are generally understated. Perhaps their own trading strategies are designed to exploit what they perceive to be unusually large orders (perhaps, for example, they try to inject themselves into the spoofing process). Perhaps differences between high-frequency programmed trading and manual trading affect the understanding of what the placement of an order conveys.[25] Perhaps manual trading strategies are independent of micro-changes in the market price or available volume of a commodity.[26]

The answers to these questions are neither self-evident nor undisputed. Citing *Sullivan & Long v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995), however, the defendants insist that this Court may declare, as a matter of law, that the placement of an order on the COMEX carries with it no implied representation of an intent to fill the order. In *Sullivan & Long*, the defendants submit, the Seventh Circuit "rejected out of hand the plaintiff's theory" that short sellers implicitly warrant that they won't short to a degree that jeopardizes their financial security. Def. Br. at 17-18. That's not so. As the discussion makes clear, the plaintiffs in *Sullivan & Long*—unlike the government here—alleged "no representations, true or false, actual or implicit" in connection with the transactions (there, short sales) at issue. 47 F.3d at 864. In the absence of such allegations, it is not

---

[25] *See*, *e.g.*, note 10, *supra*. As discussed at oral argument, distinctions between high-frequency programmed trading and manual trading might be relevant—that so-called manual trades remain open for significantly longer might, for example, bear on whether it is reasonable to infer an intent to cancel before the order was filled. But whether such distinctions exist and are material requires factual development.

[26] This list is intended neither as a determination that these issues are necessarily relevant to the question of what implicit information the Spoofing Orders communicated to the market nor as an exhaustive catalog of the issues that might bear on that question.

surprising that the court concluded that the sales at issue carried no misrepresentations. Moreover, it was actually Judge Posner, rather than the plaintiffs, who suggested (in dicta) that short sales might be argued to carry an implicit warranty that the sales would not jeopardize the short seller's financial solvency, but dismissed the significance (*i.e.*, the materiality) of such a misrepresentation because "there is as yet no rule" that bars shorting to that degree. *Id*. Here, of course, there is such a rule; given that spoofing, as a matter of law, constitutes a crime, the defendants' argument that this court can declare, as a matter of law, that futures trades carry no implicit warranty that they are not unlawful due to lack of intent to fill the order, is quite unpersuasive.[27]

The defendants' attempt to liken the scheme charged here to those merely involving "sharp dealing or unethical conduct," which fall outside the ambit of the mail and wire fraud statutes, fails for similar reasons: the conduct at issue here is alleged to involve market manipulation; it cannot be dismissed as a matter of law as merely part of the deception inherent in typical arms-length business negotiations. The defendants rely on the Seventh Circuit's opinion in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) for this argument. There, the Seventh Circuit reversed a wire fraud conviction where the evidence addressed "not material facts or promises but rather parties' negotiating positions," which the court defined as "the preferences, values, and priorities" of the parties. *Id*. at 366. Statements as to those subjective elements, the court held, "are not

---

[27] It bears noting as well that the fundamental premise of the Seventh Circuit's holding in *Sullivan & Long* is that short selling promotes the central goal of the securities laws—namely "to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflected undistorted . . . estimates of the underlying economic value of the securities traded." 47 F.3d at 861. Short selling, the court concluded as a matter of law, "accelerate[s] rather than retard[s] the convergence between the price of a stock and its underlying economic value." *Id*. The practice has, therefore, exactly the opposite effect of a spoofing scheme, which is alleged to have distorted the economic value of the commodities that were the subject of the spoofing orders. Presumably, however, the defendants do not agree that a practice that accelerates rather than retards the divergence of between the price and value of a commodity constitutes a scheme to defraud as a matter of law.

material for purposes of mail and wire fraud." *Id*. at 364. The deception alleged in this case does not involve "negotiating positions," but rather the (alleged) fact that the defendants did not intend to execute the orders they placed on the market. Independent of the application of the wire fraud statute, the conduct alleged is criminal and failing to disclose that a bid is unlawful cannot be said, as a matter of law, to be immaterial.[28] Indeed, in *Weimert* the majority distinguished a good faith "stalking horse" bidder from "a bidder who does not actually mean to follow through on the bid, but whose bid is being used by the seller to trick another potential bidder to make or increase a bid." 819 F.3d at 364-65.[29] The Court expressly declined to extend its holding that failure to disclose negotiating positions is not wire fraud to that circumstance because the evidence in *Weimert* was clear that the bid at issue "was anything other than a good-faith bid." *Id*. at 365.

Ultimately, whether the defendants' "Spoofing Orders" were "anything other than a good-faith bid" must be resolved at a trial. But for purposes of addressing the defendants' motion, this question (and the subsidiary questions on which it depends) must be answered in the government's favor.[30] The indictment, while lacking allegations that the defendants made false statements to carry out their scheme, alleges that the defendants' orders implicitly misrepresented their intention to trade and therefore deceived other traders about the true state of supply and demand in the

---

[28] This is the third reason that the defendants' reliance on *Weimert* is misplaced. *See supra* notes 9 and 23.

[29] *Cf. Wharft (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596 (2001) ("To sell an option while secretly intending not to permit the option's exercise is misleading, because a buyer normally presumes good faith.").

[30] *Weimert*, it is also relevant to note, was decided on summary judgment, on the basis of an extensive factual record that included testimony before the SEC. Here, by contrast, the defendants' arguments are, as yet, unsupported by evidence. At this juncture, the Court is required to accept the truth of the indictment's allegations that the Spoofing Orders "were material misrepresentations" about their intention to execute the Spoofing Orders they placed. Ind. ¶ 11.

market. On a motion to dismiss, the indictment's allegations—not those of the defendants—are the allegations that must be credited. Taking all of the facts alleged in the indictment as true, the indictment describes a scheme to defraud commodities market participants by deceiving them about the direction of the market by the placement of Spoofing Orders—that is, orders that they intended to cancel before they could be executed. And because the scheme alleged involved the use of interstate wire communications, the indictment adequately charges violations of the wire fraud statute.

### B.    The Wire Fraud Statute Is Not Unconstitutionally Vague.

The defendants also argue that the wire fraud statute is unconstitutionally vague as applied to the scheme alleged in the indictment. A challenge that a statute is unconstitutionally vague is a due process challenge. "To satisfy due process, a penal statute must define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402-03 (2010); *see also United States v. Hausmann*, 345 f3d 952, 958 (7th Cir. 2003) (rejecting vagueness challenge to honest services mail and wire fraud). That is, "the void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Skilling*, 561 U.S. at 412.

As for notice, the defendants' vagueness challenge fails because the very same reasons that underlie the conclusion that the alleged spoofing scheme is actionable under the wire fraud statute also rebut the asserted lack of notice. The defendants acknowledged as much during oral argument in stating that "the primary value of going through the vagueness analysis is actually to show, for the reasons Mr. McGovern has just gone through, what a radical departure permitting the government to go forward with wire fraud charging this conduct would be . . . ." Oral Arg. Tr. at 18, ECF No. 91. Having concluded that the wire fraud statute has long encompassed implied

33

misrepresentations, and that its application here does not represent a radical expansion in the statute's reach, the defendants' argument that the statute does not provide fair notice that implied misrepresentations can be actionable as wire fraud also fails; it is no more persuasive when presented in the context of a vagueness challenge.

Noting that their conduct predates the *Coscia* prosecution, the defendants protest that they had no notice that spoofing would be deemed to constitute wire fraud. The novelty of this prosecution, however, is in large measure a function of the novelty of the scheme. As the Seventh Circuit explained in *Coscia*, spoofing is a relatively new phenomenon aided by the development of high-frequency programmed trading. The mail and wire fraud statutes can, of course, be applied to new fact contexts; fraud is "as versable as human ingenuity." *Weiss v. United States,* 122 F.2d 675, 681 (5th Cir. 1941). The defendants, moreover, heap too much weight on the fact that in *Coscia* the government did not charge wire fraud. The reasons why an indictment includes some charges and not others are often inscrutable and in any event there is certainly no rule that requires the government to include in an indictment every conceivable charge.[31] And it is entirely inaccurate to say, as the defendants do, that "the Seventh Circuit in *Coscia* was unwilling to conclude" that spoofing involved the making of a false statement; the Court of Appeals merely noted that no such proof was needed under subsection (1) of the commodities fraud statute.

---

[31] The defendants speculate that the government charged wire fraud in this case rather than commodities fraud because the statute of limitations for wire fraud is longer. Def. Br. at 4, ECF No. 76. Accurate or not, the premise is unremarkable; prosecutors often resort to charging statutes that provide a longer limitations period to preserve a prosecution—sometimes successfully, sometimes not. *Cf. United States v. Banyan*, 933 F.3d 548, 551 (6th Cir. 2019) (observing that government would have prevailed had it charged mail or wire fraud in mortgage loan fraud scheme, but blew that statute and instead charged bank fraud, with a longer limitations period, resulting in acquittal because mortgage lenders were not financial institutions).

The premise that this prosecution represents a novel use of the wire fraud statute, moreover, depends upon the granularity of the scheme's description. As the Seventh Circuit characterized the spoofing scheme in *Coscia*, it was a market manipulation scheme designed "to pump and deflate the market"—in other words, it was akin to the "pump and dump" schemes that have frequently been prosecuted under the mail and wire fraud statutes. *See, e.g.*, Pickholz et al., *Recent trends in securities-related mail and wire fraud prosecutions—Market manipulation*, 21 SEC. CRIMES § 6:36 (Nov. 2018 Update) ("Mail fraud charges are routinely included in prosecutions charging market manipulation, especially so-called "pump-and-dump" schemes"; collecting cases). What the defendants claim as unprecedented is really not the use of wire fraud to charge a market manipulation scheme, but the prosecution of such a scheme based on implied, rather than express, misrepresentations. As discussed, however, implied misrepresentations have long been actionable under the mail and wire fraud statutes. And, as *Dial* illustrates, implied misrepresentations by futures traders made to counterparties about the bona fides of their bids and offers have been recognized in this Circuit as actionable under the wire fraud statute. That degree of granularity easily passes constitutional muster.

As for the second prong—arbitrary enforcement—the defendants argue that prosecuting spoofing as wire fraud would open the door to prosecutions based on the employment of routine and expressly permitted trading practices such as fill-or-kill and iceberg orders that, like spoofing orders, obscure the effect of the order on supply and demand.[32] Reply at 14, ECF No. 85. The

---

[32] To the extent that the defendants and *amici* contend that applying the wire fraud statute to implied misrepresentations will permit prosecutors to run amuck and wreak havoc on the operation of the commodities markets, there are two ready responses. First, placing orders that aren't intended to be executed is already unlawful, under both the CEA and the commodities fraud statute. If assessing a trader's intent to execute a trade at the time the order is placed is a dire problem for the commodities markets (neither the defendants nor *amici* have identified evidence that making spoofing criminal has chilled trading or had any other adverse effects), it is a problem

comparison is inapt, however, for at least two reasons, both having to do with intent. First, as the government observes, these routine practices do not involve the placement of orders that the traders do not intend to fill. What is alleged to be illusory here is not the orders themselves but the intent that animates them. The Spoofing Orders (it is alleged) impliedly misrepresented the defendants' intention, at the time they were placed, to fill the orders. Prosecuting a scheme to deceive the market in that manner does not open the door to prosecutions based on routine trading practices that do not involve similar deception about whether the order is a bona fide representation of a trader's intent to execute a trade at the price bid or offered.

Second, the defendants ignore entirely the requirement of intent to defraud. The Supreme Court has repeatedly observed, however, that "[i]nstead of adopting a circumscribed view of what it means for a claim"—or here a scheme—"to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of . . . materiality and scienter requirements." *Escobar*, 136 S. Ct. at 2002 (cleaned up). A scienter requirement, in particular, "alleviates vagueness concerns, narrows the scope of the prohibition, and limits prosecutorial discretion." *McFadden v. United States*, 135 S. Ct. 2298, 2307 (2015) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149, 150 (2007; internal quotation marks and brackets omitted)). The wire fraud statute requires proof both that the misrepresentation (whether express

that has existed at least since 2010; that horse is out of the barn, yet Congress has seen no need to adjust its approach. And second, to the extent the argument is based on policy considerations, rather than interpretations of the statute itself, the argument is misdirected. *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017) ("[e]ven if we were persuaded that Amgen had the better of the policy arguments, those arguments could not overcome the statute's plain language"); *United States v. Thompson*, 901 F.3d 785, 787 (7th Cir. 2018), cert. denied, 139 S. Ct. 1618 (2019) "policy-based reasons" for adopting a different interpretation of a statute "are best suited for the policymakers, not the courts."). Whether criminal enforcement of a statute represents good policy or bad policy is not part of this court's task in assessing a vagueness challenge. The test is whether the statute provides fair notice and precludes arbitrary enforcement.

or implied) is material and that the scheme be executed with intent to defraud. These elements effectively mitigate any risk that applying the mail fraud statute to spoofing will invite arbitrary enforcement of traders engaged in routine trading practices. Indeed, they also mitigate concerns about inadequate notice. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed").

*   *   *

In short: Wire fraud does not require proof of affirmative misstatements; implied misrepresentations will also suffice. That has long been clear and since intent to defraud is also required under the statute, its application to a spoofing scheme does not implicate vagueness concerns. Whether the defendants made implied misrepresentations, whether they were material, and whether the defendants intended to defraud other market participants are questions of fact. As they are vigorously contested, they must be resolved at trial. The defendants' motion to dismiss the indictment is denied.

Dated: October 21, 2019

_____
John J. Tharp, Jr.
United States District Judge