**FILED**

NOV 26 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 18 CR 35 **JUDGE THARP** |
| v. | ) |
| | ) Violations: Title 18, United States Code, |
| JAMES VORLEY and | ) Sections 1343 and 2; Title 18, United States |
| CEDRIC CHANU, | ) Code, Section 1349 |
| | ) |
| Defendants. | ) **MAGISTRATE JUDGE MASON** |

## SUPERSEDING INDICTMENT

### COUNT ONE
**(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)**

The SPECIAL JUNE 2018 GRAND JURY charges:

1.     At times relevant to this Superseding Indictment:

### The Defendants and Related Entities

a.     JAMES VORLEY ("VORLEY") worked from in or around May 2007 until in or around March 2015 as a metals trader at Deutsche Bank AG, where he traded precious metals futures contracts. VORLEY was based in London, United Kingdom.

b.     CEDRIC CHANU ("CHANU") worked from in or around March 2008 until in or around December 2013 as a metals trader at Deutsche Bank AG, where he traded precious metals futures contracts. From in or around March 2008 to in or around May 2011, CHANU was based in London, United Kingdom, and from in or around May 2011 to in or around December 2013, CHANU was based in the Republic of Singapore.

c.     David Liew ("Liew") worked from in or around July 2009 until in or around February 2012 as a metals trader at Deutsche Bank AG, where he traded precious metals futures contracts. Liew was based in the Republic of Singapore.

     d.      Deutsche Bank AG, together with its subsidiaries and affiliates, was a global banking and financial services company. Deutsche Bank AG operated in the United States, United Kingdom, Republic of Singapore, and elsewhere, and operated global commodities trading businesses that included the trading of precious metals futures contracts.

     e.      Deutsche Bank AG was a financial institution within the definition of Title 18, United States Code, Section 20.

### Market Background and Definitions

     f.      A "futures contract" was a type of legally binding contract to buy or sell a particular product or financial instrument at an agreed-upon price and on an agreed-upon date in the future. When the parties to the futures contract (namely, the buyer and the seller) entered into their agreement, the buyer agreed to pay for, and the seller agreed to provide, a particular product or financial instrument at the agreed-upon price on the agreed-upon date in the future.

     g.      Futures contracts were traded on markets designated and regulated by the United States Commodity Futures Trading Commission ("CFTC").

     h.      The CME Group Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including the Commodity Exchange, Inc. ("COMEX") and New York Mercantile Exchange, Inc. ("NYMEX"). Each of COMEX and NYMEX was a "registered entity" with the CFTC.

     i.      Each of COMEX and NYMEX utilized an electronic trading system called "Globex," which allowed market participants to trade futures contracts from anywhere in the world. The CME Group operated Globex using computer servers located in Chicago and Aurora, Illinois.

     j.      Precious metals futures contracts included gold, silver, platinum, and palladium futures contracts, which were contracts for the delivery of gold, silver, platinum, and

palladium, respectively, in the future at an agreed-upon price. Gold and silver futures contracts were traded on COMEX, and platinum and palladium futures contracts were traded on NYMEX, both using the Globex system.

k.      Traders using Globex could place orders in the form of "bids" to buy or "offers" to sell one or more futures contracts at various prices, or "levels."

l.      Trading on Globex was conducted electronically using a visible "order book" that displayed quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts).

m.      An order was "filled" or "executed" when a buyer's bid price and a seller's offer price for a particular contract matched.

n.      An "iceberg" order was a type of order that traders could place when trading precious metals futures contracts on COMEX and NYMEX. In an iceberg order, the total amount of the order was divided into a visible portion of a certain pre-set quantity that was visible to other market participants, and a portion of the order (*i.e.*, the remainder of the order) that was not. Whenever the visible portion of the order was filled, the same, pre-set quantity of the remaining, hidden portion automatically became visible; this process repeated until the entire remainder of the order was either executed or canceled.

o.      All dates and times referenced in this Superseding Indictment are approximate and inclusive and are in Central Standard Time or Central Daylight Time.

2.    From at least in or around March 2008 through at least in or around July 2013, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere,

JAMES VORLEY and
CEDRIC CHANU,

the defendants herein, conspired and agreed with others known and unknown to the Grand Jury to commit wire fraud affecting a financial institution, that is, the defendants did knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice, all affecting at least one financial institution, including Deutsche Bank AG, as well as other participants in the precious metals futures markets, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.    The purpose of the conspiracy was to deceive other traders by creating and communicating materially false and misleading information regarding supply or demand, in order to induce such traders into trading precious metals futures contracts at prices, quantities, and times that they would not have otherwise, in order to make money and avoid losses for the co-conspirators.

## Manner and Means of the Conspiracy

4.    It was part of the conspiracy that VORLEY, CHANU, Liew, and others placed one or more visible orders for precious metals futures contracts on one side of the market that, at the time they placed the orders, they intended to cancel before execution (the "Fraudulent Orders") in order to deceive other traders.

5.      It was further part of the conspiracy that by placing the Fraudulent Orders, VORLEY, CHANU, Liew, and others intended to create and communicate false and misleading information regarding supply or demand (*i.e.*, orders they did not intend to execute) in order to deceive other traders.

6.      It was further part of the conspiracy that this false and misleading information often caused other traders to buy or to sell futures contracts at prices, quantities, and times that they otherwise would not have because, among other things, such traders reacted to the false and misleading increase in supply or demand.

7.      It was further part of the conspiracy that VORLEY, CHANU, Liew, and others placed Fraudulent Orders to buy, which created the false and misleading impression in the market of increased demand, which was intended to manipulate and move commodity futures prices upward.

8.      It was further part of the conspiracy that VORLEY, CHANU, Liew, and others placed Fraudulent Orders to sell, which created the false and misleading impression in the market of increased supply, which was intended to manipulate and move commodity futures prices downward.

9.      It was further part of the conspiracy that VORLEY, CHANU, Liew, and others placed orders at a lower visible quantity, often in the form of iceberg orders, on the opposite side of the market, that they intended to execute (the "Primary Orders").

10.      It was further part of the conspiracy that VORLEY, CHANU, Liew, and others placed Fraudulent Orders with the intent to artificially manipulate and move the prevailing price in a manner that would increase the likelihood that one or more of their Primary Orders would be filled.

11.    It was further part of the conspiracy that the Fraudulent Orders placed by VORLEY, CHANU, Liew, and others were material misrepresentations that falsely and fraudulently represented to traders that VORLEY, CHANU, Liew, and others were intending to trade the Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, VORLEY, CHANU, Liew, and others intended to cancel them before execution.

12.    It was further part of the conspiracy that VORLEY, CHANU, Liew, and others engaged in this false, misleading, and deceptive practice both by themselves and in coordination with other traders at Deutsche Bank AG, including each other, all in furtherance of the conspiracy. When placing Fraudulent Orders by themselves, either VORLEY, CHANU, Liew, and others would place their Fraudulent Orders individually in order to facilitate the execution of their own Primary Orders, without the placement of a Fraudulent Orders by another trader. By contrast, coordinated placement of the Fraudulent Orders involved one or more additional traders. When engaging in coordinated placement of Fraudulent Orders, VORLEY, CHANU, Liew, and/or one or more other co-conspirators would place one or more Fraudulent Orders on one side of the market in order to facilitate the execution of Primary Orders placed on the opposite side of the market by either VORLEY, CHANU, Liew, or another trader.

13.    It was further part of the conspiracy that VORLEY, CHANU, Liew, and others intended to, attempted to, and often did cancel the Fraudulent Orders before any part of the Fraudulent Orders were executed.

14.    It was further part of the conspiracy that the Fraudulent Orders placed by VORLEY, CHANU, Liew, and others exposed Deutsche Bank AG to (i) new and increased risks of loss— including in the form of: (a) fees, costs, and expenses incurred through investigations, litigation, and proceedings arising from the underlying conduct; (b) losses associated with the financial risk that the Fraudulent Orders would be executed (despite the traders' intent to cancel the Fraudulent

Orders before execution); and (c) reputational harm—and (ii) actual loss, including (a) the payment by Deutsche Bank AG of a $30,000,000 civil monetary penalty to the CFTC on or around January 29, 2018, and (b) fees, costs, and expenses actually incurred through investigations, litigation, and proceedings arising from the underlying conduct.

15.    It was further part of the conspiracy that in submitting the Fraudulent Orders and Primary Orders in furtherance of their scheme, VORLEY, CHANU, Liew, and others, transmitted and caused to be transmitted, wire communications from outside the United States into and through the Northern District of Illinois.

16.    It was further part of the conspiracy that, for example, on or around November 3, 2010, VORLEY and CHANU, together with Liew, engaged in the coordinated placement of Fraudulent Orders at various prices, in order to facilitate the execution of Primary Orders placed by Liew to trade gold futures contracts.

17.    It was further part of the conspiracy that on or around that same day, November 3, 2010, at or around the time they were engaging in the fraudulent activity described in paragraph 16, VORLEY and Liew communicated via electronic chat. During this chat, VORLEY wrote to Liew, in pertinent part, that their activity "was cladssic [sic] / jam it / wooooooooooooo . . . . bif [sic] it up." Liew replied to VORLEY, in pertinent part, "tricks from the . . . master."

18.    It was further part of the conspiracy that, for example, on or around August 7, 2011, CHANU and Liew engaged in the coordinated placement of Fraudulent Orders at various prices, in order to facilitate the execution of Primary Orders placed by Liew to trade gold futures contracts.

19.    It was further part of the conspiracy that on or around that same day, August 7, 2011, at or around the time they were engaging in the fraudulent activity described in paragraph 18, CHANU and Liew communicated via electronic chat. During this chat, Liew wrote to CHANU, in pertinent part, "i should job it here right / u think?" to which CHANU replied to Liew,

in pertinent part, "yup / sell 10k here / i ll help you." Later in the chat, Liew wrote to CHANU, in pertinent part, "u be careful sweetie / dun get given here / lol."

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SEVENTEEN
### (Wire Fraud Affecting a Financial Institution)

The SPECIAL JUNE 2018 GRAND JURY further charges:

20.　　Paragraphs 1 and 3 through 19 are incorporated herein.

21.　　From at least in or around March 2008 through at least in or around July 2013, in the Northern District of Illinois, Eastern Division, and elsewhere,

JAMES VORLEY and
CEDRIC CHANU,

the defendants herein, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice—including wire communications in furtherance of the placement of Fraudulent Orders on or around the dates listed in the table below, each constituting a separate count of this Superseding Indictment, from outside the United States to the CME Group in Chicago and Aurora, Illinois—all affecting at least one financial institution, including Deutsche Bank AG, as well as other participants in the precious metals futures markets.

8

| Count | Date | Start Time | Description of Wire Communication | Defendant(s) |
|-------|------|-----------|----------------------------------|--------------|
| 2 | Feb. 12, 2010 | 03:52:21.204 AM | Placement of 11 Fraudulent Orders to sell 10 gold futures contracts each (110 contracts total) | VORLEY |
| 3 | Mar. 30, 2010 | 10:42:33.165 AM | Placement of 286 Fraudulent Orders to sell 10 silver futures contracts each (2,860 contracts total) | CHANU |
| 4 | June 17, 2010 | 10:19:31.207 AM | Placement of 10 Fraudulent Orders to buy 10 gold futures contracts each (100 contracts total) | VORLEY |
| 5 | Aug. 26, 2010 | 03:10:46.989 AM | Placement of 8 Fraudulent Orders to buy 10 gold futures contracts each (80 contracts total) | VORLEY |
| 6 | Oct. 7, 2010 | 8:02:28.639 AM | Placement of one Fraudulent Order to buy 100 gold futures contracts | VORLEY and CHANU |
| 7 | Nov. 3, 2010 | 02:44:03.584 AM | Placement of one Fraudulent Order to buy 100 gold futures contracts | CHANU |
| 8 | Nov. 3, 2010 | 02:48:04.813 AM | Placement of 17 Fraudulent Orders to buy 10 gold futures contracts each (170 contracts total) | VORLEY |
| 9 | Apr. 20, 2011 | 01:42:52.256 AM | Placement of 16 Fraudulent Orders to buy gold futures contracts each (160 contracts total) | CHANU |
| 10 | May 5, 2011 | 02:35:30.310 AM | Placement of 15 Fraudulent Orders to buy 10 silver futures contracts each (150 contracts total) | VORLEY |
| 11 | May 11, 2011 | 08:57:27.095 PM | Placement of 14 Fraudulent Orders to sell 10 silver futures contracts each (140 contracts total) | CHANU |
| 12 | Aug. 7, 2011 | 10:46:06.911 PM | Placement of 40 Fraudulent Orders to buy 10 gold futures contracts each (400 contracts total) | CHANU |
| 13 | Aug. 9, 2011 | 07:59:18.245 PM | Placement of one Fraudulent Order to buy 50 gold futures contracts | CHANU |
| 14 | Sept. 30, 2011 | 05:02:36.389 AM | Placement of one Fraudulent Order to sell 100 gold futures contracts and 32 Fraudulent Orders to sell 10 gold futures contracts each (420 contracts total) | VORLEY and CHANU |
| 15 | July 13, 2012 | 03:13:50.277 AM | Placement of 30 Fraudulent Orders to sell 10 gold futures contracts each (300 contracts total) | CHANU |
| 16 | Sept. 14, 2012 | 02:55:15.619 AM | Placement of 22 Fraudulent Orders to sell 10 gold futures contracts each (220 contracts total) | CHANU |
| 17 | July 9, 2013 | 11:52:04.617 AM | Placement of one Fraudulent Order to buy 100 gold futures contracts | VORLEY |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH SEVENTEEN

22.     The factual allegations contained in Counts One through Seventeen of this Superseding Indictment are hereby re-alleged and are incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

23.     Upon conviction of any of the offenses alleged in Counts One through Seventeen, namely, conspiracy to commit and substantive counts of wire fraud affecting a financial institution, in violation of Title 18, United States Code, Sections 1343 and 1349, the defendants, JAMES VORLEY and CEDRIC CHANU, shall forfeit to the United States any and all property, real or personal, which constitutes or is derived from proceeds traceable to the aforementioned offenses, pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United States Code, Section 2461(c), and any property traceable to such property. The property to be forfeited shall include, but is not limited to, the following:

A money judgment in favor of the United States of America equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Section 1343 and 1349.

24.     If any of the property described above, as a result of any act or omission of the defendants:

      a.     cannot be located upon the exercise of due diligence;
      b.     has been transferred or sold to, or deposited with, a third party;
      c.     has been placed beyond the jurisdiction of the Court;
      d.     has been substantially diminished in value; or
      e.     has been commingled with other property that cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek the forfeiture of any other property of the defendants up to the value of the above forfeitable property and obtain a money judgment in an amount equal to the value of the property involved in the violations.

A TRUE BILL:

_____

FOREPERSON

ROBERT A. ZINK
Chief
U.S. Department of Justice
Criminal Division, Fraud Section

By: _____      _____

Avi Perry                                 Brian Young
Assistant Chief                           Deputy Chief

U.S. Department of Justice
Criminal Division, Fraud Section