IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | |
| JAMES VORLEY and CEDRIC CHANU, | ) ) | No. 18 Cr. 35 (Tharp, J.) |
| Defendants. | ) ) ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL *BRADY* AND RULE 16 DISCOVERY**

The government's opposition brief ("Opposition") is yet another example of the obfuscation and evasiveness that continue to animate defendants' concerns regarding a potential fraud on this Court and the concomitant deprivation of defendants' due process rights.

As a preliminary matter, the government attempts to restrict this Court's scrutiny to the government's conduct in *December 2016*, when prosecutors appear—based on all available facts and the government's deafening silence in response to Court's invitation to say otherwise—to have fraudulently induced the Chief Judge of this Court into entering a Tolling Order based on a pretextual MLAT request. As to that conduct in December 2016, the government takes the extraordinary position that prosecutors are entitled to deceive federal judges into extending statutes of limitations based on pretextual MLAT requests so long as the applications for the tolling orders, on their face, *appear* sufficient to justify the requested orders. Opp. at 14-15.

But the government's use of a pretextual MLAT request in December 2016 to dupe the Chief Judge of this Court into tolling the applicable statute of limitations is just the tip of the iceberg. Indeed, the primary focus of defendants' motion is on the government's conduct *after 2016*, when prosecutors appear to have (1) invoked that fraudulently obtained Tolling Order to

81679858_1

bring substantive criminal charges in January 2018 that they knew were almost entirely time-barred; (2) attempted to leverage those time-barred charges to induce defendants to plead guilty and to cooperate against each other; (3) misled defense counsel to obtain defendants' consent to delay their voluntary appearances for months, leading the defendants to waive various rights and forgo motions that they otherwise would have made; and (4) in July 2018, dropped the time-barred charges and charged a different crime, with a longer statute of limitations and a higher maximum sentence, in an effort to cover up the government's numerous deceptions during the period December 2016 through July 2018. Tellingly, the Opposition does not even address, let alone refute, these concerns.

Instead, the government argues that no remedy is available to the defendants *even if every one of Mr. Khardori's allegations is true* and *every one of defendants' concerns about the government's misconduct is justified*. *See* Opp. at 20. Setting aside for now the audacity of that argument, it is an unconvincing effort to put the cart before the horse, and it disregards this Court's instruction that the government ensure that its response "properly focuses on what the [defendants'] motion is seeking in the first instance"—*i.e.*, "information that would inform whether . . . further motion[s] [are] appropriate." Feb. 27, 2020 Hr'g Tr. at 27.

Among the many questions the government's Opposition leaves unanswered are: (1) When were the prosecutors on this case first alerted to the possibility that the 2016 MLAT request was pretextual and that the December 20, 2016 Tolling Order fraudulently obtained?; (2) Why did they fail to inform the Court and the defendants of those facts at that time?; and (3) Who made and/or participated in the decision to conceal those facts from the Court and the defendants? These and countless other questions must be answered before any determination of prejudice can be made and all appropriate remedies fashioned by this Court.

Moreover, the government's insistence on the purported sanctity of its internal files is a red herring: defendants were compelled to request the full scope of potentially relevant documents in the government's possession because the government has *for years* refused to provide any answers to the defendants' targeted questioning regarding the MLAT request and the Tolling Order. And there is no question that the defendants have a colorable claim to such information, which the Seventh Circuit has noted is a "relatively low burden" that is amply met by facts "indicating a realistic likelihood of government misconduct." *United States v. Heidecke*, 900 F.2d 1155, 1159-60 (7th Cir. 1990). Here, we have a former member of the prosecution team in this case alleging that such misconduct occurred, substantial corroboration of his account, and complete silence by the current prosecution team on the question of whether their former colleague's allegations are true. It is hard to imagine a more colorable basis for further inquiry than that.

In addition, it is, to say the least, unconvincing for the government to argue they are unaware of any legal authority for the defendants' Motion to Compel, Opp. at 6, when Judge Breyer ordered an evidentiary hearing on this exact issue in a case involving one of the prosecutors currently assigned to this case. *United States v. Bogucki*, 316 F. Supp. 3d 1177, 1183 (N.D. Cal. 2018) (in a case brought by Fraud Section attorneys Brian Young and Sarah Hall, convening an evidentiary hearing on the question of whether the government's MLAT request was pretextual and "to inquire into the government's true motivations for obtaining the [tolling] order"). As Judge Breyer implicitly recognized, only by way of discovery and an evidentiary hearing can a defendant establish prejudice based on facts that are within the exclusive possession of the government.

Nor does anything prevent the government from providing the information defendants seek. For starters, they could have disclosed the relevant facts in their Opposition (or in letter form) consistent with the government's standard practice in disclosing *Brady* material, or by

3

producing any non-privileged material to defendants with a privilege log identifying withheld documents and the purported basis for non-disclosure.[1] By contrast, the government's (i) presentation to the Court of the very documents by which the Tolling Order was secured (together with instructions that Your Honor not look beyond them), and (ii) offer to present unspecified documents for *in camera* review, do not present a meaningful opportunity to assess whether and to what extent the government committed a series of frauds on this Court[2] or violated defendants' fundamental rights. Critically, and as the government is well aware, Mr. Khardori's allegations of prosecutorial misconduct specifically detail that a Fraud Section prosecutor advised fellow government lawyers "not to put 'in writing' anything that would suggest" that an MLAT request was simply a pretext for tolling the statute of limitations. *See* Aruna Viswanatha & Dave Michaels, *Justice Department Accused of Abusing Process to Extend Statute of Limitations*, Wall. St. J. (Feb. 2, 2020), https://www.wsj.com/articles/justice-departmentaccused-of-abusing-process-to-extend-statute-of-limitations-11580657654. In this context, it is highly unlikely that much, if any, relevant information will be found in any case materials that the government unilaterally selects for *in*

---

[1] Pursuant to the crime-fraud exception, any relevant materials may well be non-privileged anyway.

[2] These would include at least (i) securing the Tolling Order based on a pretextual MLAT (Castillo, C.J.), (ii) invoking the fraudulently obtained Tolling Order to get other judges to authorize criminal complaints and arrest warrants based on criminal charges the government knew to be time-barred (for this case, Mason, M.J; for the *Bases* and *Pacilio* case, Weisman, M.J.), and (iii) providing Your Honor with the same documents upon which Chief Judge Castillo relied in granting the Tolling Order and asking Your Honor to rely exclusively on the face of those documents in determining this motion. Opp. at 12 ("The Court's analysis of the propriety of the December 2016 MLAT and the December 2016 Tolling Request"—all that is at issue according to the government's reframing of the defendants' motion—"should be confined to the face of those submissions.").

*camera* inspection.[3] And, in any event, allowing the government to selectively produce information to the Court in an attempt to dispel concerns that it was not forthcoming with the Court or defendants in the first place would be contrary to common sense and basic principles of fairness. *See, e.g.*, *United States v. White*, 492 F.3d 380, 411 (6th Cir. 2007) (requiring an evidentiary hearing and rejecting the prosecutor's request that the Court "take his word that the evidence was not favorable to Defendants, was not material to their respective cases, and that its suppression did not prejudice them in any way" because "[a]bsent a more searching inquiry of claims as serious as those lodged by Defendants here, we effectively permit the government to ride roughshod over the accused, stripping the accused of both sword and shield"). Given the high stakes—for the defendants and for institutional integrity—the government should not be permitted to avoid answering basic questions about what prosecutors knew when they made certain representations to the Court and to defense counsel.

As set forth below, the Opposition (i) proceeds on a faulty premise by misrepresenting the scope of the potential misconduct; (ii) presupposes the impact of such misconduct without giving defendants access to the information they need to evaluate and demonstrate in full the prejudice they have suffered; (iii) ignores the government's independent ethical obligations and duty of candor to the Court; and (iv) seeks to assuage any concerns about prosecutorial misconduct by providing this Court the same documents used to perpetrate the alleged fraud on Chief Judge Castillo and offering the Court *in camera* access to an unspecified set of curated materials that cannot be expected to tell the full story and may well tell a misleading one. For these and other reasons, we respectfully submit that the defendants' Motion to Compel should be granted.

---

[3] This is especially so where, as here, a former member of the prosecution team on this case is alleging that two of the current members of the prosecution team, together with their supervisory chain, have engaged in misconduct—including potentially a *cover up*.

**ARGUMENT**

**I. THE GOVERNMENT'S ARGUMENT PROCEEDS ON A FAULTY PREMISE BY MISREPRESENTING THE SCOPE OF THE REPORTED MISCONDUCT.**

The concerns raised by the defendants are straightforward. They originate from an allegation by a former member of the prosecution team on this case that the government appears to have deceived the Chief Judge of this Court into issuing the Tolling Order in December 2016. But that is not the focal point of defendants' motion. The defendants' primary concern is with the government's conduct *after* securing the Tolling Order, when it appears that—among other things—the government invoked the Tolling Order to bring numerous criminal charges against the defendants that the government knew were time-barred and then leveraged those time-barred charges (a) to induce the defendants to delay their initial appearances and (b) to forfeit their rights to contest extradition to the United States, demand a speedy trial, and obtain relevant evidence in their defense. And, after securing those concessions, the government dropped the time-barred charges and indicted the defendants on a new theory—wire fraud affecting a financial institution, with its 30-year maximum sentence—in an effort to cover up their misconduct.

Yet despite the defendants' articulated concern in their moving brief that "Mr. Khardori's allegations detail a troubling pattern of deceptive misconduct" and their inclusion of multiple examples of potential misrepresentations to the Court and defense counsel over several years, Def. Def. Br. at 4, the Opposition strains to reduce the misconduct—and the basis of defendants' discovery request—to an allegation that "the December 2016 MLAT was pretextual and that the December 2016 Tolling Request improperly concealed its pretextual nature." Opp. at 5; *see also* Opp. at 20 ("Even if all of the defendants' allegations were true, *the government's conduct (which occurred in 2016)*" does not entitle defendants to any relief.) (emphasis added). This distortion speaks volumes in and of itself, and underscores the need for defendants to access the information

6

they seek.

Moreover, although the government claims that the prosecutors currently assigned to this case "have seen at this point more of the record than Mr. Khardori ever did," Feb. 27, 2020 Hr'g Tr. at 24, the Opposition does not dispute that Mr. Khardori's allegations are true. Instead, the government argues that they are irrelevant, asserting that "the defendants have offered no authority that even a nakedly pretextual MLAT constitutes misconduct." Opp. at 14. Of course, ethics and common sense should constitute sufficient authority. And indeed, the prosecution is subject to Rules of Professional Conduct that specifically preclude them from knowingly making a "false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." *See* Model Rule of Professional Conduct 3.3, adopted by the U.S. District Court for the Northern District of Illinois as the Rules of Professional Conduct pursuant to Local Rule 83.50; *see also, e.g.*, Feb. 27, 2020 Hr'g Tr. at 21 (observation by the Court that if there "was some merit to these claims and [] this played some role in . . . obtaining tolling agreements or tolling orders or deferring the initiation of the indictment in the case or the appearance on the indictment in the case, things like that, that is of significant concern obviously to me").

At the very least, once the prosecution was on notice that the MLAT request may have been pretextual and the Tolling Order fraudulently obtained, they had an obligation to notify the Court and defense counsel immediately. Had they done so, the defendants may have never had cause to file the instant motion. In those circumstances, defense counsel would have had an opportunity to evaluate any potential prejudice, advise their clients accordingly, and pursue any

7

motions as appropriate based on that information.[4] Consistent with Justice Brandeis's observation that sunlight is the best disinfectant, acknowledging and addressing any initial misconduct directly—as soon as it was discovered—may well have put to rest any concerns arising from that initial, ethical lapse. But that, of course, is not what happened.

To the contrary, the government contends that, even if Mr. Khardori's allegations are true, they are irrelevant because the prosecutors ultimately *discontinued* their reliance on the Tolling Order when they indicted the defendants in July 2018. Opp. at 11. What this argument conveniently ignores are the numerous instances in which the prosecutors on this case repeatedly invoked the Tolling Order in the pre-indictment phase of this case to leverage various concessions from defendants and otherwise deprive them, through deception, of the effective assistance of their counsel. Here are just a few examples:

- On January 15, 2018, the government invoked the Tolling Order to charge each of the defendants with numerous substantive criminal counts that, but for the Tolling Order, were time-barred. McGovern Decl. ¶ 4 and Ex. C; Burlingame Decl. ¶¶ 3-4 and Ex. C.

- In a series of communications in late January and early February 2018, counsel for Mr. Vorley advised the two Department of Justice ("DOJ") Fraud Section Trial Attorneys handling the matter at that time that, following consultation with counsel, including U.K. extradition counsel, Mr. Vorley had decided to voluntarily travel to the U.S. for his initial appearance. The government and Mr. Vorley agreed that he would appear on March 8, 2018. Burlingame Decl. ¶¶ 5-8.

- On February 14, 2018, defense counsel in a separate matter, *United States v. Bogucki*, filed

---

[4] By way of example, had the government immediately advised defense counsel of the issues relating to the propriety of the Tolling Order, defense counsel would have immediately recognized that *almost all* of the pending substantive spoofing charges under Section 1343 and the Dodd-Frank statute were time-barred. *See* McGovern Decl. ¶ 11, appended hereto as Ex. A; Burlingame Decl. ¶ 4, appended hereto as Ex. B. It is axiomatic that the government's deception of defense counsel in such a manner infringes a defendant's Sixth Amendment right to the effectiveness of his counsel in making critical decisions in his defense. *Cf. Strickland v. Washington*, 466 U.S. 668, 680 (1984) (noting that "reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options").

8

under seal a Motion to Dismiss the pending indictment, raising the question of whether the Fraud Section had made a pretextual MLAT request to the United Kingdom in an effort to fraudulently induce the court into entering a tolling order under 18 U.S.C. § 3292(a). *See United States v. Bogucki*, No. 18-cr-00021 (N.D. Cal. filed Jan. 16, 2018), Dkt. Nos. 27, 36.

- On February 17, 2018, Mr. Chanu's counsel informed DOJ that Mr. Chanu intended to travel from the United Arab Emirates (where he resides, and which has no extradition treaty with the United States) to voluntarily appear on the pending charges during the week of March 5, 2018, regardless of whether the parties reached any agreement on bail terms in the interim. McGovern Decl. ¶ 6.

- Two days later, on February 19, 2018, DOJ requested that Mr. Chanu agree to delay his voluntary appearance on the pending charges so that the government could work through some "resource" issues supposedly relating to an upcoming trial. *Id.* ¶ 7.

- On February 21, 2018, the prosecutors restated their request that Mr. Chanu delay his appearance, again citing the government's "manpower issues." The prosecutors added that, if Mr. Chanu was not willing to do so and instead chose to appear, the government would seek his detention, separating him indefinitely from his wife and family. *Id.* ¶ 8.

- The next day, on February 22, 2018, after discussing DOJ's request with Mr. Chanu, Mr. Chanu's counsel informed DOJ that Mr. Chanu would agree to postpone his voluntary appearance until a later date. The prosecutors thanked Mr. Chanu's counsel for Mr. Chanu's "receptiveness to deferring his appearance." *Id.* ¶ 9.

- That same day, citing logistical complications due to an upcoming trial involving one of the prosecutors, the government asked if Mr. Vorley would defer his voluntary appearance until late April. Mr. Vorley did not appear in the U.S. on March 8, 2018 as previously scheduled based on that request. Burlingame Decl. ¶¶ 10-11.

- On March 23, 2018, the presiding judge in the *Bogucki* matter ordered an evidentiary hearing to probe "the government's true motivations" in seeking the tolling order. *See* Mar. 23, 2018 Hr'g Tr. at 6:1-7:25, *Bogucki*, Dkt. No. 53 ("I need to know what the facts are. . . . It's very hard to do it on what I call a cold record."). Shortly thereafter, the government disclaimed its reliance on the tolling order, all charges that relied upon it were dropped, and the parties came to an independent agreement that obviated the need for a hearing.[5]

- On July 24, 2018, the government filed in this case an indictment with wholly new charges that doubled the applicable statute of limitations period, allowing it to proceed

---

[5] Bogucki proceeded to trial on March 4, 2019, and Judge Breyer dismissed the case on a Rule 29 motion and entered a judgment of acquittal as to all counts (one count of conspiracy to commit wire fraud affecting a financial institution and six counts of wire fraud affecting a financial institution).

9

independently of the tolling order, and increased the maximum sentence to 30 years. Notably, the government does not mention *Bogucki* in its Opposition a single time—even though the case is on all fours with this one, involves some of the same prosecutors, and appears to have influenced the governments' request to delay defendants' voluntary appearances in this matter (and this, even as the government contends—seemingly with a straight face—that defendants do not cite any "case[] or other authority that supports discovery of the records they seek in the circumstances present here," Opp. at 6).

Instead, the government asserts that the defendants cannot infer consciousness of wrongdoing from its eventual decision to disavow the Tolling Order because a prosecutor has total charging discretion "so long as the prosecutor has probable cause to believe that the accused is guilty as charged." *See* Opp. at 11 n.5. That is simply not correct. Under our criminal justice system, while charging decisions are generally committed to the prosecution's discretion, courts may and should review them when there is good reason to believe that they were animated by patently improper considerations, not to mention charges prompted by an attempt to conceal a fraud on the Court. *See, e.g.*, *United v. Brodson*, 528 F.2d 214 (7th Cir. 1975) (dismissing indictment where government improperly presented to the grand jury evidence intercepted through wire communications which were not specified by the order of authorization or approval of the original wiretap); *United v. Aguilar*, 831 F. Supp. 2d 1180 (C.D. Cal. 2011) (dismissing indictment where the government procured search warrants through materially false affidavits and violated *Brady* by withholding transcripts of an FBI agent's false and misleading grand jury testimony); *United States v. Korey*, 614 F. Supp. 2d 573 (W.D. Pa. 2009) (dismissing indictment, finding that the government's decision to bring a second indictment against defendants, after dismissal of the original indictment, was vindictive prosecution); *United States v. Pascal*, 496 F. Supp. 313 (N.D.

10

Ill. 1979) (dismissing indictment where DEA members falsely told the prosecution team that a defendant refused to cooperate). To this end, Mr. Khardori's memo reportedly documents his understanding that a companion spoofing case involving the same pretextual MLAT request, *United States v. Bases*, would have been closed in the absence of the same Tolling Order at issue here—thus suggesting that defendants may not have been charged in the first place but for the alleged prosecutorial misconduct. *See* Jack Crowe, *Former Justice Department Attorney Warns That Prosecutorial Abuses Go Beyond FISA Process*, Nat'l Rev. (Feb. 13, 2020), https://www.nationalreview.com/news/former-justicedepartment-attorney-warns-that-prosecutorial-abuses-go-beyond-fisa-process.

## II. THE GOVERNMENT IMPROPERLY PRESUPPOSES THE ABSENCE OF PREJUDICE.

Neither the defendants nor the Court should be expected to accept at face value the government's contention that "defendants have suffered no prejudice and are entitled to no relief." *See* Opp. at 10. As a preliminary matter, the government's prejudice analysis is limited to its consideration of the potential impact of any fraud underlying the issuance of the tolling order rather than the impact of the broader, ongoing pattern of deception defendants discuss in their moving brief. More critically, it is the *defendants'* prerogative to consider how the government's misconduct may have prejudiced their ability to defend themselves and to seek remedies from the Court as appropriate. It is patently absurd for the government to conclude that the effects of its own wrongdoing were ultimately of little consequence to defendants based on a unilateral and self-serving analysis of information that it has steadfastly refused to provide.

Without, at a minimum, information about what the prosecutors knew and when they knew

11

it, defendants can only guess at the prejudice flowing from the alleged misconduct.[6] The range of potential prejudice could give rise to a variety of different remedies, including but not limited to motions to dismiss the indictment based on prosecutorial misconduct, pre-indictment delay, or due process violations; adverse jury instructions; and the preclusion of certain evidence and witnesses. Thus, for the government to argue that any avenues of redress are foreclosed to defendants at this stage is premature and unfair given the glaring information imbalance preventing defendants and the Court from assessing the full scope of the government's misconduct.

### III. THE GOVERNMENT DISREGARDS ITS ETHICAL OBLIGATIONS AND RELIES ON INAPPOSITE ARGUMENTS TO AVOID DISCLOSURE.

Prosecutors wield enormous power in charging and pursuing criminal defendants. Their actions implicate defendants' liberty and constitutional rights, and their decisions ultimately shape Americans' faith in the criminal justice system. As such, they are rightly held to a higher standard and an independent duty to promote truth and justice through their dealings with defendants and the Court. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (the government's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) (observing that lack of prosecutorial candor could result in a

---

[6] Examples of potential prejudice that may be revealed by the government's misconduct include: the defendants forfeited their rights to contest extradition, waived their rights to speedy arraignment and a speedy trial, and did not file motions that they otherwise would have on the basis of a Complaint that they now know was substantially time-barred. *See* n.4, *supra* at 8.

Aside from any legal analysis that the Court may undertake of potential prejudice, the government's decisions throughout this case have had a meaningful impact on the defendants' lives and the well-being of their families. For example, in the months following the delay of defendants' initial appearance—which, contrary to the government's assertion, was undertaken at the government's request, *see, e.g.*, McGovern Decl. ¶¶ 6-9; Burlingame Decl. ¶¶ 10-11, the defendants lost their jobs and faced challenges in their personal lives as a result of the immense stress and cloud of suspicion that they were under. Defendants also incurred increased legal costs as a result of the prolonged proceedings and the repeated changes to the government's theory of the case.

violation of due process "not just because [it] involves prosecutorial misconduct, but more importantly because [it] involves a corruption of the truth-seeking function of the trial process"); *United States v. Ott*, 489 F.2d 872, 874 (7th Cir. 1973) (holding that courts are "entitled to expect candor from attorneys representing the United States" and reversing conviction where the prosecutor failed to correct a material misrepresentation to the trial court); *see also United States v. Bernal-Obeso*, 989 F.2d 331, 334 (9th Cir. 1993) ("[W]e expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery."); *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962) ("The prosecution has a special duty not to mislead.").

Notwithstanding the government's independent duty of candor as a bedrock principle of the criminal justice system, the government refuses to disclose even the most basic information that might restore a measure of public trust in the wake of Mr. Khardori's well-documented allegations about systemic misconduct in the DOJ and protect defendants' fundamental rights. To this end, for example, the government falsely reframes defendants' motion as an unreasonable demand for sensitive and privileged government "files," and asserts that such "quintessentially privileged material" is not discoverable under Rule 16 or *Brady*. In doing so, the government ignores that the defendants' interest is clearly directed at specific underlying information that is favorable to the defense rather than specific privileged materials, and that both Rule 16 and *Brady* require disclosure of favorable "information" of the type that may be implicated here.[7] Indeed,

---

[7] The government's claim that "most (if not all) of the materials sought by defendants are protected" by various privileges is unavailing. *See* Opp. at 1. Even if the government claims that "most" of the requested documents are privileged, it should be required to produce what is not and provide a privilege log for the remainder, together with sufficient information to litigate whether the claimed privilege falls within the crime-fraud exception or is otherwise not privileged. *Cf. United States v. BDO Seidman, LLP*, 492 F.3d 806, 820 (7th Cir. 2007) (holding that the crime-fraud exception could overcome privilege claims where document custodians allegedly engaged in fraud).

13

prosecutors routinely turn over *Brady*, *Giglio* and other information in letters to the defense, even without disclosure of the underlying documents. In this case, by contrast, the prosecution has—for approximately two years—suppressed information about, and repeatedly denied any knowledge of, concerns that appear to have been raised within DOJ as early as February 2018. And even after the *Wall Street Journal* reported on the alleged prosecutorial misconduct, the government continued to stonewall, leaving defendants with no choice but to demand the underlying materials and to move to compel disclosure. Without an evidentiary hearing and access to the facts, defendants are unable to assess their options and take action as appropriate to vindicate their rights.

The Seventh Circuit has held that defendants are entitled to discovery to probe prosecutorial misconduct if they make a colorable showing of misconduct that rises beyond the level of unsupported allegations. *United States v. Heidecke*, 900 F.2d 1155, 1158 (7th Cir. 1990). This "relatively low burden recognizes that most of the proof in selective prosecution cases will normally be in the Government's hands," and it is intended to strike a balance between "the government's interest in protection from abusive discovery versus the [defendant's] need for facts that are almost solely within the control of the prosecutor." *Id.* It is difficult to imagine what sort of allegations might be more "colorable" than the account of a former member of the prosecution team in a memo he submitted independently to the Office of Inspector General and which defendants learned about incidentally though media reports—particularly given that the defendants already had grounds for concern (and had already made numerous inquiries to the government regarding information about the MLAT request and Tolling Order) based on, among other things, (i) the government's ability to obtain any relevant information directly from its own cooperator (Deutsche Bank), which had a footprint in both the United States and the United Kingdom; (ii) the

14

government's otherwise inexplicable decision to charge the case in a manner that ignored the obvious, easier-to-prove charges with five and six year statutes of limitation that fit the alleged conduct (and that have been charged in all other similar prosecutions); (iii) the government's curious representations before this Court that it would *never ever* rely on the Tolling Order after the defendants requested to see the underlying application; and (iv) public reports suggesting that the same prosecutors had engaged in similar misfeasance in another matter at around the same time the government inexplicably asked defendants to delay their voluntary appearances.

Rather than address these points, the government devotes pages of its Opposition to rebutting an argument that defendants are not in a position to make without access to the very information they are seeking. *See* Opp. at 6-7. In any event, information that could form the basis for a pretrial motion to dismiss the indictment or to exclude evidence is clearly within the scope of both the *Brady* rule and Rule 16. *Cf. United States v. Glover*, No. 95-cr-0040, 1995 WL 151823, at *2 (N.D. Ill. Apr. 4, 1995) (noting that "the government should err on the side of disclosure as to anything that might be material" at the pretrial stage). And it is conceivable that the requested disclosures may bear on defendants' guilt at trial to the extent that the defendants wish to challenge the integrity of the government's investigation. At bottom, however, without an evidentiary hearing and the disclosures themselves, defendants have no way of evaluating their full import— they should not be forced to do so in the dark.

### IV. THE GOVERNMENT'S PROPOSAL TO ALLOW THE COURT *IN CAMERA* ACCESS TO CERTAIN MATERIALS IS WHOLLY INSUFFICIENT.

The government's suggestion that this Court limit its review to the face of the two documents used to perpetrate the alleged fraud on Chief Judge Castillo is an outrage. And its proposal to provide materials for the Court to review *in camera* is no better. Allowing the government to unilaterally select materials for the Court's *in camera* review does nothing to

address the defendants' concerns that the government has not been forthright with the defense or the Court from the start of these proceedings. Courts have made clear that, where there are indications of prosecutorial misconduct and the government has sole possession of the relevant evidence, courts should not rely on the government's own representations as to the relevance of that evidence. *See, e.g.*, *White*, 492 F.3d at 411. What is more, the answers to defendants' questions may not be found in the written record: Mr. Khardori reportedly alleges that Fraud Section supervisors "*instructed attorneys not to create a record of such deception by putting anything 'in writing*.'" Crowe, *supra* at 2. If Mr. Khardori's allegations are true, an *in camera* review of the government's selected materials would be a wholly futile exercise. Instead, as a first step before engaging in further motions and an evidentiary hearing, the government should be ordered to disclose to the defendants, pursuant to the protective order already in place, the Khardori memo and all other materials requested, since it is the defendants who are in the best position to evaluate the prejudice to their rights.

## **CONCLUSION**

For the reasons set forth above, and in their opening brief, Defendants' Motion to Compel *Brady* and Rule 16 Discovery should be GRANTED.

Dated: March 23, 2020                                  Respectfully Submitted,

*/s/ Roger A. Burlingame*                              */s/ Michael G. McGovern*
Roger A. Burlingame                                    Michael G. McGovern (*pro hac vice*)
Matthew L. Mazur (*pro hac vice*)                      Helen Gugel (*pro hac vice*)
Lauren Bowman (*pro hac vice*)                         Megan A. McEntee (*pro hac vice*)
Dechert LLP                                            Ropes & Gray LLP
160 Queen Victoria Street                              1211 Avenue of the Americas
London EC4V 4QQ                                        New York, NY 10036
United Kingdom                                         Telephone: (212) 596-9000
Phone: +44 20 7184 7000                                michael.mcgovern@ropesgray.com
Matthew.Mazur@dechert.com                              helen.gugel@ropesgray.com
Roger.Burlingame@dechert.com                           megan.mcentee@ropesgray.com

Christopher Burrichter                                 Aaron M. Katz (*pro hac vice*)
Dechert LLP                                            Ropes & Gray LLP
35 West Wacker Drive, Suite 3400                       800 Boylston Street
Chicago IL 60601                                       Boston, MA 02199
Telephone: (312) 646-5800                              Telephone: (617) 951-7000
Christopher.Burrichter@dechert.com                     aaron.katz@ropesgray.com

*Attorneys for James Vorley*                           Laura G. Hoey
                                                       Ropes & Gray LLP
                                                       191 North Wacker Drive
                                                       Chicago, IL 60606
                                                       Telephone: (312) 845-1318
                                                       laura.hoey@ropesgray.com

                                                       *Attorneys for Cedric Chanu*

**CERTIFICATE OF SERVICE**

       I, Michael G. McGovern, hereby certify that on March 23, 2020, the foregoing document was filed via the Court's CM/ECF system, which will automatically serve and send notification of such filing to all registered attorneys of record.

                                                    */s/ Michael G. McGovern*
                                                    Michael G. McGovern