**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
|  | ) | No. 18 Cr. 35 (Tharp, J.) |
| v. | ) ) | |
| JAMES VORLEY and CEDRIC CHANU, | ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF ALAN JUKES[1]**

The government proposes to call Alan Jukes, a market surveillance software "product manager" with Nasdaq, as an expert witness "to testify about the importance of market integrity and how market integrity can be undermined by certain trading practices, including spoofing." Ex. A, Gov't Expert Disclosures, Feb. 4, 2020, at 2; *see also* Dkt. 256, Mot. to Permit Two-Way Live Video Testimony, at 4 ("The government expects Mr. Jukes to identify certain characteristics of spoofing and to share his opinion of the negative impact that spoofing has on financial markets."). He did not review or analyze any evidence in this case. The Court should exclude Mr. Jukes' testimony pursuant to the Federal Rules of Evidence, *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579 (1993), and the Due Process Clause.

---

[1] The defendants do not know if the government still intends to call Mr. Jukes as a witness. On July 27, 2020, the government moved for an order allowing Mr. Jukes to testify by two-way video from Australia. Mot. Permit Two-Way Live Video Witness Testimony, July 27, 2020 (Dkt. 256). After the defendants opposed the motion, the government withdrew its request. Gov't Reply Mot. Permit Two-Way Live Video Witness Testimony, July 30, 2020, at 1 (Dkt. 265). However, Mr. Jukes' name still appears on the government's proposed witness list, and the government has not responded to a request to let the defense know if he may still testify.

As explained further herein, Mr. Jukes' proposed testimony about market integrity and spoofing suffers from multiple defects. *First*, Mr. Jukes is not qualified to provide the proposed testimony. *Second*, testimony by Mr. Jukes on the theories contained in his article, "Visualizing the 'Signature' of Spoofing," or on Nasdaq's SMARTS surveillance tool should be excluded as both irrelevant and unreliable under the *Daubert* standard. *Third*, any testimony about market integrity and how it can be undermined by spoofing is both irrelevant and unduly prejudicial. *Fourth*, to the extent that the government expects Mr. Jukes to give general background testimony about markets and spoofing, it would be cumulative of the testimony of several other government witnesses, including the government's FBI case agent (Luca), a cooperating witness (Liew), a representative of the Chicago Mercantile Exchange (Scheerer), and the government's principal expert, Professor Venkataraman. The Court should therefore exclude Mr. Jukes' testimony in its entirety.

## STATEMENT OF FACTS

Mr. Jukes worked as a futures trader in the early 1990s, prior to the modern era of computerized trading. Ex. B, Resume of Alan Jukes. In 2008, after leaving the industry and owning a light fixture store for twelve years, Mr. Jukes began working in market surveillance and oversight functions at ICE. *Id.* Since 2016, Mr. Jukes has worked at Nasdaq in trade surveillance and monitoring. *Id.* In this role, Mr. Jukes has helped to develop Nasdaq's market surveillance tool, known as "SMARTS." *Id.* Mr. Jukes has never worked for a high-frequency trading company or programmed any automated trading algorithm. *Id.* He has also never authored any articles published in a peer-reviewed journal, nor has he ever testified before as an expert.

Mr. Jukes has written a "case study," published online by Nasdaq, entitled "Visualizing the 'Signature' of Spoofing." Ex. C, "Visualizing the 'Signature' of Spoofing." In what amounts to

a Nasdaq marketing piece, Mr. Jukes discusses his role in developing "a new 'spoofing' alert for the SMARTS surveillance application." *Id.* at 2. Mr. Jukes writes that "[a]s an ex pit trader, I am familiar with spoofing as a practice and was quite quickly able to 'see' the behavior in the raw data." *Id.* Mr. Jukes goes on to describe his theory that various characteristics—including "large orders on one side of the order book only, deleted rapidly after trading on the other side," "position oscillation," "direction of trade is always contrary to the weight of orders shown," and "position size is not reflected by order size"— amount to a "'signature' of spoofing." *Id.* Mr. Jukes also discusses his use of Nasdaq's SMARTS surveillance application to identify spoofing, including one instance in 2011 when his analysis formed a "key part" of an unidentified regulatory prosecution of a trader. *Id.* at 2-3. Finally, Mr. Jukes touts the benefits for trading firms of using Nasdaq's SMARTS tool for market surveillance. *Id.* at 3.

In its disclosures, the government has proffered Mr. Jukes to offer opinions regarding: (1) how spoofing can be identified forensically from trading data; and (2) how spoofing affects financial markets:

(1) *Identification of Spoofing from Trading Data*. The government has disclosed that Mr. Jukes is expected to testify about his "case study" and how Nasdaq's SMARTS tool identifies spoofing:

- "[S]poofing may be identified through review of trading data [that is reviewed for] certain indicia of spoofing, including (but not limited to) as described in his [case study]" and that "trades that fit the characteristics identified in his article constitute spoofing."

- "SMARTS is a market surveillance tool that helps users identify trading activity that is calculated to manipulate a financial market or send false signals of supply and demand."

- "[T]here is a need for the SMARTS software because market participants and financial institutions recognize that the practice of placing orders for the purpose of

3

sending false signals of supply and demand is considered illicit and harmful to the integrity of financial markets."

(2) *The Effects of Spoofing on The Market.* The government also proposes to have Mr. Jukes testify about how spoofing affects traders and the market:

- "The practice of placing orders for the purpose of sending false signals about supply and demand has long been recognized and prohibited as a type of market manipulation."

- "Spoofing, and other disruptive and fraudulent trading practices, are bad for trading markets because of the distrust that it can create among traders and others in the downstream sector."

- "[P]rovide some examples of negative impacts that can be created by market manipulation, including traders leaving certain markets because of perceived spoofing."

*See* Ex. A at 2; Ex. D, Gov't Supp. Expert Disclosures, Feb. 12, 2020, at 2.

The basis for Mr. Jukes' testimony on these subjects is his experience assisting with development of the SMARTS program and other market surveillance programs, along with his interactions with financial institutions that use his companies' software. Ex. D, Gov't Supp. Expert Disclosures, Feb. 12, 2020, at 2. He has not a reviewed any records or evidence in this case. *See* Ex. E, Gov't Supp. Expert Disclosures, Apr. 22, 2020 ("The government has not provided … Alan Jukes with records or evidence to review."). Nor was the SMARTS surveillance tool used to review any of the trading data identify the trading sequences that the government alleges to be fraudulent.

## LEGAL STANDARD

When a party offers expert evidence, district courts must act as "gatekeepers" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Expert testimony should be excluded if it fails to meet the

4

*Daubert* standard for reliability or if "its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The court's gatekeeping role is crucial because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

The government has the burden of establishing the admissibility of its expert witnesses' testimony under Rule 702. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). *First*, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. *Second*, an expert's opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591 (citation omitted). *Third*, an expert's opinion also must be reliable, which requires that (1) the opinion must be "based on sufficient facts or data"; (2) the opinion must be "the product of reliable principles and methods"; and (3) the opinion must be the result of the "expert . . . reliably appl[ying] the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). When assessing the reliability of a qualified expert's principles and methods, courts in this Circuit "are to consider, among other things: '(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community.'" *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) (quoting *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017)).

**ARGUMENT**

**I. MR. JUKES IS NOT QUALIFIED**

Rule 702 permits an expert to testify based on their "knowledge, skill, experience, training, or education." "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) ("To gauge reliability, the district court must determine whether the expert is qualified in the relevant field.") (internal quotation marks omitted). Here, Mr. Jukes' experience at Nasdaq and ICE Futures Europe relates to developing and marketing regulatory surveillance software. He was also once a "pit" trader in the era before computerized trading.

Nothing in Mr. Jukes' background qualifies him to provide opinion testimony regarding the behavior of precious metals traders, high frequency traders or their algorithms, the legality of trading practices over time, or the forensic identification of spoofing through analyzing trading data. According to the government, "Mr. Jukes' experiences interacting with financial institutions that use his software help inform his views on the sorts of techniques that manipulate financial markets and the impacts that manipulation has on the marketplace." Ex. A. While such interactions may "inform his views," Mr. Jukes lacks the relevant personal experience or knowledge base to be an expert in precious metals trading and high frequency trading, and he should not be allowed to repackage customer feedback from unnamed companies who use his surveillance products as expert testimony. *See S.E.C. v. Pasternak*, No. CIV A 05-3905 (D.N.J. May 29, 2008) ("Gunter has no experience in wholesale market making firms, or in trading high-

6

volume, highly-volatile stocks . . . As a result, Gunter has no particular expertise, knowledge, or experience in the nature and type of trading that is the focal point of this action.").

## II. MR. JUKES' TESTIMONY ABOUT THE "SIGNATURE" OF SPOOFING AND THE SMARTS SURVEILLANCE TOOL SHOULD BE EXCLUDED AS IRRELEVANT AND UNRELIABLE

Even though Mr. Jukes has not reviewed any of the trading data in this case, and even though the trading at issue occurred on the CME's COMEX and NYMEX exchanges, the government intends to have Mr. Jukes testify about Nasdaq's SMARTS surveillance tool and his "case study" on the development of an application to detect spoofing. This testimony should be excluded as both irrelevant and unreliable under *Daubert*.

### A. Testimony Regarding SMARTS Is Irrelevant

Testimony about Nasdaq's SMARTS system or Mr. Jukes' theory that he can "visualize" a "signature" of spoofing have no place in this trial. Mr. Jukes did not apply any of his spoofing theories to defendants' episodes in this case. Ex. E ("The government has not provided … Alan Jukes with records or evidence to review."). Nor did the government or any of its experts utilize SMARTS. Ex. F, Gov't Supp. Expert Disclosures, Jun. 4, 2020. Any testimony about Mr. Jukes' theory or the SMARTS tool thus fails the most basic requirement of relevance under Rule 401. Such testimony not "help the trier of fact to understand the evidence or to determine a fact in issue," as required for expert testimony under Rule 702, and should be excluded as irrelevant.

Mr. Jukes' proposed testimony about market surveillance and his theories about how to detect spoofing also be excluded because the danger of unfair prejudice substantially outweighs any possible probative value. Fed. R. Evid. 403. The SMARTS system, including its application for detecting spoofing, is nothing more than Nasdaq's proprietary market surveillance tool. Market surveillance is designed to identify instances of *potential* misconduct. *See* "How Can Nasdaq

7

SMARTS Trade Surveillance Help You?" *available at* https://www.nasdaq.com/solutions/nasdaq-trade-surveillance (last visited August 7, 2020) (SMARTS has the "ability to … ensure[] that *potential* gaming or abuse is not left undetected when conducted across multiple market places or asset classes.) (emphasis added). Once alerted to potential misconduct, firms or regulators may then follow up to determine whether it has actually occurred. Particularly in a criminal case, where the standard of proof is much higher than an internal or regulatory investigation, allowing Mr. Jukes to testify about market surveillance techniques would create a substantial risk that the jury could conclude, erroneously, that those techniques are capable of identifying spoofing with certainty. The Court should therefore bar Jukes from offering such unreliable methodology under the guise of expert testimony.

### B. Mr. Jukes' Methodology Fails To Satisfy *Daubert*

Mr. Jukes' testimony about the "signature" or "visualization" of spoofing also fails to meet the *Daubert* standard for reliability. In his "case study," Mr. Jukes posits four so-called "indicia" of spoofing: (a) large orders on one side of the book only, deleted rapidly after trading on the other side; (b) position oscillation; (c) direction of trade is always contrary to the weight of orders shown; and (d) position size is not reflected by order size. Ex. C at 2.

*Daubert* requires the Court to ask four questions to assess the reliability of an expert's methodology: (a) has the methodology been tested; (b) has the methodology been peer reviewed; (c) has the methodology been evaluated in light of potential error rates; and (d) has the methodology been accepted in the relevant scientific community? *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017). Mr. Jukes' methodology fails to satisfy any of the *Daubert* factors.

First, Mr. Jukes' method of identifying spoofing through trading data is untested. "A very significant *Daubert* factor is whether the proffered scientific theory has been subjected to the

scientific method." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 735 n.2 (N.D. Ill. 2005) ("The first factor, the existence of testing employing a verified scientific method is … probably the single most important factor."). In *Chapman*, the Seventh Circuit reversed and remanded a case for a new trial, based in part on the use of untested expert methodology. *Id.* 687-88 ("the absence of any testing indicates that [the expert's] proffered opinions cannot fairly be characterized as scientific knowledge. *Personal observation is not a substitute for scientific methodology* and is insufficient to satisfy *Daubert*'s most significant guidepost.") (internal citation omitted) (emphasis supplied). Nothing in Mr. Jukes' "case study" or the government's disclosures suggests that his theories or the SMARTS tool have been tested using any scientific method, and his theories appear to be based on nothing more than his own claimed ability as a former pit trader to "see" spoofing in trading data.

Second, Mr. Jukes' methodology as identified in the government's disclosure has not been subject to peer review. The lack of any peer review weighs heavily against Mr. Jukes' methodology. *See United States v. Johnsted*, 30 F. Supp. 3d 814, 820 (W.D. Wis. 2013) (excluding expert testimony for, among other reasons, its lack of peer review, even where the court was provided with a list of journals addressing the topic and the government explained that a second examiner reviewed the work). The "case study" was published on an online blog by Mr. Jukes' employer, in order to promote the SMARTS product it was selling, not a peer reviewed journal. It contains no citations or footnotes. It is not even an actual "case study" but a marketing piece.

Third, Mr. Jukes' methodology as described in his article has no known error rate. Without this, Mr. Jukes' testimony cannot be confirmed to be reliable for the purposes of a *Daubert* analysis. *See United States v. Lea*, 249 F.3d 632, 640 (7th Cir. 2001) (affirming the exclusion of expert witness testimony because, in part, "the court was concerned with West's inability to

9

conclusively provide the accuracy rates for the polygraph examination he conducted … [and] that West was [] unaware as to whether there were any known statistics on the accuracy rate of the test he had given."); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 774 (7th Cir. 2014) (excluding expert testimony, faulting expert's analysis for, among other issues, having no known error rate).

Fourth, Mr. Jukes' methodology set forth in the government's disclosure is not generally accepted in the relevant community. As explained above, market surveillance tools are designed to identify potential misconduct. There is no evidence that the SMARTS tool has gained general acceptance as being able to identify spoofing with any degree of certainty. *See Chapman*, 297 F.3d at 688 ("[Expert] presented no proof that his theory is generally accepted in the scientific community. Instead, his theory is novel and unsupported by any article, text, study, scientific literature or scientific data produced by others in his field.").

### III. MR. JUKES' TESTIMONY ABOUT HOW SPOOFING UNDERMINES MARKET INTEGRITY SHOULD BE EXCLUDED AS IRRELEVANT AND UNDULY PREJUDICIAL

Mr. Jukes' testimony about "the negative impact that spoofing has on financial markets," Dkt. 256 at 4-5, should be excluded because it is irrelevant and unduly prejudicial. The government has charged the defendants with conspiracy to commit wire fraud affecting a financial institution and 16 counts of wire fraud affecting a financial institution. Testimony by Mr. Jukes that spoofing is "bad for trading markets because of the distrust that it can create among traders and others in the downstream sector," "negative impacts that can be created by market manipulation, including traders leaving certain markets because of perceived spoofing," and "how market integrity can be undermined by certain trading practices, including spoofing," has no bearing on the truth or falsity of any relevant fact. Fed. R. Evid. 401. Whether or not spoofing is

"bad for trading markets," opinions of this kind will not "help the trier of fact understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a); *see also Daubert*, 509 U.S. at 59 (evidence must be "sufficiently tied to the facts of the case [to] aid the jury in resolving a factual dispute").

Even if there were any connection to the defendants' trading, Mr. Jukes' background testimony about spoofing and market integrity should be excluded as unduly prejudicial. Background evidence with only minimal probative value, but a substantial risk of prejudice, is not admissible. *United States v. Boros*, 668 F.3d 901, 910 (7th Cir. 2012). In *Boros*, the Seventh Circuit affirmed the district court's exclusion of expert testimony relating to a drug's dramatic side effects and birth defects in a prosecution for distribution of controlled substances. While acknowledging that this evidence could perhaps have some narrow relevance to the case, the Circuit explained that "testimony about the drugs' side effects and birth defects had a meaningful potential for unfair prejudice, which substantially outweighed the limited probative value of the background evidence." *Id.*; *see also United States v. Cooper*, 591 F.3d 582, 589 (7th Cir. 2010) (evidence that defendant's customers died from drugs he sold them properly excluded under Rule 403); *Martin v. City of Chicago*, No. 15-cv-04576, 2017 WL 2908770, at *6 (N.D. Ill. July 7, 2017) (excluding evidence of unrelated allegations of police misconduct as unduly prejudicial to defendant in § 1983 action). Likewise here, Mr. Jukes' proposed testimony about the negative effects of spoofing would divert the jury's focus from the elements of the charged offenses to the purported threat to market integrity. Allowing such opinions in the form of expert testimony in particular would magnify the unfair prejudice, which substantially outweighs any probative value.

### IV. MR. JUKES' BACKGROUND TESTIMONY ABOUT TRADING, MARKETS, AND SPOOFING SHOULD BE EXCLUDED AS UNNECESSARY AND CUMULATIVE

Mr. Jukes' proposed testimony regarding financial markets, trading, and spoofing is also cumulative of the testimony of at least four other witnesses. Fed. R. Evid. 403 (providing for exclusion of evidence that risks "undue delay, wasting time, or needlessly presenting cumulative evidence"). The same subjects will be covered in the testimony of the government's principal expert, Professor Venkataraman, the testimony of John Scheerer, a representative of the Chicago Mercantile Exchange ("CME"), the testimony of cooperating witness David Liew, and the testimony of Special Agent Jonathan Luca, who is a former precious metals trader. Ex. A. Each of these witnesses has at least some connection to the allegations against the defendants—Professor Venkataraman reviewed trading data, Mr. Scheerer works for the exchange on which the defendants traded, Liew is the defendants' former colleague, and Special Agent Luca led the government's precious metals investigation. But Mr. Jukes' testimony has no such connection, and the government should not be allowed to prolong the trial unnecessarily and place undue emphasis on the general topic of financial markets spoofing. *See Holmes v. Godinez*, 311 F.R.D. 177, 210 (N.D. Ill. 2015) ("we will not allow truly cumulatively [sic] evidence at trial").

### CONCLUSION

For the reasons set forth above, the Court should exclude Mr. Jukes' testimony in its entirety.

Dated: August 7, 2020

Respectfully submitted,

*/s/ Roger A. Burlingame*

Roger A. Burlingame
Matthew L. Mazur (*pro hac vice*)
Lauren A. Bowman *(pro hac vice)*
Dechert LLP
160 Queen Victoria Street
London EC4V 4QQ
United Kingdom
Phone: +44 20 7184 7000
Roger.Burlingame@dechert.com
Matthew.Mazur@dechert.com
Lauren.Bowman@dechert.com
Christopher Burrichter
Dechert LLP
35 West Wacker Drive, Suite 3400
Chicago IL 60601
Telephone: (312) 646-5800
Christopher.Burrichter@dechert.com

***Attorneys for James Vorley***

*/s/ Michael G. McGovern*

Michael G. McGovern (*pro hac vice*)
Helen Gugel (*pro hac vice*)
Megan A. McEntee (*pro hac vice*)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
michael.mcgovern@ropesgray.com
helen.gugel@ropesgray.com
megan.mcentee@ropesgray.com

Aaron M. Katz (*pro hac vice*)
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
aaron.katz@ropesgray.com

Laura G. Hoey
Ropes & Gray LLP
191 North Wacker Drive
Chicago, IL 60606
Telephone: (312) 845-1318
laura.hoey@ropesgray.com

***Attorneys for Cedric Chanu***

**CERTIFICATE OF SERVICE**

     I, Roger Burlingame, do hereby certify that on August 7, 2020 a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's EM/ECF system. Notice of this filing will be sent to all registered attorneys of record by operation of the ECF System.


                                          */s/ Roger A. Burlingame*
                                          Roger A. Burlingame