UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 18 Cr. 35 (Tharp, J.) |
| v. | ) | |
| | ) | |
| JAMES VORLEY and CEDRIC CHANU, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' RESPONSE TO THE
GOVERNMENT'S OMNIBUS MOTIONS *IN LIMINE***

Defendants James Vorley and Cedric Chanu respectfully request that this Court deny the

government's omnibus motions *in limine* (Dkt. 271) for the reasons explained below.

**ARGUMENT**

**I.    THE GOVERNMENT'S MOTIONS TO ADMIT EVIDENCE SHOULD BE
DENIED.**

**A.    Lay Opinion Under Rule 701 From David Liew Should Be Excluded.**

The government seeks to admit lay opinion testimony by its cooperating witness, David

Liew, interpreting electronic chat communications, including those in which he did not participate.

Gov't Mot. 1-4. Indeed, as the single example provided by the government demonstrates, the chats

include communications occurring *years before and after Liew began working at Deutsche Bank*,

involving people Liew may never have spoken to, as to which Liew's interpretation would be

entirely speculative. This is improper, and the government should not be given carte blanche to

introduce its own interpretations of chats under the guise of lay opinion testimony.[1]

Rule 701 provides that lay opinion testimony must be (a) rationally based on the witness's perception; (b) helpful to the jury in understanding the witness's testimony or to a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Liew's interpretation of the only chat cited by the government, GX 38, fails on all three counts—it is not rationally based on his perception, his opinions will be of no assistance to the jury, and his interpretation of the chat could only be based on specialized knowledge about precious metals trading.

GX 38 is an electronic chat involving Mr. Vorley and another trader, Patrick Cornish, on June 26, 2007, more than two years before Liew began working at Deutsche Bank. Ex. A, GX 38.[2] Taking two lines of a chat completely out of context, the government writes that "another Deutsche Bank trader told Mr. Vorley, 'I hate electronic trading,' and Mr. Vorley responded, 'easy to manipulate,'" and the government "anticipates that Liew will testify that he understood Mr. Vorley to mean that markets with electronic trading were susceptible to manipulation through deceptive techniques like spoofing." Gov't Mot. 3.

But the context—omitted by the government—is important. In the chat, at 2:31:55, Mr. Cornish wrote, "all the pukes front run any size on the board don't thye." Twenty-one seconds

---

[1] The defendants have separately moved to exclude Liew's interpretation of trading data as improper lay opinion testimony. *See* Defs.' Mot. *in Limine* to Preclude Improper Lay Opinion Testimony From David Liew (Dkt. 277).

[2] The same chat was cited in the government's *Santiago* proffer, and the defendants opposed its admission as a statement in furtherance of the alleged conspiracy. *See* Defs.' Opp. to the Gov't's Mot. for Preliminary Admission of Co-Conspirator Statements (Dkt. 268), at 20. As explained in the Opposition, this chat is inadmissible because it occurred prior to start of the alleged conspiracy and amounts to idle chatter to a coworker who is not alleged to be a part of the conspiracy. *Id.* Furthermore, reviewing the chat transcript, Mr. Vorley's remark "easy to manipulate" appears to reference other market participants who are manipulating the market by front running. *Id.*

later, Mr. Vorley wrote, "yep." And then ten seconds later, he wrote "easy to manipulate," finishing that exchange. Two seconds prior to Mr. Vorley writing, "easy to manipulate," Mr. Cornish started a new exchange, writing, "I hate electronic trading." To which Mr. Vorley responded seven seconds later, "Dont get me started." Eleven seconds after that, Mr. Vorley wrote, "I would use the floor if i still could," completing this later exchange.

As can be seen from the full chat, the nature of electronic chat messaging is that responses are sometimes delayed, and the messages can overlap as a result. Mr. Vorley wrote "easy to manipulate," not in response to Mr. Cornish's statement about "electronic trading," but in response to Mr. Cornish's statements about "pukes" who "front run any size on the board," referring to manipulation by other traders. His response to Mr. Cornish's comment, "I hate electronic trading" comes later, when Mr. Vorley wrote, "Dont get me started … I would use the floor if i still could." By focusing on Mr. Vorley's statement "easy to manipulate," both the government (and apparently Liew) have missed the forest for the trees, erroneously assuming that Mr. Vorley responded instantaneously, rather than in keeping with the pace of the back and forth demonstrated, where there are several seconds before responses and responses are broken up over multiple entries.

While the government can certainly argue to the jury for its preferred interpretation of this type of chat, Liew has no personal knowledge that would allow him to testify as to its meaning. Nor would his interpretation be helpful to the jury, which can read the chat for itself. The only possible basis for him to opine on the meaning of this chat would be some specialized knowledge of precious metals trading beyond what a layperson would understand, but then it would not be admissible as lay testimony under Rule 701.

The circumstances in which a lay witness can provide testimony about matters he has not personally observed are limited and provide no support for the notion that Liew should be able to

interpret the chat evidence here. In *United States v. Mendiola*, 707 F.3d 735 (7th Cir. 2013) (cited at Gov't Mot. 1-2), a DEA linguist was permitted to offer her lay opinion as to the identity of a voice on a phone after first listening to and translating a series of related phone calls for the jury, and comparing the voice to an exemplar. The court explained that this testimony was permitted under Rule 901(b)(5), the standard for authenticating a speaker's voice in an audio recording and was not persuaded by the defendant's argument that such voice identification was an improper lay opinion simply because she was not a participant on the phone call. *See id.* at 741 ("[T]he specific rule governing voice identification—Rule 901(b)(5)—clearly contemplates that the interaction leading to identification might not be in person[.]"). Here, Liew is not merely being asked to identify who participated in chats but to offer his interpretation of the substantive meaning of the chats—something the witness in *Mendiola* was never permitted to do.

In *United States v. Saulter*, 60 F.3d 270 (7th Cir. 1995) (cited at Gov't Mot. 2), the Seventh Circuit held that the trial court did not abuse its discretion by allowing a former drug dealer to testify as to "the meaning of certain words" in a conversation he was not a part of, where the witness had knowledge of those specific terms and phrases from his time as a drug dealer and as a member of the same drug dealing organization as one of the defendants. *Id.* at 276. The court reasoned that the testimony was no different than a federal agent testifying as to the meaning of certain "drug phrases." *Id.* Here, however, Liew is not merely being asked to define terms of art used during his time as a precious metals trader but to interpret the meaning of conversations as many as two years earlier, when he was still in college. Indeed, in the government's own example, Liew would opine that Mr. Vorley's statement "easy to manipulate" somehow demonstrates his knowledge of "deceptive trading techniques like spoofing." Nothing about Liew's interactions with Mr. Vorley more than two years after this chat provides any basis for him to provide his

(mistaken) interpretation of what Mr. Vorley meant in this chat, which does not mention or have anything to do with spoofing.

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) (cited at Gov't Mot. 2), illustrates the difference between permissible lay opinion testimony and what the government seeks to introduce through Liew. There, the Seventh Circuit explained why an affidavit of a party was sufficient to defeat summary judgment. The Court wrote that "although personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. *They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.*'" *Id.* at 772 (emphasis added) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)). Liew's testimony about matters two years remote from his employment at Deutsche Bank—when he was still a student— would inevitably be speculative.

Finally, the government contends that Liew's chat interpretations need not meet the heightened requirements for expert testimony under Rule 702. Gov't Mot. 3. But that assumes that the witness has personal knowledge in the first place. For instance, in *United States v. Oriedo*, 498 F.3d 593 (7th Cir. 2007) (cited at Gov't Mot. 4), an officer was permitted to provide lay opinion testimony even though his "specialized knowledge informed his mental state" at that time. *Id.* at 602. The Seventh Circuit held that this was not expert testimony because he was "report[ing] his state of mind and his observations on the day in question" and he did not "offer an explicit opinion" that would have required expertise. *Id.* Here, Liew is not being called to offer his state of mind or to recall his observations from the date of certain chats. The only possible basis for his "interpretation" of chats in which he did not participate is his relatively brief experience working as a precious metals trader from December 2009 to February 2012. The government's motion to

admit Liew's lay opinions about chat communications by other traders in which he did not participate should be denied.

**B.      Evidence of Defendants' Compensation Should Be Excluded.**

Nowhere in its motion does the government advance a plausible reason for telling the jury how much money the defendants made at Deutsche Bank. To the contrary, any points the government wishes to make at trial can be made without introducing the actual dollar value of the defendants' compensation.

First, the government suggests that defendants' total compensation "establish[es] the defendants' motive and intent to participate in a market manipulation scheme" because "this level of compensation . . . provided strong incentives for defendants to keep their jobs." Gov't Mot. 5. Courts have rejected the inference that a well-paid person is more likely than a poorer one to participate in a crime. *See United States v. Mitchell*, 172 F.3d 1104, 1108-09 (9th Cir. 1999) ("A rich man's greed is as much a motive to steal as a poor man's poverty . . . . [I]t is in anyone's interest to be richer rather than poorer."). And even if the Court allowed the government to make such a dubious suggestion, the government could do so without introducing into evidence the defendants' total pay (for example, by adducing testimony that the defendants were experienced traders at a well-respected global bank).

The cases cited by the government do not dictate otherwise. *See* Gov't Mot. 5-6. In *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006), for example, the defendant—who managed 400 employees and led an entire department of his firm—was charged with obstructing a federal investigation that threatened to derail his firm's entire capital markets business. *Id.* at 161-62. There, a clear link existed between the defendant's compensation as a senior executive and his incentive to avoid the serious reputational damages to himself and his department that would stem from the investigation if he did not attempt to obstruct it. *Id.* at 187. No such link exists here. The

government purports to connect the defendants' alleged "motive" to commit fraud—"keep[ing] their jobs"—with their total compensation. Gov't Mot. 5. But there is no indication that profits from individual trades had any material impact on their job security, let alone that they risked losing their jobs if they did *not* engage in fraud. Such an argument would defy common sense.[3]

Next, the government contends that evidence of the defendants' total compensation "tends to defeat the anticipated defense that traders' bonuses were unrelated to profitability" because "a bank would not pay an employee huge amounts of money to do things that did not directly help the bottom line." Gov't Mot. 6. As an initial matter, this argument is premature because the defendants have not indicated that they will argue that the traders' bonuses were wholly unrelated to profitability. And in any event, this argument wrongly assumes that evidence of *all* trading profits is relevant as long as such profits factor into the bonus calculus. Courts have made clear, however, that evidence regarding defendants' compensation is only relevant to the extent the government can connect it directly to profits *from the charged offenses*. *See* Defs.' Mot. 6, Dkt. 279 (collecting cases). To the extent profitability factored into the defendants' bonuses, the profits to Deutsche Bank from any given trade (or even all the trades the government intends to offer in summary fashion) would be miniscule compared to the annual profits generated for Deutsche Bank by the defendants, and the impact of any given profit on the defendants' bonuses would be impossible to measure.

Finally, the government argues that evidence of the defendants' total compensation is admissible to establish that they were more senior and sophisticated traders than the government's cooperating witness, David Liew. Gov't Mot. 6. But such evidence is unnecessary to prove that

---

[3] Neither of the other cases cited by government endorse the admission of compensation numbers to show motive. *See* Gov't Mot. 5-6.

simple and undisputed fact, particularly where the defendants do not intend to suggest that Liew is "cooperating down" as part of their defense. *See id.* To the extent the government seeks to establish that the defendants were more experienced and sophisticated traders than Liew, it can do so through more direct means, such as by eliciting testimony from Liew and other Deutsche Bank witnesses. There is absolutely no need to introduce the total amount of defendants' compensation for this purpose.

For similar reasons, the government should be precluded from arguing or presenting evidence purporting to link the defendants' profits from trades to their bonuses. Gov't Mot. 7. As the government concedes, "the traders on Deutsche Bank's precious metals desk did ***not*** receive a fixed percentage of their profits," but rather "their bonuses were determined by several factors." *Id.* (emphasis added). As discussed above, to the extent profits from individual trades somehow factored into the bonus calculus, the impact of any given profit on the defendants' bonuses would be diluted and impossible to calculate. Such evidence therefore has no probative value.

The government's claim that "[a]ny potential prejudice resulting from introduction of the defendants' compensation is far outweighed by its probative value," Gov't Mot. 8, ignores the vast weight of authority excluding compensation evidence on Rule 403 grounds. *See* Defs.' Mot. 8-9 (collecting cases). Even with a limiting instruction, compensation evidence would undoubtedly "play[] into a bias against people of wealth," *see United States v. Cassese*, 290 F. Supp. 2d 443, 457 (S.D.N.Y. 2003), and trigger unwanted negative associations on the part of certain jurors that would infect their view of the evidence, *see United States v. Bradley*, 644 F.3d 1213, 1271 (11th Cir. 2011). Accordingly, and for the reasons set forth in the defendants' motion, evidence of the defendants' compensation should be excluded. *See* Defs.' Mot. 6-9.

C.      **The Government's Motion to Admit the CFTC Settlement Should Be Denied as Moot.**

The parties have now agreed to stipulate that, if the scheme or conspiracy alleged in the Superseding Indictment is proven beyond a reasonable doubt, then it would have affected Deutsche Bank, including for purposes of 18 U.S.C. §§ 1343, 1349, and 3293(2), and the government has agreed not to introduce any evidence (other than the stipulation itself) for the purpose of proving that the alleged conspiracy and scheme affected Deutsche Bank, including but not limited to the CFTC settlement or any other evidence of the $30 million fine paid to the CFTC. The government's motion to admit the CFTC settlement should be denied as moot.

## II.     THE GOVERNMENT'S MOTIONS TO EXCLUDE EVIDENCE SHOULD BE DENIED.

A.      **Evidence Regarding the Government's Selection Criteria Is Admissible.**

Defendants are entitled to present evidence that the government's methodology for identifying trading sequences allegedly indicative of spoofing led the government and its witnesses to misinterpret the trading data. The Court's order directing the disclosure of the government's selection criteria recognized that the potential value of the selection criteria to defendants would be to assesses whether it "systematically included, or excluded, information that would potentially be relevant to a determination of whether a particular trading episode was fraudulent." Dkt. 158 at 4. That is exactly what defendants plan to do here—ferret out the impact of the government's selection criteria on it findings, so that the jury may give any related evidence the proper weight.

The government argues that its selection criteria are not relevant because the criteria are both under and over-inclusive and the actual "episodes" the government will introduce into evidence at trial were selected by prosecutors using their subjective judgment. Gov't Mot. 11. But this is misleading. The selection criteria were used to identify all of the 61 episodes—they are a subset of the larger group chosen by the selection criteria—with the exception of a few episodes

that may have been selected based on contemporaneous electronic chats. The government's expert then examined the 61 episodes—a group the government chose and provided to him because they fit its spoofing theory—and "found" that they included indicia of spoofing. The expert then extracted certain characteristics found within the 61 cherry-picked episodes, searched to see if they existed elsewhere in the data, and used that as a basis for a conclusion that the conduct in the episodes occurred elsewhere. This backwards process necessarily excluded data that undermines the government's theory—an error that began with the government's selection criteria, was amplified by its provision of a subset of those episodes to its expert to confirm its conclusions, and amplified further by the expert's unreliable methodology. *See* Defs.' Mot. to Exclude Expert Testimony of Kumar Venkataraman, Dkt. 276.

As the defendants will show at trial, the government's initial selection criteria, which systematically included only those trading sequences where the defendants placed visible orders opposite iceberg orders and then cancelled the visible orders (and excluded those trading sequences where the visible orders were executed and the iceberg orders cancelled),skewed the government's analysis toward its favored conclusion, whereas an unbiased examination of their trading on both sides of the market would show that the government's conclusions are wrong. For example, as a result of the government's selection criteria, the 61 episodes all involve placement of a fully-visible order opposite an iceberg order, execution of the iceberg order, and cancellation of the fully-visible order. And the government will argue that the iceberg was the primary order and the fully-visible order was fraudulent. An unbiased analysis of *all the instances* when the defendants placed fully-visible orders opposite iceberg orders, however, demonstrates *a much higher rate of execution on the fully-visible order and a lower rate for the iceberg order* than the government's cherry picked episodes. The fact that the iceberg always executes and the fully-visible order always cancels in

the 61 episodes and in the other instances identified working backwards from the 61 episodes is merely an artifact of the government's selection criteria.

The government suggests that "the defendants intend to find a benign-seeming sequence that satisfies the government's initial selection criteria and argue to the jury—wrongly and misleadingly—that if an episode fitting the initial selection criteria does not amount to a crime, then the entire prosecution is flawed." Gov't Mot. 13. That is not what the defendants will argue. The problem with the selection criteria is that it introduced a bias into the government's analysis of the trading data. The defendants are entitled to explain that to the jury. *Cf. Walker v. Soo Line R. Co*., 208 F.3d 581, 591 (7th Cir. 2000) ("If there was evidence that Tower A was unsafe that Denbrock should have considered but did not, or if there was reason to believe that Denbrock's investigation was shoddy, Mr. Walker could have uncovered those flaws through cross-examination and through the presentation of contrary evidence.").

**B.      Argument that the 61 Trial Episodes Were *De Minimis* Is Permissible.**

The government has suggested throughout this case that the defendants had a motive to defraud others in order to inflate the P&L of Deutsche Bank's precious metals desk, which in turn could somehow affect their variable compensation at the end of the year. As the government concedes, the defendants are entitled to show that the alleged profits earned from each episode, typically between $20-200, was *de minimis* in comparison to tens or even hundreds of millions of dollars in P&L in order to demonstrate the absence of such a motive. Gov't Mot. 15. Contrary to the government's suggestion, *id.*, the defendants do not plan to invite jury nullification by arguing that the alleged profits or losses were *de minimis*. They will simply argue the government's claim that such negligible profits could serve as a motive is absurd and misguided (which it is). The government's motion should therefore be denied as moot.

## C. Argument Regarding Prosecution Decisions Is Permissible.

Defendants do not intend to introduce *evidence* regarding alleged prosecutorial misconduct raised in its Motion to Compel *Brady* and Rule 16 Discovery, Dkt. 171. Defendants should be permitted to present *argument* regarding prosecution decisions, however, insofar as it supports their trial defense that the government overreached to charge the defendants with wire fraud affecting a financial institution. The defendants' core task at trial is to rebut the government's theory that they committed wire fraud. As this Court is aware, the charges are a poor fit for the alleged conduct, requiring the prosecution to show an implied misrepresentation in anonymous electronic market via orders that on their face convey solely the type of metal, quantity, price and direction (buy or sell). Defendants anticipate that their market experts will testify that such a showing cannot be made because no such implied representation exists. *See, e.g.*, Ex. B, Defs.' Expert Discls., Mar. 31, 2012, at 2 ("[Jerry Markham] is . . . expected to testify that bids and offers on commodity futures exchanges, where the overwhelming majority of orders are cancelled quickly, do not carry any representations about a trader's intent or implied representations about supply and demand."). Defendants should be allowed to supplement such testimony with argument that the prosecutors shoehorned a putative spoofing case into a wire fraud charge to circumvent the five-year statute of limitations applicable to spoofing charges. Such an argument will provide important context for a defense theme that the crime charged does not fit the facts, and that the prosecution is asking the jury to stretch to make a finding well beyond what those facts will bear. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (defense was entitled to attack the "thoroughness and even the good faith of the investigation"); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant. . . ."); *Lindsey v. King*, 769 F.2d 1034,

-12-

1042 (5th Cir. 1985) (reversing defendant's conviction based on suppression of evidence that would have been "discrediting, in some degree, of the police methods employed in assembling the case against him.").

### D. Evidence of Victim-Witnesses' Overall Trading Successes Is Admissible.

Evidence of the victim-witnesses' profitability is highly probative of the defendants' intent. The defense anticipates that the government will offer testimony from these so-called "victim-witnesses" to prove that the defendants "intended to create and communicate false and misleading information regarding supply or demand . . . in order *to deceive other traders*." Superseding Indictment, Dkt. 127, ¶ 5 (emphasis added). "[C]ourts have held repeatedly that loss is relevant in fraud cases to demonstrate a defendant's knowledge or intent to commit fraud." *United States v. Munoz-Franco*, 487 F.3d 25, 62 (1st Cir. 2007); *see also United States v. Harvey*, 959 F.2d 1371, 1374 (7th Cir. 1992) ("Proof that someone was victimized by the fraud [may be] evidence of the schemer's intent.").

But the converse is also true: proof that an alleged victim did not in fact suffer a loss may negate any inference of fraudulent intent. *See United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983) ("[W]hen the contested issue [in a fraud case] is intent, whether *or not* victims lost money can be a substantial factor in a jury's determination of guilt or innocence.") (emphasis added). Thus, "to the extent that the [g]overnment uses victim testimony to prove intent, [a defendant] may cross-examine witnesses about whether they were actually 'misled or defrauded' or 'got the benefit of their bargains.'" Mem. Op. & Order, *United States v. Coscia*, No. 14-cr-00551 (N.D. Ill. Oct. 19, 2015), Dkt. 67 at 4 (allowing the defendant to introduce evidence of the victim-witnesses' profits on cross-examination in a recent spoofing trial).

Against this backdrop, defendants intend to introduce evidence of the victim-witnesses'

profits on the trading days at issue not, as the government suggests, to assert a "no harm, no foul" defense, but rather to counter any notion that the defendants' counterparties were defrauded, and thus any implication that the defendants intended to defraud them. *See* Gov't Mot. 18. Evidence of the victim-witnesses' profits from other trading days is likewise relevant to place any losses into context and show that the defendants' trading had no material impact on the witnesses' overall success. Such evidence fits squarely within the scope of proper cross-examination, which "may be used to develop all circumstances within the knowledge of witness[es] which explain, qualify, discredit or destroy [their] direct testimony." *U.S. ex rel. Humphrey v. Roth*, No. 91-cv-1350, 1991 WL 259494, at *6 (N.D. Ill. Dec. 3, 1991). For those reasons, the Court should allow evidence of the victim-witnesses' overall trading successes.

### E. Evidence of Misconduct of Non-Coconspirators Is Admissible.

The government seeks to preclude evidence of non-coconspirators' misconduct as "irrelevant to the issue" of whether the defendants engaged in criminal misconduct. Gov't Mot. 19. This argument ignores the critical relevance of such evidence to the defendants' case. The defendants do not seek to introduce such evidence to support an "'everybody-is-doing-it defense," as the government suggests, but rather to show that the defendants' trading strategies were entirely legitimate and not indicative of their fraudulent intent. *See* Gov't Mot. 19.

Because wire fraud is a specific intent crime, the defendants generally are "entitled to introduce evidence of good faith or absence of intent to defraud." *United States v. Warner*, 498 F.3d 666, 691 (7th Cir. 2007) (citing *United States v. Longfellow*, 43 F.3d 318, 321 (7th Cir. 1994)). As this Court has acknowledged, "whether the defendants ***intended to defraud*** other market participants" is a "vigorously contested" question of fact to be "resolved at trial." Dkt. 119 at 37 (emphasis added). Where, as here, a defendant's good faith is at issue, "since it may be only

inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it may have." *United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (citing *United States v. Brandt*, 196 F.2d 653, 657 (2d. Cir. 1952)); *United States v. English*, 785 F.3d 1052, 1056 (6th Cir. 2015) (probative value of evidence of intent is great when intent to defraud is a decisive issue in the case).

The government intends to introduce expert testimony—over the defendants' strenuous objections—that "the defendants' use of resting, non-iceberg orders of certain types and sizes is consistent with spoofing, and inconsistent with legitimate trading activity." *See* Ex. C, Gov't Supp. Expert Discls., Feb. 12, 2012, at 2 (Venkataraman). The government will seek to prove this assertion, along with the defendants' allegedly fraudulent intent, by offering evidence of the presence of certain characteristics in their trading activity, which the government will argue are hallmarks of fraud. Defendants intend to rebut these arguments by introducing evidence that these characteristics were in fact common and routine in the market and therefore not indicative of fraudulent intent. Analyses and examples of the trading patterns of other market participants, particularly of those counterparties who will testify as so-called "victims" in this case, are an entirely permissible vehicle for the defense to do this. *See e.g.*, *Brandt*, 196 F.2d at 657 ("The fact that other charities hired professional fundraisers certainly indicates that the idea was not a new one with appellants in view of their long associations with such organizations and their familiarity with generally accepted operational practices in fund raising.").

In fact, in the two recent spoofing cases that went to trial, *United States v. Coscia*, No. 14-cr-551 (N.D. Ill.) and *United States v. Flotron*, No. 17-cr-220 (D. Conn.), both sides relied on comparisons between the defendants' trading activity and the trading activity of other participants

in the futures market in part as evidence of the defendants' intent. *See Coscia*, Trial Tr., Dkt. 92 at 1447 (Government: "[D]efendant's trading is not normal. It's not routine compared to other traders."); *id.* at 1517 (Defense: "[The defendant's] large orders were filled more than any -- by other traders."); *Flotron*, Trial Tr., Dkt. 234 at 1373 (Defense: "[The defendant] canceled less than the rest of the market."). These cases make clear that the trading activity of other market participants is admissible, and the government has offered no compelling reason for this Court to deviate from this precedent.

> **F.     The Government's Motion to Exclude Evidence About Deutsche Bank Market Surveillance Programs Should Be Denied as Moot.**

Defendants do not intend to cross-examine any Deutsche Bank representative, or otherwise introduce evidence, as to whether Deutsche Bank's surveillance systems flagged and/or cleared any of the defendants' trading. *See* Gov't Mot. 20. Accordingly, the government's motion to exclude evidence about Deutsche Bank's market surveillance programs should be denied as moot.

> **G.     Fee Arrangement Evidence for Testifying Witnesses Is Admissible.**

On March 19, 2020, the government disclosed that it has paid an economic consulting firm, the Analysis Group, Inc. ("AGI"), $5,821,309 over a five-year period for its work analyzing trading data "relating to various spoofing, fraud, and commodities manipulation investigations [,]" including $656,746 in fees related to this case. Ex. D, Vendor Payment Disclosure Letter, Mar. 19, 2020, at 1. The government anticipated that it would continue to make payments to AGI "between now and trial" and stated that a likely witnesses from AGI, Samir Warty, did not have knowledge about payments to AGI. *Id.* at 2. The government now "seeks to preclude evidence or examination of both how much AGI has been paid in this case and of AGI's broader work and billing to the Department of Justice." Gov't Mot. 23. The motion should be denied.

In addition to Mr. Warty (or Maria Garibotti, whom the government recently stated may

testify in his place), the government's witness list also includes another AGI employee, Lisa Pinheiro, and its expert witness Kumar Venkataraman who secures expert witness assignments through AGI (including, presumably, his assignment for this case[4]).

Defendants' have a Sixth Amendment right to question witnesses employed by or affiliated with AGI about the financial relationship between the government and AGI and to elicit evidence of the payments to AGI in order to expose bias that could lead the witnesses—consciously or unconsciously—to slant their testimony in favor of the government. *See Davis v. Alaska*, 415 U.S. 308, 315, 318 (1974) (exposing witness bias is at the core of the Sixth Amendment); *United States v. Martin*, 618 F.3d 705, 727 (7th Cir. 2010) (understanding a "relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony" is proper); *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C. Cir. 1976) ("Bias is never classified as a collateral matter which lies beyond the scope of inquiry[.]").

The government has made its relationship with AGI relevant by choosing to call related witnesses, thereby putting at issue whether they have a motive to align their testimony with the government. *See Abernathy v. E. Illinois R.R. Co.*, 940 F.3d 982, 992 (7th Cir. 2019) ("[C]hoosing to call an expert witness with economic ties to ADM, the Railroad made its parent-subsidiary relationship with ADM relevant to show potential bias[.]"); *Majestic v. Louisville & N.R. Co.*, 147 F.2d 621, 627 (6th Cir. 1945) (same). Questioning witnesses regarding potential bias is entirely proper where an organization, and not the individual witness, has the relevant relationship. *See Townsend v. Benya*, 287 F.Supp.2d 868, 876 (N.D. Ill. 2003) ("[A] party's and a witness's common group membership is probative of bias[.]"); *Cooper v. Dailey*, No. 07 C 2144, 2012 WL 1748150,

---

[4] This fact has not been disclosed by the government. The inference stems from a review of Professor Venkataraman's CV, which notes that he performs expert and consulting work for AGI.

at *4 (N.D. Ill. May 16, 2012) (questioning bias based on loyalty is appropriate).

The government argues that it would be inappropriate to question witnesses about payments as to which they are not aware. But the defendants do not have to take the government's word for it. *See Abernathy*, 940 F.3d at 992 (permitting questioning about the witness's employer's parent company to expose potential bias despite the witness not knowing who the parent company was).[5] Even if the AGI witnesses do not know the precise amounts paid by the government to AGI, the defendants are entitled to probe what they know about (a) the government's relationship with AGI, (b) its significance to AGI, including the fact that AGI has been paid almost $6 million in fees by the government, and (c) AGI's significance to the witnesses themselves, in order to argue based on this evidence that the AGI witnesses—three of 12 witnesses the government intends to call—are biased. Moreover, even if the AGI witnesses were to disclaim any knowledge of the financial relationship between AGI and the government, such a response could itself call into question their credibility, where the company has been working so closely with the government for years. Eliciting such evidence would not be unduly prejudicial. *See United States v. Williams*, 954 F.2d 668, 672 (11th Cir. 1992) ("If the amount paid . . . is felt by the government to be too prejudicial . . . the solution is for the government to make reasonable payments . . . not for the court to rule the evidence irrelevant as too prejudicial. The large and outrageous payments may be just the kind that are of the most help to the jury in arriving at the truth."). For the foregoing reasons, the government's motion to exclude evidence of its payments to AGI should be denied.

---

[5] The government cites two cases involving undisclosed plea agreements for the proposition that it would be "improper and unfairly prejudicial" to question a witness regarding a fact of which he was unaware. Gov't Mot. 23 (citing *Williams v. Scott*, 35 F.3d 159, 162 (5th Cir. 1994); *Willhoite v. Vasquez*, 921 F.2d 247, 249 (9th Cir. 1990). In both cases the courts found that questioning the witness about the agreements would not have had a material impact on the trial, not that questioning would have been "improper and unfairly prejudicial."

**H.      Evidence Relating to Attorney Proffer Is Admissible.**

The government moves to preclude the introduction of testimonial and documentary evidence relating to two attorney proffers that David Liew's lawyer, Neil MacBride of Davis Polk, made to the DOJ in 2016, in advance of Liew's first meeting with prosecutors.  Gov't Mot. 24. Records reflecting statements made at the attorney proffers have been produced both by the DOJ and Davis Polk.  The government asserts that the attorney proffer statements may not be admitted as "substantive evidence or for the purposes of impeachment even assuming, for the sake argument only, that Liew provides inconsistent evidence at trial."  *Id.* at 25.  But, as the defendants explained in their opposition to the government's motion to quash their subpoena to Davis Polk, Dkt. 247 at 8-9, the attorney proffer statements are admissible for reasons other than impeachment of Liew. They are relevant because they show Liew's motivation to provide evidence against his former colleagues at Deutsche Bank that conformed to the government's theory, and they show that the government ignored information provided by Liew's lawyers that was inconvenient and exculpatory.  Dkt. 247 at 8-9 (citing *Kyles v. Whitley*, 514 U.S. 419, 443-46 (1995)).

The way the government uses cooperators has a tendency to produce testimony increasingly favorable to the government over time.  *See id.* at 8 n.1.  Here, the records from the attorney proffers demonstrate that Liew initially sought "immunity" for crimes committed with a trader at UBS named Mike Chan and offered to cooperate with the government's investigation of his former colleagues at Deutsche Bank.  At the same time, the attorneys made clear that it never occurred to Liew while he was working at Deutsche Bank that the conduct he now describes as spoofing and wire fraud was improper.  The defendants are entitled to present this evidence to the jury to demonstrate the unreliability of the government's evidence.  The evidence is admissible regardless of the truth of the matters asserted by Liew's attorneys or whether Liew could be

impeached with his attorney's statements.[6] The government's motion should therefore be denied.

## CONCLUSION

For the foregoing reasons, the government's omnibus motions *in limine* should be

DENIED.

Dated: August 25, 2020                                    Respectfully submitted,

                                                          */s/ Michael G. McGovern*
                                                          Michael G. McGovern
                                                          Helen Gugel
                                                          Ropes & Gray LLP
                                                          1211 Avenue of the Americas
                                                          New York, NY 10036
                                                          Phone: (212) 841-8860
                                                          Michael.McGovern@ropesgray.com
                                                          Helen.Gugel@ropesgray.com

                                                          Aaron Katz
                                                          Katherine McDonald
                                                          Ropes & Gray LLP
                                                          800 Boylston Street
                                                          Boston, MA 02199
                                                          Phone: (617) 951-7117
                                                          Aaron.Katz@ropesgray.com

                                                          *Attorneys for Defendant*
                                                          *Cedric Chanu*

                                                          */s/ Roger A. Burlingame*
                                                          Roger A. Burlingame
                                                          Matthew L. Mazur
                                                          Lauren A. Bowman
                                                          Dechert LLP
                                                          160 Queen Victoria Street
                                                          London EC4V 4QQ
                                                          United Kingdom
                                                          Phone: +44 20 7184 7333
                                                          Roger.Burlingame@dechert.com

---

[6] The relevant portions of the notes themselves should be admissible for the non-hearsay purpose of demonstrating Liew's bias and the government's disregard of exculpatory evidence, if not for the truth of the matters asserted. However, the defendants have also listed Mr. MacBride on their witness list in the event that the notes themselves were to be deemed inadmissible hearsay.

Matthew.Mazur@dechert.com

Christopher S. Burrichter
Dechert LLP
35 W. Wacker Drive
Suite 3400
Chicago, IL 60601
Phone: (312) 646-5800
Christopher.Burrichter@dechert.com

*Attorneys for Defendant James Vorley*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 25th day of August 2020, I filed the foregoing

document using the CM/ECF system, which automatically sends notice and a copy of the filing to

all counsel of record.

*/s/ Michael G. McGovern*
Michael G. McGovern