**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) No. 18 Cr. 35 (Tharp, J.) <br> ) <br> ) |
| JAMES VORLEY and CEDRIC CHANU, | ) <br> ) |
| Defendants. | ) <br> ) |

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S**
**MOTION TO EXCLUDE EXPERT TESTIMONY**

Defendants James Vorley and Cedric Chanu respectfully submit this opposition to the Government's Motion to Exclude Expert Testimony (Dkt. 278) (the "Motion").

**PRELIMINARY STATEMENT**

The defendants expect to present testimony by three experts: Professor Jerry Markham, the author of multiple books and articles on the history of commodities markets and regulation and a former chief counsel of the CFTC's enforcement division; Ray Keenan, who traded and supervised precious metals trading for 33 years at several major financial institutions; and Dr. Jamie Walton, a former quantitative trader who has developed a high frequency trading platform from scratch, teaches financial mathematics to undergraduate and graduate students, as well as courses on electronic trading to professional traders and compliance professionals, and runs a firm that conducts market surveillance. The defendants disclosed these experts to the government on March 21, 2020. Ex. A, Def's Expert Disclosures, Mar. 21, 2020. Since that time, the defendants have made several supplemental disclosures, including various analyses of trading data by Dr. Walton and a Chicago-based economic consulting firm, Compass Lexecon.

The government seeks to exclude portions of Professor Markham's and Mr. Keenan's testimony and to exclude Dr. Walton's testimony or, alternatively, require further disclosures. But the Motion badly mischaracterizes the expected testimony and the defendants' disclosures. Indeed, the government fails entirely to mention the defendants' disclosure of Dr. Walton's 23-page analyses on July 31, 2020, or to suggest any reason why it has failed to meet and confer on the disclosure issue as proposed by the defendants and as required by Local Rule 37.2. Contrary to the government's arguments, Professor Markham and Mr. Keenan's opinions are admissible, and Dr. Walton's expected testimony has been properly disclosed.

## ARGUMENT

**I. PROFESSOR MARKHAM'S TESTIMONY ON THE HISTORY OF COMMODITY TRADING AND REGULATION IS BOTH RELEVANT AND ADMISSIBLE**

**A. Professor Markham's Qualifications**

Professor Markham is the foremost authority in the United States on the history of commodities markets and regulation. His curriculum vitae, disclosed to the government on March 21, 2020, sets forth his decades of professional experience. *See* Ex. B, Markham Curriculum Vitae. Among other things, he has authored or co-authored 17 books on financial markets, their history and regulation, including *The History of Commodity Futures Trading and Its Regulation* (1987), cited by the United States Supreme Court in *Dunn v. Commodity Futures Trading Commission*, 519 U.S. 465 (1997). *See* Ex. C.[1] He has also authored or co-authored dozens of articles on commodities futures trading and regulation. *Id.* Professor Markham has worked in government for the SEC, the Chicago Board Options Exchange, and as Chief Counsel for the

---

[1] Professor Markham's publication list is linked to his Florida International University School of Law faculty website. *See* Ex. C, Publication List, *available at* https://law.fiu.edu/wp-content/uploads/sites/2/2019/10/Markham-cv-10-01-19.pdf (last visited Aug. 17, 2020).

Division of Enforcement at the CFTC, and for years he has taught courses on commodities futures regulation at Georgetown University Law Center, the University of North Carolina School of Law, and now at Florida International University College of Law. Ex. B.

### B. Professor Markham's Opinions

In their March 21, 2020 expert disclosure letter, the defendants summarized Professor Markham's expected testimony "based on his extensive research and experience in financial markets." Ex. A at 2. He is expected to testify "about the evolution of the commodity futures markets, including the transition from 'open outcry' markets to electronic platforms dominated by high-frequency traders who enter and cancel orders in milliseconds; different types of participants in the market (such as hedgers, speculators, and market-makers); and the role of Designated Contract Markets (such as the CME, COMEX and NYMEX)." *Id.* In addition, Professor Markham will offer the following opinions:

- "[T]rading is a competitive activity in which the participants actively and legitimately conceal their intentions and strategies from other participants." *Id.*;

- "[C]oncealment and deception have been integral to commodity and futures markets since their inception." *Id.*;

- "[T]he term 'spoofing' has been used to describe various different activities." *Id.*;

- "[T]here are many legitimate trading strategies that involve placement of orders coupled with the intent to cancel before execution." *Id.*;

- "[M]arket participants know that an order may be cancelled at any time … and it would be unreasonable for any market participant to assume that an order will remain on the market for any length of time." *Id.*; and

- "[B]ids and offers on commodity futures exchanges, where the overwhelming majority of orders are cancelled quickly, do not carry any representations about a trader's intent or implied representations about supply and demand." *Id.*

Three weeks after this disclosure, on April 14, 2020, the defendants provided additional explanation of the bases and reasons for these opinions by referring the government to Professor

3

Markham's *amicus* brief to the United States Supreme Court in *Coscia v. United States*. *See* Ex. D, Def's Supp. Expert Disclosures, Apr. 14, 2020; Ex. E, *Coscia v. United States*, Brief for *Amici Curiae* Jerry W. Markham and Ronald H. Filler In Support of the Petitioner ("Amicus Brief").

      **C.**      **Professor Markham's Testimony Is Relevant And Admissible**

The government moves to exclude three portions of Professor Markham's testimony. First, the government seeks to exclude Professor Markham's opinion that "[b]ids and offers on commodity futures exchanges … do not carry any representations about a trader's intent or implied representations about supply and demand." Mot. 6. The government argues that Professor Markham should not be allowed to offer this opinion because he has not worked as a trader, researched the economics of trading, or analyzed trading data. *Id.* at 7. But Professor Markham's opinions are based on his extensive knowledge of commodities futures trading and regulation.

The meaning of a bid or offer on the COMEX and NYMEX exchanges will be a key "question of fact" for the jury, as this Court previously recognized:

> What, if anything, beyond commodity, price, and quantity an order conveys is plainly a question of fact and the defendants' arguments about whether their Spoofing Orders carried any implied misrepresentations are arguments about the sufficiency of the evidence that will be presented in the case…

Dkt. 119, Oct. 21, 2019 Order Mot. Dismiss at 29. Professor Markham's testimony—based on his specialized knowledge of the history of commodities trading—provides important context that will help the jury understand the evidence and determine a fact in issue. Fed. R. Evid. 702(a).

Professor Markham's opinions about "how traders perceive live orders" are not "*ipse dixit*," as the government contends. Mot. 7 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). In *Joiner*, the Supreme Court affirmed the exclusion of expert testimony as *ipse dixit* when the opinion was unsupported by any medical research or medical literature. *Joiner*, 522 U.S.

at 144-45.  Professor Markham's opinion, by contrast, is supported by decades of research on financial markets and trading and experience as a regulator.  *See* Ex. C; *see also* Ex. E at 17-21 (explaining why and how traders conceal their true intentions while trading).[2]

Second, the government moves to exclude Professor Markham's opinion that "There are many legitimate trading strategies that involve placement of orders coupled with the intent to cancel."  Mot. 6.  The government contends this is a baseless, irrelevant opinion that Professor Markham is unqualified to offer.  *Id.*  Professor Markham's Amicus Brief provides additional explanation, based on his specialized knowledge of commodity futures trading, in support of his opinion, including that commodities markets contain among other things, (1) limit orders, which market participants know may be cancelled at any time, (2) orders by speculators who intend to cancel, (3) HFT future orders that are cancelled well over 90% of the time, (4) orders by traders with pre-set cancellation instructions (such as fill-and-kill or fill-or-kill orders), and (5) orders entered by traders to test the market by "pinging" it.  *See* Amicus Brief at 12-14.  Professor Markham will testify these ordering practices are widespread in the commodities market, a fact that jurors must be allowed to weigh when interpreting "[w]hat, if anything… an order conveys." Dkt. 119, Oct. 21, 2019 Order Mot. Dismiss at 29.

The government is wrong to contend that Professor Markham is unqualified to opine that such strategies are "legitimate."  Mot. 8-9.  As discussed above, his testimony will be based on

---

[2] The government confuses the issue when it argues that Professor Markham's amicus position was "contrary to the law as defined by the Seventh Circuit." Mot. 7.  The Amicus Brief did dispute the Seventh Circuit's holding in *Coscia* concerning the validity of the Dodd-Frank anti-spoofing law, but this case is not about whether the defendants were spoofing as defined in Dodd-Frank. The government has charged the defendants under a wire fraud theory.  Professor Markham's opinions concerning the history of commodities trading, different trading strategies, and the meaning of an order placed on an electronic exchange have nothing to do with Dodd-Frank; they go directly to the question of whether the defendants engaged in a scheme to defraud involving a material misrepresentation.

years of research and scholarship, including work in the industry and ongoing teaching and writing on these subjects. Ex. B; Ex. C. He has ample knowledge and expertise about what trading strategies are considered legitimate and illegitimate. The government argues that testimony about legitimate trading strategies involving cancellations is irrelevant because this case "involves very different allegations." Mot. 9. But the existence of legitimate trading practices involving cancellations of orders will be critical for the jury to evaluate whether other market participants can be defrauded by such cancellations as the government contends.[3]

Finally, the government seeks to exclude Professor Markham's opinion that "Concealment and deception have been integral to commodity and futures markets since their inception." Mot. 6. In his Amicus Brief, Professor Markham explains that "illusions of market demand and the concealment of actual trading strategies of market participants has been an integral part of trading markets since their inception." Ex. E at 17-18. He further explains—with citations to several different sources—that many types of traders actively disguise their intentions using various techniques. *Id.* at 19. And he concludes by citing the example of Nathan Rothschild in the 1820s, who was known for "entering sell orders in the market in order to disguise and deceive other traders from discovering the fact that he actually was intending subsequently to engage in large purchases." *Id.* at 21 n.31. Like his other testimony, Professor Markham's opinions about these historical trading practices are based on his specialized knowledge and will assist the jury in

---

[3] Professor Markham will testify that commodities markets historically contain, among other things, (1) limit orders, which market participants know may be cancelled at any time, (2) orders by speculators who intend to cancel, (3) HFT future orders that are cancelled well over 90% of the time, (4) orders by traders with pre-set cancellation instructions (such as fill-and-kill or fill-or-kill orders), and (5) orders by traders quickly "pinging" the market. *See* Amicus Brief at 12-14. Professor Markham will testify these ordering practices are widespread in the commodities market, a fact that jurors must be allowed to weigh when interpreting "[w]hat, if anything… an order conveys." Dkt. 119, Oct. 21, 2019 Order Mot. Dismiss at 29.

determining whether the defendants' orders conveyed a material misrepresentation about their intent to trade or about supply and demand.

## II. RAYMOND KEENAN'S TESTIMONY ON PRECIOUS METALS TRADING IS RELEVANT AND ADMISSIBLE

Ray Keenan worked for 33 years as a trader and supervisor on the precious metals desks of several major financial institutions, including Sharps Pixley, Deutsche Bank, Dresdner Bank, and Prudential Financial. He also served as an elected Governor on the Board of the Commodity Exchange, Inc. ("COMEX"). Ex. F, Keenan Curriculum Vitae. Mr. Keenan's expected testimony—applying this background to put the government's evidence concerning defendants' trading in its proper context—is both relevant and admissible.

### A. Raymond Keenan's Opinions

In their March 21, 2020 expert disclosures, the defendants summarized Mr. Keenan's expected testimony:

- "[B]ackground facts concerning precious metals trading and markets," similar to the information he provided in *United States v. Flotron*, No. 17-cr-00220 (D. Conn.), a transcript of which was disclosed to the government. Ex. A at 1;

- "[T]he records of the defendants' trading in this case appear consistent with the legitimate precious metals trading he observed during his career." *Id.*; and

- "[G]iven the nature of precious metals trading at a large financial institution, significant additional information would be needed to determine the trading strategy behind orders and cancellations observable in the records, and there is no basis in the available evidence to form a reliable conclusion that the defendants intended to defraud other market participants." *Id.*

The defendants also included a copy of Mr. Keenan's expert testimony in *United States v. Flotron*, Ex. G, in which he testified about:

- What types of institutions buy and sell precious metals (*Id.* at 993:25-996:15);

- How orders are entered into the market (*Id.* at 996:17-1000:9);

- The role of client service and managing risks (*Id.* at 1000:10-1001:13);

7

- How the futures market works (*Id.* at 1003:24-1006:19);
- Order cancellation (*Id.* at 1038:7-1039:3); and
- What types of information traders review while trading (*Id.* at 1040-42).

In *Flotron*, Mr. Keenan also reviewed some of that defendant's trading episodes and interpreted the data on the screen for the jury, including his opinions as to what factors would have been relevant to a precious metals trader in the market at that time. *See, e.g.*, *id.* at 1051:11-1055:20.

  **B.** **Mr. Keenan's testimony is relevant and admissible, as it was in *United States v. Flotron***

The government does not object to Mr. Keenan's qualifications as an expert in precious metals trading or his background testimony on such trading. Instead, the government moves to exclude Mr. Keenan's opinion that "there is no basis in the available evidence to form a reliable conclusion that the defendants intended to defraud other market participants." Mot. 9. The government's objection that this opinion "embraces an ultimate issue" is misplaced. *Id.*

Rule 704(a) makes clear that "An opinion is not objectionable just because it embraces an ultimate issue," while Rule 704(b) adds a narrow exception that "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." By the plain language of the defendants' disclosure, Mr. Keenan is not offering testimony on the defendants' mental state. He is instead offering an opinion that it is impossible to determine a trader's mental state based solely on a review of tiny slices their trading data and snippets of their communications. As Mr. Keenan explained in *Flotron*, such evidence represents only a fraction of what the trader would have been seeing and doing. *See* Ex. G at 1052:15-25. His opinion that it is insufficient to determine a trader's mental state based on such evidence directly rebuts the government's attempt to do so—

in particular through the testimony of Professor Venkataraman, who has never traded in or even studied precious metals markets.

The government's reliance on *United States v. Brown*, 871 F.3d 532 (7th Cir. 2017) (cited at Mot. 9), is misguided. In *Brown*, the defendant was not permitted to offer expert testimony that he "acted reasonably under the circumstances," due to the lower court's concern that the testimony "came too close to the line drawn in Rule 704(b)." *Id.* at 539. The Seventh Circuit affirmed, explaining that experts may not "merely tell the jury what result to reach." *Id.* (citation omitted). Here, Mr. Keenan is not telling the jury what result to reach, nor is he testifying that the defendants did or did not trade reasonably. Instead, he is testifying that the record is insufficient to convincingly piece together the defendants' trading strategies from a decade ago, as the government and its experts purport to do.

Mr. Keenan should also be permitted to testify that the defendants' trading in this case appears to be "consistent with the legitimate precious metals trading he observed during his career." Mot. 9. The Seventh Circuit permits expert testimony of this nature. For instance, in *United States v. Kohli*, 847 F.3d 483 (7th Cir. 2017), the court affirmed the admission of testimony that a doctor's practices "lacked a legitimate medical purpose" because the expert "clearly and properly based his expert opinion on a review of [the doctor's] office records in light of his own experience and training," while not offering an opinion about the doctor's "subjective mental state" or whether he "had the requisite mental state to be convicted of the crimes charged." *Id.* at 491; *see also United States v. Chube II*, 538 F.3d 693, 697 (7th Cir. 2008) (affirming admission of expert testimony that certain prescriptions were not written "consistent with the usual standards of medical practice" and were written without a "legitimate medical purpose"). Similarly here, Mr. Keenan should be permitted to testify that the defendants' trading appeared consistent with

9

what he witnessed to be legitimate trading practices during his career. Namely, market making—the defendants' job and the job Mr. Keenan performed for 30 years.

In *United States v. Sinclair*, 74 F.3d 753 (7th Cir. 1996) (cited at Mot. 10), the Seventh Circuit affirmed the trial court's exclusion of expert testimony that certain business practices "were illegal." *Id.* at 757. Similarly, in *Fulton v. Dulin*, No. 1:16 CV 010, 2018 WL 2432740 (N.D. Ind. May 29, 2018) (cited at Mot. 10), a trial court cautioned attorneys before trial that experts would not be permitted to offer legal conclusions. Relying on these cases, the government misbrands Mr. Keenan's testimony as "legal opinions." But Mr. Keenan's testimony compares the facts of this case to the facts he observed as a precious metals trader and supervisor of precious metals trading, leading him to a non-legal conclusion that the defendants' trading appears "consistent with the legitimate precious metals trading he observed during his career." Ex. A at 1. The government's citation to *United States v. Neushwander*, No. 15 CR 542-1, 2017 WL 4572212 (N.D. Ill. Oct. 14, 2017) (cited at Mot. 10), is instructive. There, the trial court excluded expert testimony labeling certain statements "material" because "material" has a "specialized meaning in the law." *Id.* at *4. "Legitimate" does not have a specialized meaning in the law—it refers to how industry participants acted and thought. Mr. Keenan's experience working as a precious metals trader and supervisor for 33 years gave him exposure to trading practices, and an understanding of which practices serve a legitimate trading purpose.

Finally, the government argues that the defendants should have to make further disclosures as to what type of trading Mr. Keenan observed personally during his career. Mot. 11. That information has already been disclosed in the transcript of his testimony from the *Flotron* trial, where he testified about various trading practices that might look like spoofing to an untrained eye reviewing historical trading data but were in fact perfectly legitimate. These include situations

10

where (1) a client changes their mind after an order was already placed, (2) two clients request two different orders on opposite sides of the market, and (3) different sized orders are entered to look for market signals. Ex. G at 1038:7-1039:3; 1046:7-17; 1047:14-1048:20.

### III. DR. JAMIE WALTON'S EXPERT OPINIONS HAVE BEEN PROPERLY DISCLOSED

Dr. Walton is a quantitative analyst with more than twenty years of experience in e-trading, derivatives, surveillance, and regulations. The government mischaracterizes the defendants' disclosures relating to Dr. Walton's opinions, ignoring key information that the defendants already provided, as well as defense counsel's offer to meet and confer as required by the Local Rules.

#### A. Dr. Walton's Qualifications

Dr. Walton is a graduate of Cambridge and the University College of London, where he graduated with a Ph.D. in Mathematics. Ex. H, Walton CV. He first worked as a quantitative analyst at UBS, and later at BNP Paribas. *Id.* In 2005, he was hired as the Global Head of FX Quantitative Analysts at Morgan Stanley, where he later worked as head of the Global Macro quantitative analysts, and e-trading, options, and emerging markets analysts. *Id.* During his time at Morgan Stanley, he not only headed a team that designed and built a high-frequency trading platform from scratch (that earned upwards of $100 million a year trading electronic markets), but also supervised the continual improvement of the logic that controlled its trading. When he left, he supervised more than 75 other quantitative traders, the majority of whom also held PhDs. He has served as an honorary research fellow and lecturer in financial mathematics at University College London since 2005. *Id.* Since 2016, he has also taught electronic trading to professional traders, salespeople and compliance professionals employed by the vast majority of major international financial institutions. In 2016, he founded Raidne, a quantitative surveillance and trading analytics firm. *Id.*

B.  **The Defendants Disclosure of Dr. Walton's Opinions**

In their original letter dated March 21, 2020, the defendants disclosed Dr. Walton as "an expert in electronic trading, quantitative trading strategies, market surveillance, and the mathematics of trading," attaching a copy of his CV. Ex. A at 2; Ex. H. Thereafter, on May 7, 2020, the defendants disclosed a summary of Dr. Walton's opinions, including:

- *Professor Venkataraman's analysis*: "Professor Venkataraman's conclusions concerning the trade data … are tainted by selection bias. He is further expected to testify that an unbiased analysis of visible orders placed opposite iceberg orders demonstrates that the visible orders are not unusual in size or duration, and they frequently execute, which undermines Professor Venkataraman's conclusion that they were not intended to execute." Ex. I, Def's Supp. Expert Disclosures, May 7, 2020 at 1;

- *Electronic trading*: "[A] visible order within the first five levels of the order book is at a significant risk of execution" and "visible orders do not convey implied representations about a trader's subjective intent and that different market participants react differently to visible orders." *Id.*;

- *High Frequency trading*: "[H]igh-frequency traders typically make money by buying and selling quickly as the market moves … [and] they do not trade based on implied representations of another trader's intent." *Id.* Additionally, "trading algorithms are typically designed based on historical data, including market data; the algorithm is programmed to trade based on the statistical likelihood of what the market will do in the near future. This includes the statistical probability of cancelation and the speed of cancelation of visible orders." *Id.* at 2; and

- *Market surveillance*: Originally in response to Alan Jukes' disclosed opinions, Dr. Walton is prepared to opine that the results of market surveillance programs "can be useful to identify potential instances of spoofing, they are not considered definitive." *Id.*

On June 30, 2020, the defendants disclosed charts prepared by economic analysts at Compass Lexecon on which Dr. Walton may rely as a basis for his opinions. Ex. J, Def's Supp. Expert Disclosure, Jun. 30, 2020. These statistics include: (1) an order summary for the defendants, David Liew, and the two alleged victims; (2) cancellations of orders by the defendants, David Liew, and the two alleged victims; (3) the prices of the allegedly fraudulent orders compared to the Best Bid or Offer ("BBO") in the market at that time; (4) a comparison of the defendants' hidden and visible buy and sell orders in the government's 61 episodes, compared to all of the

episodes meeting the government's criteria; (5) a summary of the number and percent of orders the defendants and David Liew cancelled that are not among the 61episodes; and (6) a detailed breakdown of the realized spread gain/loss for the 61 episodes.[4]  *Id.*

Finally, *and omitted entirely in the government's motion*, on July 31, 2020, the defendants disclosed Dr. Walton's own analyses of the defendants' trading.  Ex. L, Def's Supp. Disclosure, July 31, 2020.  These charts include a statistical analysis of order size distribution, comparisons of the defendants' full day trading versus the episode trading by order size and cancellation times, and also cancellation times, order execution, and profitability for alleged victim Citadel.  *Id.*[5]

### C. The Government's Request for Additional Disclosure Is Improper

The government, in advance of filing what is essentially a motion to compel further disclosures, did not request to meet and confer by phone regarding its concerns with Dr. Walton's disclosures, as required under Local Rule 37.2 and the Court's Individual Procedures.  Moreover, the government misrepresents the parties' prior communications about these disclosures.  The government requested additional information regarding the bases for Dr. Walton's opinions on May 28, 2020.  Mot. 3.  The government states "The defendants did not respond," but that is not true.  *Id.*  On June 3, 2020, the defendants responded by letter, explaining that summaries had already been provided, and that additional analyses would be provided well in advance of trial.  Ex. N, June 3, 2020 Letter.  The government never asked to meet and confer about their requests.

On July 13, 2020, the government sent a separate request for additional details regarding the methodology behind Compass Lexecon's summary statistics.  Mot. Ex. G.  On July 16, counsel

---

[4] On August 11, 2020, the government was provided with updated drafts of two of these charts. Ex. K, Def's Supp. Expert Disclosure, Aug. 11, 2020.
[5] On August 23, 2020, the defendants disclosed additional analyses by Dr. Walton.  Ex. M, Def's Supp. Expert Disclosure, Aug. 23, 2020.

13

for Mr. Vorley responded, providing requested details to the government. *Id.* The government responded on July 17, 2020, seeking further details. *Id.* Counsel for Mr. Vorley responded again, stating that the defendants had adequately summarized Dr. Walton's expected testimony and the bases for his opinions, including Compass Lexecon's calculations. *Id.* Counsel for the defendants further wrote "*we would be happy to meet and confer*." The government ignored the defendants' offer to meet and confer, choosing to go straight to the Court in violation of the Rules.

### D. Dr. Walton's Opinions Have Been Properly Disclosed

The defendants are not obligated to provide additional disclosures to supplement the information already provided to the government. First, the defendants have disclosed the basis is for Dr. Walton's opinions that (1) "visible orders do not convey implied representations about a trader's subjective intent," and (2) "[HFTs] . . . do not trade based on implied representations of another trader's intent." Mot. 11. On May 7, 2020, the defendants disclosed that "Dr. Walton's opinions will be based on his expertise in electronic trading, quantitative trading strategies, market surveillance, statistics, and mathematics, his review of the literature on which Professor Venkataraman relies, and the results of analyses of the trade and market data, which are ongoing." Ex. I at 2. While the government argues "the defendants have not clarified whether 'this opinion is based on Dr. Walton's own experience as a trader or, if not, what the basis is for this opinion,'" Mot. 11, the answer—given by the defendants on May 7, 2020—is that Dr. Walton's opinions are based on his experience as a trader, his review of the literature cited by Professor Venkataraman, and his analysis of the trade data in this case, which has also been disclosed. Ex. I at 2.

Second, the defendants have disclosed multiple analyses of the trade data, but the government requests "disclosures clarifying their import or what Dr. Walton will say about them." Mot. 12. No Rule requires the defendants to "clarify [the] import" of their experts' disclosures,

14

nor preview the defense strategy involved in determining Dr. Walton's specific trial testimony. These requests from the government for nuances of Dr. Walton's methodology are all the more vexing in light of the government's response to the defendants in June following their request for the formulae and inputs used by Professor Venkataraman in his analyses. Ex. O, June 4, 2020 Letter from DOJ. Instead of providing the program necessary for the defendants to understand Professor Venkataraman's calculations, the government responded with a block quote of the Court's statement during the February 27, 2020 conference:

> I don't expect that level of detail in the disclosure. What I do expect is his analysis is going to be, I looked at the fill rate for this. I looked at the fill rate for that. I have computed them. The difference is this. If you want to cross-examine, tell us how you computed them, you'll have that opportunity at trial, but I think that is well beyond the detail that's necessary as a summary of what his opinions are because, I mean, we have to be realistic here. You're not going to win this case by challenging, you know, his calculation of the fill rate. You're going to win this case by challenging his argument that, you know, there is some probative force to the difference between the fill rates. And that's what I think we need to be focused on.

*Id.*, *quoting* Feb. 27, 2020 Tr. (Dkt. 176) at 18:20-19:7. The Court's reasoning applies equally to Dr. Walton as to Professor Venkataraman. If the government seeks to challenge the granular details of how Dr. Walton reached his opinions, including his understanding of Compass Lexecon's analyses, the government can cross-examine him at trial. But that level of detail is not required when the parties are exchanging a summary of the disclosures in a criminal case.

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied.

| | |
|---|---|
| Dated: August 25, 2020 | Respectfully submitted, |

*/s/ Roger A. Burlingame*                          */s/ Michael G. McGovern*

Roger A. Burlingame  
Matthew L. Mazur (*pro hac vice*)  
Lauren A. Bowman *(pro hac vice)*  
Dechert LLP  
160 Queen Victoria Street  
London EC4V 4QQ  
United Kingdom  
Phone: +44 20 7184 7000  
Roger.Burlingame@dechert.com  
Matthew.Mazur@dechert.com  
Lauren.Bowman@dechert.com  

Christopher Burrichter  
Dechert LLP  
35 West Wacker Drive, Suite 3400  
Chicago IL 60601  
Telephone: (312) 646-5800  
Christopher.Burrichter@dechert.com  

**Attorneys for James Vorley**

Michael G. McGovern (*pro hac vice*)  
Helen Gugel (*pro hac vice*)  
Ropes & Gray LLP  
1211 Avenue of the Americas  
New York, NY 10036  
Telephone: (212) 596-9000  
Michael.McGovern@ropesgray.com  
Helen.Gugel@ropesgray.com  

Aaron M. Katz (*pro hac vice*)  
Katherine M. McDonald (*pro hac vice*)  
Ropes & Gray LLP  
800 Boylston Street  
Boston, MA 02199  
Telephone: (617) 951-7000  
Aaron.Katz@ropesgray.com  
Katherine.McDonald@ropesgray.com  

Laura G. Hoey  
Ropes & Gray LLP  
191 North Wacker Drive  
Chicago, IL 60606  
Telephone: (312) 845-1318  
Laura.Hoey@ropesgray.com  

**Attorneys for Cedric Chanu**

## **CERTIFICATE OF SERVICE**

I, Roger Burlingame, do hereby certify that on August 25, 2020 a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's EM/ECF system. Notice of this filing will be sent to all registered attorneys of record by operation of the ECF System.


                                        */s/ Roger A. Burlingame*
                                        Roger A. Burlingame