**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) No. 18 Cr. 35 (Tharp, J.) |
| v. | ) |
| | ) |
| JAMES VORLEY and CEDRIC CHANU, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT JAMES VORLEY'S MOTION TO EXCLUDE EVIDENCE**
**RELATING TO DEUTSCHE BANK'S INTERNAL INVESTIGATION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

DEUTSCHE BANK'S INTERNAL INVESTIGATION ............................................. 4

ARGUMENT .............................................................................................................. 13

I. DEUTSCHE BANK'S INTERNAL INVESTIGATION AND THE AUDIOTAPE AND TRANSCRIPT OF MR. VORLEY'S MARCH 17, 2015 INTERVIEW SHOULD BE EXCLUDED IN THEIR ENTIRETY ....................................... 13

    A. Mr. Vorley's Statements Should Be Excluded As Irrelevant Because He Had No Memory Of The Events Of March 16, 2011, And His Interpretations Of The Chat And Trading Records Were Speculative ............... 13

    B. Evidence Relating to Deutsche Bank's Internal Investigation and Whether Mr. Vorley Violated Bank Policies Would Confuse the Jury............................ 16

    C. Admission of the Interview and Internal Investigation Evidence Would Result in a Trial Within The Trial........................................................................ 17

II. DEUTSCHE BANK'S ACCUSATIONS AGAINST MR. VORLEY ARE TESTIMONIAL HEARSAY, VIOLATE HIS RIGHTS UNDER THE CONFRONTATION CLAUSE, AND ARE UNDULY PREJUDICIAL ...................... 19

III. MR. VORLEY'S REFUSALS TO ANSWER QUESTIONS ON THE ADVICE OF COUNSEL ARE IRRELEVANT AND PREJUDICIAL, AND THEIR ADMISSION WOULD VIOLATE HIS RIGHT TO REMAIN SILENT...................... 22

CONCLUSION............................................................................................................ 23

# TABLE OF AUTHORITIES

**CASES**

*Abney v. Badger Mut. Ins. Co.*,
2014 WL 85986 (N.D. Ill. Jan. 9, 2014) ...............................................................18

*Crawford v. Washington*,
541 U.S. 36 (2004)..................................................................................................20

*ED&F Capital Markets Ltd. v. JVMC Holdings Corp.*,
2020 WL 3469128 (N.D. Ill. June 25, 2020) .........................................................15

*Filar v. Chicago Sch. Reform Bd. of Trustees*,
375 F. App'x 607 (7th Cir. 2010) ..........................................................................17

*Heflin v. City of Chi.*,
1996 WL 28238 (N.D. Ill. Jan. 22, 1996) ..............................................................18

*Jones v. Basinger*,
635 F.3d 1030 (7th Cir. 2011) ...............................................................................20

*Lewis v. City of Chi.*,
563 F. Supp. 2d 905 (N.D. Ill. 2008), *aff'd sub nom. Lewis v. City of Chi.*
*Police Dep't*, 590 F.3d 427 (7th Cir. 2009) ..........................................................16

*Martin v. Grosshans*,
424 F.3d 588 (7th Cir. 2005) .................................................................................22

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009)................................................................................................20

*Moore v. Principi*,
2002 WL 31767802 (N.D. Ill. Dec. 10, 2002) .......................................................16

*Ryan v. Miller*,
303 F.3d 231 (2d Cir. 2002)...................................................................................20

*Thakore v. Universal Mach. Co. of Pottstown, Inc.*,
670 F. Supp. 2d 705 (N.D. Ill. 2009) ....................................................................20

*Thompson v. City of Chi.*,
2004 WL 5655801 (N.D. Ill. July 6, 2004), *aff'd*, 472 F.3d 444 (7th Cir. 2006) ...................16

*United States v. Adams*,
628 F.3d 407 (7th Cir. 2010) .................................................................................20

*United States v. Adeyinka*,
   2010 WL 11545913, at *1 (N.D. Ill. Mar. 9, 2010)........................................................14

*United States v. Bear Killer*,
   534 F.2d 1253 (8th Cir. 1976) .......................................................................................15

*United States v. Bland*,
   237 F. App'x 268 (9th Cir. 2007) .................................................................................14

*United States v. Durham*,
   139 F.3d 1325 (10th Cir. 1998) ....................................................................................15

*United States v. Jumper*,
   497 F.3d 699 (7th Cir. 2007) ........................................................................................22

*United States v. Martoma*,
   2014 WL 31700 (S.D.N.Y. Jan. 6, 2014) ....................................................................15

*United States v. Nicholson*,
   176 F. App'x 386 (4th Cir. 2006) .................................................................................14

*United States v. Perez*,
   790 F. Supp. 2d 824 (N.D. Ill. 2011) ...........................................................................14

*United States v. Rose*,
   12 F.3d 1414 (7th Cir. 1994) ................................................................................13, 14

*United States v. Westbrook*,
   125 F.3d 996 (7th Cir. 1997) ........................................................................................13

## OTHER AUTHORITIES

Fed. R. Evid. 401(a)................................................................................................................13

Fed. R. Evid. 403................................................................................................................21

Defendant James Vorley respectfully moves this Court to exclude evidence relating to Deutsche Bank's internal investigation of alleged spoofing, including an audio recording and transcript of Mr. Vorley's March 17, 2015 disciplinary investigation interview (*see* GX 105-107), pursuant to the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment.[1]

## PRELIMINARY STATEMENT

On March 17, 2015, following receipt of a letter requiring him to attend an interview to address allegations that he had engaged in "spoofing" during a short trading sequence on March 16, 2011 and other unspecified dates, Mr. Vorley met with members of Deutsche Bank's human resources and compliance departments. At the interview, he explained that he could not remember the four-year-old trading or a related chat about it, but that he would provide his best guess as to what occurred based on his review of the limited materials provided to him in advance.

After answering some questions about his background, Mr. Vorley read from a prepared written statement, which he later provided to the interviewers. For the remainder of the 1.5 hour interview, the two interviewers repeatedly stated that Mr. Vorley's interpretation of the materials did not make sense and that the bank's review of the trading on this occasion and others indicated a pattern of market manipulation. Mr. Vorley disputed these accusations, and when they asked him to review additional trading records, he stressed (again and again and again) that he would

---

[1] On March 11, 2020, this Court denied Mr. Vorley's motion to suppress his statements as involuntary under the Fifth Amendment. (Dkt. 185). The instant motion was prompted by the recent revelation that the government will seek to admit evidence of Deutsche Bank's internal investigation, including Mr. Vorley's entire 1.5 hour audiotaped interview, without calling a witness who can be cross-examined. Although the government had previously disclosed *Jencks* material for one of Deutsche Bank's interviewers, neither interviewer's name appears on the government's witness list. On August 11, 2020, the government informed the defendants that it would seek to admit the evidence using business record certifications and without calling a live witness, and the defendants promptly objected. (Dkt. 283). This motion outlines Mr. Vorley's additional objections to GX 105-107.

only be guessing based on the paucity of information made available to him, and that he had been advised by counsel not to comment on any materials that had not been provided to him in advance.

This motion seeks the exclusion of (i) the letter containing the bank's accusation that Mr. Vorley had engaged in spoofing on March 16, 2011 and other unspecified occasions (GX 105), and (ii) the audio recording and transcript of the 1.5 hour interview (GX 106 & 107). The government seeks to admit Deutsche Bank's letter accusing Mr. Vorley of misconduct and his subsequent 94-minute disciplinary investigation interview without calling a witness who can be cross-examined about their contents. By doing so, the government would place before the jury the bank's out-of-court accusations that he violated bank policies by spoofing. Presumably, the government will argue that Mr. Vorley's either neutral or exculpatory statements are somehow false and therefore evidence of his bad faith or "consciousness of guilt," but this ignores the fact that Mr. Vorley repeatedly stated he had no recollection of his trading four years earlier, that he was only guessing as to possible explanations for his trading, and that he is not charged with violating bank policy or the Dodd Frank spoofing provision. To admit this evidence in this fashion would be error.

To begin, the government has no evidence that Mr. Vorley made any false statements at his interview other than its own hypothesis that he was spoofing. If the government had any such evidence, it would simply introduce his statements and try to prove them untrue. Instead, it seeks to admit the entire interview, including the interviewers' repeated allegations of misconduct, disagreements with his responses, and attempts to persuade him to ignore advice of counsel and address other trading sequences, none of which is necessary to place his statements attempting to interpret the March 16, 2011 chat and trading data (which is not even one of the separately charged episodes in the Superseding Indictment) into context.

Mr. Vorley's statements that he could not remember a short trading sequence and related chat, followed by his speculation as to what might have occurred have no relevance to any fact at issue in the trial and do not demonstrate any bad faith. The chat and trading data will be in evidence, and the government will have every opportunity to argue that they are incriminating. But Mr. Vorley's speculative statements from an internal investigation into whether he breached bank policy would confuse the jury and necessitate a trial within a trial on the complicated circumstances surrounding the interview, including the bank's simultaneous cooperation with the government, its prior disciplinary proceeding clearing Mr. Vorley of spoofing, its threat to withhold Mr. Vorley's deferred compensation, and the differences among the bank's policies, the Dodd Frank anti-spoofing provision, and wire fraud.

Furthermore, Deutsche Bank's allegations against Mr. Vorley, in both the letter and in the statements of the interviewers, are inadmissible, testimonial hearsay whose admission into evidence in the absence of a witness who could be cross-examined would violate the Sixth Amendment. This risk is especially pronounced because the interviewers—financial professionals speaking with seeming authority of the underlying, arcane trading activity—are in fact compliance and human resources officers with no trading experience. This dynamic significantly leverages the already severe prejudice of their testimonial hearsay, inviting the jury to defer to the apparently knowledgeable professionals with access to facts from the internal investigation that are outside the jury's purview.

Finally, the portions of the interview containing Mr. Vorley's refusals to answer questions on the advice of his counsel are inadmissible as irrelevant and unduly prejudicial, and their admission would violate his right to remain silent. Even if the government's simultaneous investigation of Deutsche Bank were not animating the interview, Seventh Circuit precedent would

bar admission. With it, the imposition on Mr. Vorley's right to remain silent would constitute clear error.

The Court should preclude this irrelevant, confusing, and unduly prejudicial evidence relating to Deutsche Bank's internal investigation.

## DEUTSCHE BANK'S INTERNAL INVESTIGATION

In 2013, Deutsche Bank commenced an internal investigation of its precious metals trading operations, including whether its traders had engaged in spoofing. After the bank's outside counsel interviewed Mr. Vorley six times, a disciplinary panel determined in February 2014 that he had not engaged in misconduct and that his occasional use of unprofessional language "d[id] not warrant disciplinary action." (Dkt. 146-3).

Later that year, Deutsche Bank decided to exit the precious metals business and, in November 2014, informed Mr. Vorley he would likely be "terminated by reason of redundancy" and presented with a severance agreement. (Dkt. 146-5; Dkt. 146-20). On December 9, 2014, the bank gave Mr. Vorley formal notice that his employment would end on March 11, 2015. (Dkt. 146-6; 146-21).

### The March 9, 2015 Letter

On November 25, 2014, the same day that Mr. Vorley was first informed of his redundancy, the Department of Justice sent document requests to Deutsche Bank in connection with an investigation of precious metals trading. (Dkt. 146-8). The bank also a received a subpoena *duces tecum* from the CFTC on February 3, 2015. (Dkt. 146-9). While simultaneously negotiating with Mr. Vorley over his separation and cooperating with these U.S. government investigations, outside

counsel for Deutsche Bank re-interviewed Mr. Vorley on February 9, 2015 and February 19, 2015 concerning his trading.  (Dkt. 146-1).[2]

Then, on March 9, 2015, two days before Mr. Vorley's last day of work, Deutsche Bank sent an "Invitation to Disciplinary Investigation Meeting" to Mr. Vorley.  Ex. A (GX 105) at DOJ00124391.  The letter informed Mr. Vorley that he was the subject of a formal investigation into his "involvement in a pattern of trading that, if established, may amount to a breach of Bank policy."  *Id.*  The bank provided a Yahoo messenger chat involving Mr. Vorley and his colleague, Adam Farthing, which included a reference to "spoofing":

| | |
|---|---|
| (11:02:54 AM) | Farthing: i am selling both |
| (11:03:01 AM) | Farthing: right ? |
| (11:03:10 AM) | Farthing: <ding> |
| (11:03:14 AM) | Vorley: yep |
| (11:03:47 AM) | Farthing: you knew that aal; along right ? |
| (11:04:51 AM) | Vorley: 99.56 |
| (11:04:58 AM) | Vorley: *spoofing it up* |
| (11:05:03 AM) | Vorley: *ahem* |
| (11:05:09 AM) | Farthing: hehencheers mate |

*Id.* at DOJ00124337-38 (emphasis added; typos in original).  In addition, the bank sent Mr. Vorley a copy of its pre-Dodd Frank 2011 Market Abuse policy (which was in effect on the date of the chat with Mr. Farthing and did not mention "spoofing"), as well as its then-current 2014 Market Abuse policy (which included a prohibition on "spoofing" based on Dodd Frank).

The letter stated that Mr. Vorley was "required to attend a formal investigation meeting" with the bank to discuss his trading, and that "[i]f it is found that you have committed conduct in breach of a Bank policy, then notwithstanding the fact that your employment will have already terminated, the relevant Disciplinary Panel will be required to make findings as to appropriate

---

[2] Counsel for Deutsche Bank debriefed the government on these interviews as well as the six prior ones.

sanctions that would otherwise have applied had you remained an employee and also as to the impact of any such conduct on any outstanding deferred compensation." *Id.* at DOJ00124392-93.

<u>The March 17, 2015 Interview</u>

Two days later, on March 17, 2015, Mr. Vorley sat for a ninety-minute interview with Sarah Fawcett, from the bank's employee relations department, and Robert Lissmann, from its compliance department. Ex. B (GX 107).[3]

*Mr. Vorley's Statements.* After first answering questions about his background and roles at Deutsche Bank, Mr. Vorley explained that he had reviewed the materials provided by the bank in advance of his interview.[4] *Id.* at 13-15. He cautioned that they were a woefully incomplete record of the information he would need to accurately assess the trading, expressing discomfort that the two minutes of trading data left out a large part of the necessary facts. *Id.* at 13 ("instructions to me would be coming in from Adam as well as others on a hoop box, an Avistar video conference system, and colleagues on the desk acting on behalf of clients simultaneously"); *id.* at 42 ("I have highlighted as well that this is an incomplete dataset… You don't have any of the voice data, any of the video data, you don't have any of the other customer data, you don't have any of the sales data, you don't have any …. So, you're asking me to comment on 10% of… of a possible scenario. I don't think there's much benefiting to me speculating on four-year-old data with… with 10% of the available data being shown to me"). Given the lack of necessary

---

[3] Ex. C (GX 106) is an audio recording of Mr. Vorley's interview that the government seeks to admit into evidence. Per this Court's August 27, 2020 instructions, a copy of this audio file has been emailed to Proposed_Order_Tharp@ilnd.uscourts.gov, copying counsel for the government.

[4] In addition to the chat message, the bank provided certain limited trading records.

information, he explained that the one chat and small slice of trading data "is only a snapshot of what could be occurring." *Id.* at 13.

Before moving to the substance of the trading, Mr. Vorley stressed "***I cannot remember any of this***, but I am doing my best to try to piece together what may have been meant or why I traded as I did." *Id.* at 15 (emphasis added). He repeated throughout the interview that he was merely guessing as to potential explanations for the trading. *See id.* at 15 ("I cannot remember any of this."); *id.* at 17 ("I have no actual memory of the events which I'm being asked to comment on."); *id.* ("[I]t is very difficult for anyone to know what is actually unfolding with any degree of certainty."); *id.* at 30 ("[I]t's impossible to know what's going on."); *id.* at 31 ("I'm hazarding a guess at possible explanations in attempt to be helpful, but I can't be absolutely sure.").

Mr. Vorley described what may have happened during those minutes of trading four years earlier by reading from a prepared statement, which he later gave to the interviewers. Comparing the chat timestamps to the trading data—and without any independent recollection of the event or the complete set of materials he explained would be required to assess it—Mr. Vorley provided the following possible interpretation of the trading:

1) Adam provides order instruction to sell 1K of platinum and 5K of gold…

2) After a 13 second delay, Adam pings the chat[5] to get my attention.

3) I acknowledge with an N, which is obviously a fat-finger,[6] and a yes five seconds later.

4) I proceed to enter a 50 lot buy-order at 06:02:33:123 trading time.
   …

---

[5] A "ping" is a function that causes a chat message to flash on the recipient's screen, commanding his or her attention.

[6] A "fat-finger" is a mistake in trader parlance.

5) I provide a platinum execution price and a rough gold execution price.

6) Adam now questions whether I have understood the direction of his instruction correctly by making the comment, 'I'm selling both, right?' This is because I've put a buy-order in rather than a sell. It's here, I remind you, that Adam would see on his screen all my trading and order activity as it occurred in real-time.

7) [A]t nine seconds later he pings me to draw my attention to the… to his comment as he can see I have made an error and not yet responded.

8) I see the message and I cancel my 50-lot buy order and replace it with a 56-lot sell order and acknowledge with a yes.

9) Adam's next communication comes at… comes in at 11:03:47, after he has observed my activity and normality has returned. He makes the sarcastic observation 'You knew that all along, right?' A lighthearted reference to the fact that clearly I didn't know and I'd clearly messed up because he had to point out my error himself, while badgering me.

10) In an attempt to diminish his comment I make an off-the-cuff remark of, 'Spoofing it up, ahem, ahem.' We both know at this point that a genuine error has occurred and I'm attempting to deflect his criticism in a lighthearted way.

11) Adam replies with a 'Hee-hee-hee. Cheers, mate'. Now I believe this is his way of acknowledging my lighthearted reply and we both know there's an error and that the joke is on me.

12) [T]he entire conversation up to 11:05:09 on the Yahoo has been solely about the initial 50-lot buy-order I made at 06:02:33:123, as well as a couple of execution prices. Ex. B at 15-16.

Mr. Vorley also explained that his use of the word "spoofing" in this 2011 chat occurred before the word had taken on the negative connotations it had by the time of the 2015 interview. *Id.* at 14-15. When Mr. Lissmann expressed skepticism on this point, Mr. Vorley explained "[i]n my recollection, in 2011 it was a word mainly used to describe how the responsibility for the execution of menial tasks was decided" and explained that the traders would play a game called "Spoof" at their desks.[7] *Id.* at 14. But in reviewing the chat, he did not suggest it referred to this

---

[7] This squares with dozens of chats, *see, e.g.*, (DOJ00037443) (Vorley writes, "lost spoof … getting coffees"); (DOJ00037464) (Vorley writes, "lost spoof so had to leg it to coffee shop"), and

game and, as he explained in his written statement, believed that he could "come up with no explanations [for his use of the word spoofing] other than a bad example of market banter masquerading as sarcasm when one trader ridiculed another." *Id.* at 15. In other words, Mr. Vorley said he thought it was a joke he made after Farthing chided him for an error, as indicated by Mr. Vorley's "ahem ahem" and Farthing's "hehe" laughing response.[8]

Reading from his written statement, Mr. Vorley also explained—given that the events took place four years earlier and he had no recollection of them—that an alternative explanation might exist: he may have had multiple execution requests at the same time. *Id.* at 29 ("[A]nother common scenario at the time and another possible contributing factor were surges in transaction instructions …. I may have offered Adam's request to the traders and sales people on the desk. As I initiated a sell order in the market it is possible that willing takers showed an interest."). Again here, Mr. Vorley reiterated "***it's impossible to know what's going on***" and further cautioned "***I'm hazarding a guess at possible explanations in attempt to be helpful, but I can't be absolutely sure***." *Id.* at 30-31 (emphasis added).

*The Interviewer's Accusations.* In response to Mr. Vorley's statements, the interviewers repeatedly suggested that the explanations he proposed did not add up and that the trading data suggested a pattern of "market manipulation":

---

that the word "spoof" refers to such a game is not in dispute. *See* Wikipedia, Spoof Game, https://en.wikipedia.org/wiki/Spoof_(game) (last visited August 31, 2020).

[8] The trade data supports Mr. Vorley's interpretation because in it he first starts to buy futures, but then after Mr. Farthing pings him, he reverses course and begins to sell. The joke would have been that he was buying futures in order to "spoof" the market before he began selling a larger amount; this is different than "spoofing" under the Dodd Frank law, which involves placing orders that the trader intends to cancel before execution.

- "[B]ecause on an interpretation of that data it shows a pattern of inputting orders and cancelling which could be used to either support the market price or alter it in some way, or, um, in other ways they breach the mar… market manipulation policy." *Id.* at 53;[9]

- "I think [the word 'spoofing' is] quite a toxic word … Whether it's a month ago or 10 years ago … European regulation of which I've been privy to for quite a long time, is that, you know, I studied market manipulation and … it's something that's been around for quite some time … The word and the activity." *Id.* at 50;[10]

- "And I'm just saying that by putting orders in on both sides of the order book, it is artificially keeping a… level which may not have been there as… a result of… being on both sides." *Id.* at 27;[11]

- "[T]he first time I … I might get [that Mr. Vorley made a 'fat finger'], but then the second time…it starts, uh, I'm starting, you know, to think how many fingers you got." *Id.* at 27-28;

- "Then you cancel them all... The effect of that, you must know. Well, I… I just imagine one must sort of know that the market impact on that would be that people would see those orders and… and question what kind of demand is there." *Id.* at 24;[12]

---

[9] Admitting—without any cross-examination—the hearsay lay opinion of a Deutsche Bank employee relations employee who purports to identify "patterns" in market data, and that those supposed patterns could be used to "alter" the market, would be reversible error. *See infra* at 18-21.

[10] This compliance officer's lay opinion on this topic is at odds with the opinion of the former CFTC Director of Enforcement. On December 2, 2010 (four months before Mr. Vorley's questioned trading) Gregory Mocek, the CFTC's Director of Enforcement, stated "I'm not quite sure I know what spoofing is." CFTC Staff Roundtable on Disruptive Trading Practices (Dec. 2, 2010) at 171, *available at* https://www.cftc.gov/sites/default/files/idc/groups/public/@swaps/documents/dfsubmission/dfsubmission24_120210-transcri.pdf (last visited August 31, 2020).

[11] This comment demonstrates a fundamental misunderstanding of Mr. Vorley's job as a market maker by his interviewer, who is not a trader. The defendants are confident that all traders and trading experts at trial—government and defense alike—will testify that market makers routinely trade on both sides of the book simultaneously, that such trading is appropriate, necessary, and permitted, and that there exist a myriad of legitimate reasons to place such trades. The government will argue that in certain situations such trading is motivated by an attempt artificially put pressure on the order book, but as discussed *infra* at 18-21, admission of incorrect lay opinion flatly stating trading on both sides indicates artificially maintains a price by a Deutsche Bank compliance officer who cannot be cross-examined about his lack of trading experience would be error.

[12] The same applies again. The defendants are confident there will be uniform trial testimony from traders and experts that the vast, vast majority of orders are cancelled, and that traders do not decide to trade based on a simple calculation of visible supply and demand. Indeed, the

- "The appearance of it looks a bit sort of repetitive in… in some of these other examples, really, where one sort of stand away and goes, you know, what would a reasonable outsider look at this and say, 'Well, why… why would someone do this? Why would someone buy…?'" *Id.* at 51;[13]

- "[T]he pattern of… trading in this example and other examples … would indicate, um, on one interpretation … an attempt to ma… manipulate the market in… some way.  And you understand that that was policy at the time and that's what the bank is saying about what this data might show." *Id.* at 54;[14]

- "[T]he a policy at the time, though it didn't mention spoofing, it did identify market manipulation and things…" *Id.* at 52;

- "I've heard of the word spoofing for quite some time and … and certainly spoofing is not the word that you use, two of the words, you know, misleading what market manipulation is, and … and that woulda been, you know, those are all defined terms[.]" *Id.* at 16;

- "There doesn't seem to be an actuating purpose [to Mr. Vorley's orders] about … what your genuine intent is around there." *Id.* at 44;[15] and

- "Well, I mean, you know, there was no actuating purpose to [the orders from] what I can see." *Id.* at 31.

---

government's testifying expert, Professor Kumar Venkataraman, has written an entire scholarly article about gauging hidden (invisible) liquidity in making decisions on trading open orders. When this Court has previously stated that the core question for trial is whether cancelled orders convey a message to the market about the order's intent, admitting the lay opinion of a compliance officer speaking with seeming authority about counterparty intent who is not subject to cross examination is, again, reversible error.

[13] Again, this non-trader compliance officer cannot educate the jury about market participants' perceptions without an opportunity for cross examination.

[14] The defendants' intent is, of course, a core issue for the jury.

[15] The concept of genuine intent is, again, a core issue that will be hotly disputed at trial. In a market where the overwhelming majority of orders are cancelled, and one of the government's victim witnesses cancel the vast, vast majority of its own trades in under .002 of a second, admission of a statement that canceling a trade signals something to the market about the trader's subjective intent by a seemingly knowledgeable compliance professional who is not subject to cross-examination is, again, reversible error.

*Mr. Vorley's Refusal to Answer Questions on Advice of Counsel.* Mr. Vorley was also asked on more than *30* occasion to answer questions about additional trading sequences he had not been shown in advance that supposedly suggested a "pattern" of misconduct:

- "Well, there has to be … [a] first time for everything. There has to be a first time for us to show you the data … and that's what we're going to do. If you choose not to answer, then that's your prerogative, but we are nonetheless going to show you the data. *Id.* at 35;

- "The bank has also identified a number of further examples of you engaging in similar trading conduct which we would like to discuss with you in addition to your actions." *Id.* at 41;

- "[O]ne of the questions we would ask is about some of the patterns in the data that we see in your trades on the surrounding days to this particular day." *Id.* at 42-43;

- "Because what we'd like to do is discuss with you the...the patterns emergent and it's your opportunity to tell us, (A) 'Look, I just can't remember, it's too long ago,' or, (B) um, there may be an explanation that emerges from these patterns that occurs to you. And it's to your advantage to have the opportunity to look at the data with us and consider it." *Id.* at 53;

- "And we understand that there may or may not be an explanation for that in your memory, but we're never gonna get to that point if you won't let us show you the data and discuss…" *Id.*;

- "I hear what you're saying, but why I want to make it clear to you is that it...it is for your benefit as well as ours for you to look at the data, for you're ... for you to listen to the questions we've got to ask, and for you to give..." *Id.* at 42; and

- "But what...what we want to do is consider that explanation in the light of the other trading data that we have on some of the other days." *Id.* at 53.

Mr. Vorley refused to answer these repeated questions. He explained, "I'm not gonna to sit here and comment on things that have so far … not been made available to me … As you can see, everything's four years old and to sit here and pull things that are four years old apart is tough enough." *Id.* at 33-34. As the interviewers continued to push him, Mr. Vorley reiterated, "I can't possibly sit here and be expected to remember events four years old and make… I can blanket say that for everything you're going to show me." *Id.* at 37. He did not wish to discuss other trading with "no other information to back it up than just a bit of trade data." *Id.* at 42. Finally, Mr. Vorley

stated that his employment attorneys had advised him not to answer questions about other transactions. *Id.* at 43 ("I've spoken to my lawyers about it, as well, and they informed me quite clearly you're allowed to talk about the… the pack that you were sent with the information you were provided."), 53 ("I'm sorry, I've been advised… I've been advised not to.").

## ARGUMENT

### I. DEUTSCHE BANK'S INTERNAL INVESTIGATION AND THE AUDIOTAPE AND TRANSCRIPT OF MR. VORLEY'S MARCH 17, 2015 INTERVIEW SHOULD BE EXCLUDED IN THEIR ENTIRETY

#### A. Mr. Vorley's Statements Should Be Excluded As Irrelevant Because He Had No Memory Of The Events Of March 16, 2011, And His Interpretations Of The Chat And Trading Records Were Speculative

Relevant evidence has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). "One measure of the relevance of evidence is whether its exclusion would leave a chronological and conceptual void in the story." *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997) (internal quotation omitted). Here, Mr. Vorley's statements in 2015 about alleged spoofing in 2011 are not necessary for the government to tell the story of the alleged conspiracy to commit wire fraud between 2008 and 2013. Mr. Vorley could not possibly have been expected to remember a 2.5-minute trading sequence and 21-word electronic chat message from four years earlier, and his attempts to interpret the trading data and the chat—which he repeatedly characterized as guessing and speculation based on information representing only a fraction of what would have been available to him at the time—have no relevance to whether he engaged in a scheme to defraud. Nor is the March 16, 2011 trading episode charged as a substantive wire fraud count in the Superseding Indictment.

The government will presumably argue that Mr. Vorley made false exculpatory statements that somehow suggest bad faith or a consciousness of guilt. False statements can certainly be evidence of consciousness of guilt. *See, e.g.*, *United States v. Rose*, 12 F.3d 1414, 1421 (7th Cir.

1994).  But there is no evidence that Mr. Vorley was lying when he said he could not remember a single short trading sequence and chat from four years earlier out of the hundreds of thousands of orders he placed and thousands of chats he took part in as a precious metals trader with Deutsche Bank.  Nor is there any evidence that Mr. Vorley's attempts to interpret the trading data and the chat—while repeatedly stating he could not remember what had occurred four years ago—were misleading.

Admission of allegedly false but otherwise exculpatory statements that are not demonstrably false can be reversible error.  *See United States v. Bland*, 237 F. App'x 268, 270 (9th Cir. 2007) (reversing conviction, in part because the trial court admitted "false exculpatory statements" where "the government failed to show that Smith's 'false exculpatory statements' were, in fact, false"); *see also United States v. Nicholson*, 176 F. App'x 386, 399 (4th Cir. 2006) ("Ms. Nicholson's answers are properly classified as denials of guilt, not as false exculpatory statements.").  Here, Mr. Vorley repeatedly said he has "no actual memory of the events"—a very difficult fact *not* to believe regarding a 2.5 minute trading sequence and a 21-word chat exchange from four years earlier—and that he is trying to "piece together" a "guess" based on an "incomplete data set" but that he "can't be absolutely sure."[16]  The chat itself and the underlying trading data confirm that Mr. Vorley's reference to "spoofing it up … ahem ahem" was a joke.

It is unclear if the government contests this reading of the chat, which is supported by the trade data, but even if it does, it is a far cry from the sort of demonstrably false statement necessary to qualify as a false exculpatory statement.  *See, e.g.*, *United States v. Perez*, 790 F. Supp. 2d 824, 826 (N.D. Ill. 2011) (permitting evidence of a false exculpatory statement where defendant, who

---

[16] If Mr. Vorley were to take the stand at trial and testify inconsistently with his prior statement by saying that he *does* remember the events of March 16, 2011, then the government could presumably seek to admit the statements on rebuttal.

was indisputably an American citizen, lied to border patrol agents by saying he was an undocumented Mexican national); *United States v. Adeyinka*, 2010 WL 11545913, at *1 (N.D. Ill. Mar. 9, 2010) (permitting evidence of false exculpatory statement where defendant told police he believed he was being paid $2,000 to deliver a bag of lemons, not drugs, across town); *United States v. Rose*, 12 F.3d 1414, 1416 (7th Cir. 1994) (permitting false exculpatory statement evidence where defendant lied to FBI about whether his own employee worked for him).

Here, the government has no evidence that Mr. Vorley was lying at his interview other than its own hypothesis that he was spoofing, and that is circular—the only way the jury could infer consciousness of guilt would be if it had already determined that he was guilty. *See United States v. Durham*, 139 F.3d 1325, 1332 (10th Cir. 1998) ("The only way the jury could find that the statements at issue in this case were false would be to conclude that Durham was a member of Montgomery's cocaine distribution conspiracy. That conclusion would necessarily render irrelevant consciousness of guilt. This circularity problem recurs whenever a jury can only find an exculpatory statement false if it already believes other evidence directly establishing guilt. Under such circumstances, it is error to give a false exculpatory statement instruction."); *see also United States v. Bear Killer*, 534 F.2d 1253, 1260 (8th Cir. 1976) ("A denial of guilt can never be evidence of guilt."); *ED&F Capital Markets Ltd. v. JVMC Holdings Corp.*, 2020 WL 3469128, at *4-5 (N.D. Ill. June 25, 2020) ("Plaintiffs claim that the email shows Staniford's 'consciousness of guilt,' but that overstates what the emails says. Staniford was clearly concerned about *something*. It is unclear, however, [what the concerns were].") (emphasis original); *United States v. Martoma*, 2014 WL 31700, at *2 (S.D.N.Y. Jan. 6, 2014) (excluding consciousness of guilt evidence where defendant fainted after being accused of insider trading, because fainting was an

15

"involuntary physiological event that has myriad causes, almost none of which relate to consciousness of guilt").

The March 16, 2011 chat and trading data itself will be in evidence, and if the government wants to argue they are incriminating, it can do so without introduction of the letter and recording of Mr. Vorley's 2015 interview. But no rational factfinder could infer bad faith or consciousness of guilt from Mr. Vorley's speculative and otherwise exculpatory statements.

**B.     Evidence Relating to Deutsche Bank's Internal Investigation and Whether Mr. Vorley Violated Bank Policies Would Confuse the Jury**

Admission of Mr. Vorley's statements would also conflate the question of whether Mr. Vorley violated bank policy by engaging in spoofing as later defined by Dodd Frank with the question the jury will need to decide in this case—whether he engaged in a scheme to commit wire fraud by sending false signals into the market. *See* Aug. 30, 2020 Order (Dkt. 291) at 2.

Courts in this Circuit regularly exclude reference to internal investigations at trial to avoid juror confusion. *See, e.g.*, *Thompson v. City of Chi.*, 2004 WL 5655801, at *1 (N.D. Ill. July 6, 2004), *aff'd*, 472 F.3d 444 (7th Cir. 2006) (granting motion to exclude testimony gathered during internal police investigation into plaintiff's claim, and to exclude the findings of that internal investigation). Evidence of such investigations "create[s] an undue risk of confusion in that the jury might simply adopt the result of the internal investigation rather than come to its own conclusion after hearing all the evidence." *Lewis v. City of Chi.*, 563 F. Supp. 2d 905, 920 (N.D. Ill. 2008), *aff'd sub nom. Lewis v. City of Chi. Police Dep't*, 590 F.3d 427 (7th Cir. 2009) (affirming exclusion of internal investigation into plaintiff's complaints); *Moore v. Principi*, 2002 WL 31767802, at *8 (N.D. Ill. Dec. 10, 2002) (excluding records of internal investigation and its determinations in part because "[t]he Court also agrees that the determination would unfairly

prejudice the jury by giving the appearance that the ultimate issues to be decided by it had already been decided by another entity.").

Internal investigation evidence will raise questions for the jury that beg to be answered regarding a number of complicated issues, none of which relate to the government's charges. The letter and recording would present jurors with evidence that (i) Mr. Vorley was under investigation for the same trading at issue in this case, (ii) the investigation centered on whether he had violated a pre-Dodd Frank 2011 bank policy that did not mention spoofing, (iii) his interviewers believed he engaged in market manipulation and spoofing as defined in the Dodd Frank law, (vi) unnamed others at Deutsche Bank shared the interviewers' opinions, and (v) he declined to answer questions as part of this investigation on the advice of counsel. Such evidence—particularly when presented by seemingly knowledgeable banking executives who are not subject to cross-examination regarding an arcane subject matter—would create an enormous risk that a confused jury will infer guilt from the fact of an investigation and the interviewers' and unnamed others' conclusion that Mr. Vorley engaged in wrongdoing. There is also substantial risk that the jury will lose the distinction between the bank's policy under investigation, the Dodd Frank anti-spoofing provision, and the wire fraud charges in this case, deferring to the bank executive's judgement on these rules rather than applying the evidence to the elements of wire fraud.

### C. Admission of the Interview and Internal Investigation Evidence Would Result in a Trial Within The Trial

This Court should also exclude evidence of Mr. Vorley's interview and Deutsche Bank's internal investigation to avoid the obvious risk of generating a trial-within-a-trial. *See Filar v.*

*Chicago Sch. Reform Bd. of Trustees*, 375 F. App'x 607, 610 (7th Cir. 2010) (affirming decision to exclude evidence that would have created a trial-within-a-trial).

This trial should be about whether the evidence—trading records from the charged conspiracy period in 2008 to 2013, contemporaneous communications, and the testimony of the government's witnesses—proves that the defendants engaged in wire fraud, not Mr. Vorley's speculative statements in 2015 about a chat in 2011 that he did not remember, in which he made a joke using the word "spoofing." If the jury is permitted to hear that Mr. Vorley was under investigation by the bank, the defense will be compelled to introduce evidence during cross-examination that Mr. Vorley was made redundant because of restructuring (Dkt. 146-4) and offered a settlement (Dkt. 146-5; 146-20), and then the bank itself came under investigation by the U.S. government (while operating under a deferred prosecution agreement that followed a 2010 non-prosecution agreement)[17], at which point the bank decided to interview him on tape, even though it had previously cleared him of spoofing a year earlier. In addition, the defense would have to show the jury during cross-examination that the bank could avoid paying Mr. Vorley his deferred compensation if it found that he had engaged in misconduct, that the troubled bank could simultaneously earn cooperation credit by providing the government with a taped interview and other assistance to secure conviction of its employees, that Deutsche Bank was already laboring under numerous enforcement proceedings and a deferred prosecution agreement, and that the HR

---

[17] In addition to Deutsche Bank's deferred prosecution agreement relating to LIBOR manipulation and its non-prosecution relating to tax evasion, the bank was also under federal investigation for money laundering and mortgage fraud.

and compliance executives who interviewed Mr. Vorley are not traders, and many of their statements reveal a fundamental lack of trading knowledge.[18]

There is ample reason to avoid such a mini-trial on Deutsche Bank's internal investigation where the government has no legitimate purpose for introducing evidence of speculative statements by Mr. Vorley and accusations by bank employees. *See, e.g.*, *Abney v. Badger Mut. Ins. Co.*, 2014 WL 85986, at *2 (N.D. Ill. Jan. 9, 2014) (discussion of separate insurer's coverage decision would "lead to needless waste by requiring a 'mini-trial' about differences between the companies' investigations and coverage decisions," and there was "substantial risk that introduction of evidence about AAA's coverage decision will confuse the issues, mislead the jury, and waste time"); *see also Heflin v. City of Chi.*, 1996 WL 28238, at *2 (N.D. Ill. Jan. 22, 1996) (excluding evidence of prior employment complaints against defendants, where such would "necessitate a 'trial within a trial' concerning [defendants'] prior conduct," and would require defendants to present evidence to rebut the allegations in the prior complaints).

## II.  DEUTSCHE BANK'S ACCUSATIONS AGAINST MR. VORLEY ARE TESTIMONIAL HEARSAY, VIOLATE HIS RIGHTS UNDER THE CONFRONTATION CLAUSE, AND ARE UNDULY PREJUDICIAL

If the government wanted to admit *Mr. Vorley's* statements attempting to interpret the March 16, 2011 chat and related trade data, it would have sought to call a witness to (a) authenticate the audiotape and play those parts of the tape for the jury, and/or (b) authenticate and admit his written statement. But *Mr. Vorley's* statements—in which he says he cannot remember the trading four years earlier, hazards guesses at what might have been happening, and refuses to answer additional questions on the advice of counsel—are not what the government is after. What the

---

[18] These issues would be raised during cross-examination if the testimony were to come in through an appropriate witness; it is fundamentally unfair to deny the defendants the opportunity to provide this necessary context.

19

government seeks to admit are *Deutsche Bank's hearsay accusations* against Mr. Vorley—the statements of the seemingly knowledgeable interviewers repeatedly opining that his answers do not square with their interpretation of events and accusing him of engaging in misconduct. These statements are deeply prejudicial testimonial hearsay and completely unnecessary to put Mr. Vorley's statements—which are set forth in a written statement—in context.

Deutsche Bank's March 9, 2015 letter to Mr. Vorley states, "Specific matters have emerged from recently identified trading data that suggest that you may have engaged in inappropriate ordering and trading activity in relation to gold futures in breach of Bank policy." (Dkt. 146-10). After quoting the bank's 2014 policy against "spoofing," the letter highlights one of Mr. Vorley's trading episodes, and adds, "[t]he Bank has also identified a number of further examples of you engaging in similar trading conduct in 2011." *Id.* At the interview, Mr. Lissmann and Ms. Fawcett repeatedly question Mr. Vorley's interpretation of his trading and refer to evidence they contend would support a conclusion that Mr. Vorley had violated bank policy. *See, e.g., supra* at 9-11.

Such out-of-court accusations cannot be admitted into evidence. "[T]he Sixth Amendment bars the admission of 'testimonial hearsay' against a criminal defendant unless (1) the declarant is unavailable at trial; and (2) the defendant had a prior opportunity to cross-examine that declarant." *Jones v. Basinger*, 635 F.3d 1030, 1041 (7th Cir. 2011) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Both the letter outlining Deutsche Bank's allegations against Mr. Vorley and the recorded interview were created in the context of an internal investigation and while the bank was cooperating with the government's precious metals investigation. They are therefore testimonial. *See United States v. Adams*, 628 F.3d 407, 417 (7th Cir. 2010) (error to admit out of court accusation that defendant possessed drugs, as the accusation was "offered for its truth ... and it was testimonial"). Neither the letter

20

nor the accusations against Mr. Vorley during his interview can be admitted at trial without an opportunity for cross-examination.[19]

Accusations by Deutsche Bank against Mr. Vorley are also hearsay. *See Ryan v. Miller*, 303 F.3d 231, 247 (2d Cir. 2002) ("[A]ccusatory assertions introduced without the testimony of the accuser not only violate the Confrontation Clause, but they also violate rules against hearsay."); *Thakore v. Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp. 2d 705, 722 (N.D. Ill. 2009) (finding no guarantees of trustworthiness to support admitting hearsay investigation report when "it cannot be said that the investigation was not made with an eye toward litigation of some sort[.]"). Nor are the bank's allegations and the accusatory questioning admissible to put Mr. Vorley's statements into context. Statements that he could not remember the trading and his interpretations of the trading and the chat are perfectly intelligible on their own. But the existence of the internal investigation and the reference to other, unspecified evidence suggesting a pattern of spoofing will improperly prejudice Mr. Vorley by implying that others have already reviewed the evidence and come to the same conclusion as the government.

Finally, the interviewers' myriad statements that Mr. Vorley engaged in wrongdoing and that they and others at Deutsche Bank reached these conclusions following a review of the evidence, would be extraordinarily and unfairly prejudicial, inviting the jury to defer to the judgment and conclusions of these bank executives—finance industry professionals who profess and appear to understand the arcane trading at the center of the trial (but demonstrably do not, as described *supra*)—particularly where they would not be subject to cross examination about their

---

[19] As noted, the defendants only recently learned that the government does not intend to call any witness who could testify regarding the content or the context of Mr. Vorley's interview. The government had previously provided *Jencks* material for Sarah Fawcett, but neither interviewer appears on the government's witness list, and on August 11, 2020, the government informed the defendants that it would seek to admit GX 105-107 using a certificate rather than a live witness.

lack of trading experience or expertise, as well as all of the circumstances surrounding Mr. Vorley's interview. Any probative value of Mr. Vorley's guesses about at what took place during the trading sequence based on his review of a partial record, his lack of memory about any of the events at issue, and his refusal to answer questions related to other trading sequences is substantially outweighed by the danger of such unfair prejudice from the admissions of the questioners' accusations. Fed. R. Evid. 403.

## III.  MR. VORLEY'S REFUSALS TO ANSWER QUESTIONS ON THE ADVICE OF COUNSEL ARE IRRELEVANT AND PREJUDICIAL, AND THEIR ADMISSION WOULD VIOLATE HIS RIGHT TO REMAIN SILENT

Finally, evidence of Mr. Vorley's refusals to answer questions based on advice of counsel is irrelevant and prejudicial, and violates his right to remain silent. *See, e.g.*, Ex. B at 43 ("I've spoken to my lawyers about it, as well, and they informed me quite clearly you're allowed to talk about the… the pack that you were sent with the information you were provided.'"); *id.* at 53 ("I've been advised not to. Uh, if you're telling me to ignore the advice that I've sought, then please tell me.").

Such testimony will confuse the jury and unfairly prejudice them against Mr. Vorley, raising jurors' suspicions that Mr. Vorley must have something to hide if his attorneys advised him not to answer the investigators' questions. *See Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) ("Calling Morancheck to testify that Martin acted on the advice of counsel and did not verbally respond to the accusations against him served no legitimate purpose and led the jury to the impermissible inference that Martin must be guilty since he retained a lawyer and did not defend himself at the interview."). The prejudice to Mr. Vorley is compounded by testimony showing Deutsche Bank's investigators continuing to goad Mr. Vorley to answer their questions on more than 30 occasions, including on multiple occasions after he informed them of his legal advice not to do so. *E.g.,* Ex. B at 53 ("We understand that there may or may not be an explanation

22

for that in your memory, but we're never gonna get to that point if you won't let us show you the data and discuss...").  Particularly where the bank was already cooperating with the government's investigation, admitting evidence that Mr. Vorley invoked his right to remain silent would violate his constitutional rights.  *See United States v. Jumper*, 497 F.3d 699, 706 (7th Cir. 2007) ("We find that the district court abused its discretion in allowing into evidence the portions of the videotaped interrogation where the defendant invoked his right to remain silent by stating that he did not want to answer the question.")

## CONCLUSION

For the foregoing reasons, Mr. Vorley moves to exclude evidence of Deutsche Bank's internal investigation and the audio and transcript of his March 17, 2015 interview.


Dated:  August 31, 2020                          Respectfully submitted,

*/s/ Roger A. Burlingame*
Roger A. Burlingame
Matthew L. Mazur (*pro hac vice*)
Lauren A. Bowman (*pro hac vice*)
Dechert LLP
160 Queen Victoria Street
London EC4V 4QQ
United Kingdom
Phone: +44 20 7184 7000
Roger.Burlingame@dechert.com
Matthew.Mazur@dechert.com
Lauren.Bowman@dechert.com

Christopher Burrichter
Dechert LLP
35 West Wacker Drive, Suite 3400
Chicago IL 60601
Telephone: (312) 646-5800
Christopher.Burrichter@dechert.com

*Attorneys for James Vorley*

23

## CERTIFICATE OF SERVICE

I, Roger A. Burlingame, hereby certify that on August 31, 2020, the foregoing was filed via the Court's CM/ECF system, which will automatically serve and send notification of such filing to all registered attorneys of record.

*/s/ Roger A. Burlingame*
Roger A. Burlingame