UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | No. 18 Cr. 35 (Tharp, J.) |
| JAMES VORLEY and CEDRIC CHANU, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MOTION TO PRECLUDE THE GOVERNMENT'S RULE 1006 SUMMARY CHARTS IN THEIR CURRENT FORM**

The Government has disclosed that it intends to introduce into evidence pursuant to Rule 1006 of the Federal Rules of Evidence a series of exhibits that do not simply display voluminous evidence, but present argument on it. They do so by (i) including written commentary that is not found in any underlying exhibit, (ii) selectively presenting the underlying data, and (iii) combining the data from various different pieces of evidence in one place. Because the charts are demonstratives appropriate for argument, not introduction into evidence pursuant to Rule 1006, the government should not be permitted to introduce the exhibits in their current form.[1]

**PRELIMINARY STATEMENT**

Proposed government exhibit 1 (GX1), attached as Exhibit A, consists of numerous charts concerning the 61 Episodes through which the government seeks to prove that the defendants were spoofing. The charts do three things:

1. They extract the defendants' and certain alleged co-conspirators' trade data, presenting it in visual form by depicting an iceberg order on one side of the market,

---

[1] The defense conferred with the government regarding this issue and the parties were unable to reach an agreement.

2.       one or more visible orders on the other side of the market, the movement of prices during the episodes, and the execution and cancellation of the orders.

2. On top of the visuals, the charts overlay text boxes containing commentary about the data that is not found in any other exhibit. As discussed below, the text is not uniform from chart to chart, with the variation driven by how the data fits into the government's theory of the case. It also reflects the government and its witnesses' opinions of the trading, such as that iceberg orders are genuine and visible orders are not.

3. Finally, the charts superimpose excerpts of chats contained in other exhibits on top of the trade data, reflecting the government's argument that the chats serve as a guide to what is taking place in the trading.

Proposed government exhibits 32 & 33, attached hereto as Exhibits B & C, make a similar mistake, setting forth in visual form the conclusions of the government's expert under the guise of a summary chart.

The government is perfectly entitled to argue its view of the evidence to the jury. It may not, however, do so through Rule 1006 charts admitted into evidence.

## APPLICABLE LAW

It is black letter law in the Seventh Circuit that a summary exhibit cannot be argumentative. *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013) ("Because a Rule 1006 exhibit is supposed to substitute for the voluminous documents themselves . . . the exhibit must accurately summarize those documents. It must not misrepresent their contents or make arguments about the inferences the jury should draw from them."); *United States v. Spalding*, 894 F.3d 173, 185 (5th Cir. 2018) ("[B]ecause summaries are elevated under Rule 1006 to the position of evidence . . . care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes."); *Peat, Inc. v. Vanguard Research*, Inc., 378 F.3d 1154, 1159-1160 (11th Cir. 2004) (finding summary charts were improperly admitted that included "conclusory allegations concerning [the defendant's] alleged . . . intent.").

**ARGUMENT**

The text boxes commenting on the data detailed in the charts found in GX1 inappropriately argue the government's case in a number of ways.

First, they reflect the government's view of the nature of the orders. To take the most glaring example, iceberg orders are deemed part of a single, unitary, "genuine" order but visible orders are not. In charts that detail numerous iceberg orders placed and cancelled at different price levels, text boxes explain that each iceberg is part of the same order by describing the number of orders in the original order "remaining" to be filled or that the "final" orders from the original iceberg order have been executed at a new price level. Exhibit A, e.g., #20 ("Sells remaining 16 contracts [of an iceberg]", #33g ("sells final 19 contracts [of iceberg]") (hereinafter "#X").

Conversely, where visible orders are cancelled and replaced at different price levels in exactly the same manner, they are deemed different orders. E.g., #20a (showing a 100 lot visible order that is initially placed one price level (or tick) below the market, before being cancelled and replaced three times at new price levels that are also one tick below the moving market). Unlike the text commenting on the icebergs, the commentary on the visible orders does not explain that they could be a single order the trader is repeatedly resetting at different prices in an attempt to buy one price level below the market. Instead, the text definitively states (in red) that there are four separate, disconnected orders. This discrepancy—treating one set of orders as a unitary part of a legitimate strategy to execute and the other identical pattern as orders that could not be part of such a strategy—is argument. The government can argue that theirs is the correct view. But it is not the only view,[2] and they cannot argue for it in Rule 1006 summary charts.

---

[2] "Pegged orders"—a strategy involving placing and canceling orders just above or below the market in hopes of executing on market movements and profiting by a return to the prior price

3

Chart #20a demonstrates another inappropriate argument present in the majority of the underlying GX1 charts. The government's expert will argue that if visible orders make up a higher percentage of the resting visible order book, they are more likely to place pressure on the market (supposedly fulfilling the defendants desire to manipulate it). The government is entitled to that testimony. What it may not do is include on each chart red text boxes that build off that testimony by detailing the percentage of the visible order book comprised by the visible orders for the trading at issue. This argument is all the more inappropriate given that the commentary relies on and exacerbates the misperception caused by the government's assumption that the visible orders are not part of a legitimate strategy. Because the charts treat each visible order as its own, separate, "fake" order designed to pressure the order book rather than as a single repeatedly cancelled and replaced order following a legitimate trading strategy (the treatment the charts afford the iceberg orders deemed "real"), the four 100-lot visible orders cancelled and replaced one level below the market in Chart #20a, receive the following narration:

> 4 orders to buy 400 total contracts ($41,527,000) Orders are up to 42.4% of the visible order book Active for 0.523 seconds on average (shortest 0.448 seconds) Cancels all 400 buy contracts

By shoehorning the underlying data into a one-sided argument about the intent of the trader—there are now 400 total visible contracts not 100 contracts being cancelled and replaced four times—the government then moves to step two, noting the pressure these 400 orders place on the price. Again, the government is free to make these arguments; it just can't admit them as exhibits.

The government has also egregiously, on eight occasions, superimposed the text of various chats on top of the charts. E.g., #8a. The excerpted chats all come from separately marked exhibits

---

level—is an extraordinarily common practice. *See* Pegged Order, moneyland.ch, https://www.moneyland.ch/en/pegged-order-definition.

that will be in evidence, and that are in no way voluminous. E.g., GX 44 (Cedric Chanu electronic communication). Yet under the guise of creating a summary chart under Rule 1006, the government seeks to include the chats in its charts in order to argue to the jury what the trade data shows—seemingly providing the trader's own commentary on the trading as it takes place. Not only is this obvious argument as to the government's view of the "story" behind the data, but it is also misleading, as the excerpted text often falls well outside the time period covered in the data. E.g., #8a (only one word of the 60+ word chat falls within the window of time covered by the chart); #11a (including chats that took place 45 minutes after the chart's end time); #28a (including chats that are exclusively outside the time period covered). Again, the government can make these arguments to the jury, and it can even save these very same charts for closing. What it cannot do is insert this argument into evidence under Rule 1006.

The GX1 charts also vary significantly from one to the other, including information where the government deems it compelling, excluding it where it does not. This takes many forms:

- In some GX1 charts, text boxes provide commentary about how quickly an iceberg received fills following the placement of a visible order and/or how quickly a visible order was cancelled following the completion of an iceberg order. E.g., #33s. This text appears where the government will argue the times are evidence of guilt. But this same information does not appear at all on many of the charts where the evidence does not fit the government's theory, e.g., #37, and in others, only one half of the argument appears. E.g., #44.

- Occasionally, GX1 chart commentary explains the time elapsed from the placement of an iceberg order to the placement of a visible sell order. This happens where it appears to be in keeping with an argument that the visible order was placed to create fills for the frustrated trader. E.g., # 59 ("Buy order placed 202.614 seconds after sell order"). In most instances, however, there is no such commentary. E.g., # 9.

- Occasionally, GX1 charts provide commentary that visible order fills are later resold, presumably in order to argue that the resale shows that the traders—market makers whose jobs are buying and selling constantly —did not really "want" the visible order filled. E.g., # 8. And in some instances, the government even creates separate charts to show the fate of such visible order fills. E.g., # 38(a). On other occasions that presumably do not fit the government's argument, the fate of the visible order fills is nowhere to be found. E.g., #2.

5

- The duration of the GX1 charts also vary wildly, sometimes extending well before and/or after the alleged trading sequence to show market movement supporting the conclusion that the visible order moved the market, e.g. # 1a (showing the market dropping following the cancellation of the visible buy order). But the vast majority of the time—presumably when the market's future movements did not square with the government's theory—the charts provide no additional information about what happened to the market following the end of the trading sequence. E.g., # 10.

- More generally, even in the few places where the text is uniform across the charts—for example, the number of iceberg orders filled while an opposite side visible order is open—the charts selectively highlight the data that fits the government's theory of the case, while not shining the authoritative text commentary elsewhere. For example, the charts never point out the trader's position at the time of the trading—information also found in the data—and a fact that could be included in text to provide explanations for and context around why certain orders are placed or cancelled at certain times.

The government can present data in chart form pursuant to Rule 1006. What it cannot do is superimpose argumentative commentary that selectively highlights facts the government believes are favorable.

Similar to GX1, the charts found at proposed government exhibits 32 and 33 reflect the work performed and conclusions of its expert witness. These charts, attached hereto as Exhibits B & C, are not objective summaries of underlying data, but simply track the expert's conclusions about what various statistics suggest to him about the defendants' intent. Each chart takes a point from his testimony—that the duration of visible orders is longer than icebergs; that the average iceberg order size is smaller than average visible order size; that market depth expands when a visible order is added to it; that the notional values of visible orders are larger than iceberg orders; etc.—and sets it out in visual form. The charts each make a point, and in each instance, it is the expert's point. If the government wants to present the underlying evidence in summary charts that do not argue, they are of course entitled to. What it cannot do is introduce argument into evidence.

## CONCLUSION

Summary charts are permitted to present voluminous materials in a manageable format; not to create closing argument charts that can be entered into evidence. For the reasons above, these charts fit into the latter category, and should not be permitted into evidence.

Dated: September 4, 2020                                  Respectfully submitted,

*/s/ Roger A. Burlingame*                                 */s/ Michael G. McGovern*
                                                     Michael G. McGovern (*pro hac vice*)
Roger A. Burlingame                                       Helen Gugel (*pro hac vice*)
Matthew L. Mazur (*pro hac vice)*                         Megan A. McEntee (*pro hac vice*)
Lauren A. Bowman *(pro hac vice)*                         Ropes & Gray LLP
Dechert LLP                                               1211 Avenue of the Americas
160 Queen Victoria Street                                 New York, NY 10036
London EC4V 4QQ                                           Telephone: (212) 596-9000
United Kingdom                                            Michael.McGovern@ropesgray.com
Phone: +44 20 7184 7000                                   Helen.Gugel@ropesgray.com
Roger.Burlingame@dechert.com
Matthew.Mazur@dechert.com                                 Aaron M. Katz (*pro hac vice*)
Lauren.Bowman@dechert.com                                 Katherine M. McDonald (*pro hac vice*)
                                                     Ropes & Gray LLP
Christopher Burrichter                                    800 Boylston Street
Dechert LLP                                               Boston, MA 02199
35 West Wacker Drive, Suite 3400                          Telephone: (617) 951-7000
Chicago IL 60601                                          Aaron.Katz@ropesgray.com
Telephone: (312) 646-5800                                 Katherine.McDonald@ropesgray.com
Christopher.Burrichter@dechert.com
                                                     Laura G. Hoey
***Attorneys for James Vorley***                          Ropes & Gray LLP
                                                     191 North Wacker Drive
                                                     Chicago, IL 60606
                                                     Telephone: (312) 845-1318
                                                     Laura.Hoey@ropesgray.com

                                                     ***Attorneys for Cedric Chanu***

7

## **CERTIFICATE OF SERVICE**

I, Roger A. Burlingame, hereby certify that on September 4, 2020 the foregoing was filed via the Court's CM/ECF system, which will automatically serve and send notification of such filing to all registered attorneys of record.

*/s/ Roger A. Burlingame*
Roger A. Burlingame
