**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 18 Cr. 35 (Tharp, J.) |
| | ) | |
| CEDRIC CHANU, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM ON BEHALF OF CEDRIC CHANU**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

I. CEDRIC'S PERSONAL BACKGROUND ...............................................................................4

II. SENTENCE OF TIME-SERVED IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO SERVE THE PURPOSES OF PUNISHMENT........................................9

A. The Advisory Guidelines Sentencing Range ...............................................................9

B. The Nature and Circumstances of the Offense...........................................................16

C. The History and Characteristics of the Defendant .....................................................17

D. The Need to Avoid Unwarranted Sentencing Disparities...........................................18

E. The Need for Punishment and Deterrence ..................................................................24

CONCLUSION........................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fuchs v. United States*,
2014 WL 1652151 (N.D. Ill. Apr. 24, 2014) ........ 18

*Kimbrough v. United States*,
552 U.S. 85 (2007) ........ 24

*In re. Rajeev Kansal*,
CFTC Docket No. 20-73 (Sept. 30, 2020) ........ 19

*In re. Thomas Donino*,
CFTC Docket No. 20-68 (Sept. 28, 2020) ........ 18

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........ 23

*United States v. Anderson*,
267 F. Appx. 847 (11th Cir. 2008) ........ 26

*United States v. Brown*,
732 F.3d 781 (7th Cir. 2013) ........ 18

*United States v. Carter*,
538 F.3d 784 (7th Cir. 2008) ........ 18

*United States v. Chube*,
538 F.3d 693 (7th Cir. 2008) ........ 12

*United States v. Connolly*,
16-cr-370 (S.D.N.Y. Oct. 24, 2019) ........ 21, 22

*United States v. Cooper*,
394 F.3d 172 (3d Cir. 2005) ........ 22

*United States v. Coscia*,
866 F.3d 782 (7th Cir. 2017) ........ 9, 10, 14, 19

*United States v. Desmond*,
2008 WL 686779 (N.D. Ill. Mar. 11, 2008) ........ 23

*United States v. DiAmbrosio*,
2008 WL 732031 (E.D. Pa. Mar. 13, 2008) ........ 22

*United States v. Gallant*,
537 F.3d 1202 (10th Cir. 2008)....................17

*United States v. Ghaddar*,
678 F.3d 600 (7th Cir. 2012)....................11

*United States v. Gupta*,
904 F. Supp. 2d 349 (S.D.N.Y. 2012)....................23

*United States v. Howe*,
543 F.3d 128 (3d Cir. 2008)....................22

*United States v. Jordan*,
991 F.3d 818 (7th Cir. 2021)....................9

*United States v. Kontny*,
238 F.3d 815 (7th Cir. 2001)....................17

*United States v. Musgrave*,
647 F. App'x 529 (6th Cir. 2016)....................22

*United States v. Nesbeth*,
188 F. Supp. 3d 179 (E.D.N.Y. 2016)....................17

*United States v. Olis*,
429 F.3d 540 (5th Cir. 2005)....................13

*United States v. Pankow*,
884 F.3d 785 (7th Cir. 2018)....................9

*United States v. Prosperi*,
686 F.3d 32 (1st Cir. 2012)....................22

*United States v. Roth*,
2008 WL 686783 (N.D. Ill. Mar. 11, 2008)....................17, 26

*United States v. Shabudin*,
701 F. App'x 599 (9th Cir. 2017)....................14

*United States v. Shapiro*,
No. 15-cr-00155 (D. Conn. Dec. 17, 2020)....................22

*United States v. Skys*,
637 F.3d 146 (2d Cir. 2011)....................15

*United States v. Sonsalla*,
241 F.3d 904 (7th Cir. 2001)....................17

*United States v. Viemont*,
91 F.3d 946 (7th Cir. 1996) ........ 17

*United States v. Warner*,
792 F.3d 847 (7th Cir. 2015) ........ 26

*In re. Wesley Johnson*,
CFTC Docket No. 20-72 (Sept. 30, 2020) ........ 19

**Statutes**

18 U.S.C. § 3553(a) ........ 18

**Other Authorities**

Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 Fed Sent'g Rep. 167 (2008) ........ 23

## INTRODUCTION

After three days of deliberations and four deadlock notes, the jury acquitted Cedric Chanu of the indictment's conspiracy count and three substantive wire fraud counts but found him guilty of seven substantive wire counts. In light of the jury's mixed verdict, the trial record, and the post-trial information that the parties have submitted, we understand that the Probation Office will be recommending that Cedric—a first-time offender who has otherwise lived an exemplary life and is a loving father to his two young daughters—be given a sentence of time served regardless of what advisory Guidelines range the Court ultimately calculates. We respectfully request that the Court follow Probation's recommendation, for the following reasons:

***First***, despite the government's efforts to inflate the applicable Sentencing Guidelines range, the correctly calculated Guidelines range is 0 to 6 months' imprisonment. As a first-time offender who has otherwise lived an exemplary life, and considering the severe collateral consequences that a prison sentence would have on Cedric as a foreign national, a sentence at the lowest end of this range is appropriate. If the Court sentences Cedric to prison, Cedric would almost certainly be forced to spend an indefinite period of additional incarceration—likely several months or more—in an Immigration and Customs Enforcement ("ICE") detention facility after the completion of his prison term.

***Second***, the nature and circumstances of Cedric's offense do not warrant incarceration, let alone a significant period of incarceration. Cedric's conduct was nothing like a typical white-collar fraud offense, where the perpetrator seeks to line his own pockets by stealing from unwitting clients or investors to whom he owes a fiduciary duty. Sophisticated hedge funds that traded using high-frequency trading algorithms were the only parties that could even plausibly have been financially impacted by the ephemeral, miniscule price gyrations that the government believes Cedric's trading activity caused. The trial evidence demonstrated that the members of Cedric's

trading desk, such as David Liew, did not consider spoofing to be tantamount to stealing from these hedge funds, but rather as a way that a manual trader could compete and defend against the hedge funds' predatory algorithms. Moreover, Cedric was not trading for himself; all of his trading was done for his employer, Deutsche Bank. There is no evidence that a desire for indirect personal financial gain—such as an increased salary or bigger bonus—is why Cedric engaged in the charged conduct. Indeed, Cedric *did not* obtain any personal financial gain from the execution of Deutsche Bank's iceberg orders. Had Cedric never placed opposite side orders at all, those iceberg orders almost certainly would have been filled—it just might have taken a few minutes or a few hours longer. And even *assuming* that Deutsche Bank sometimes realized some marginal additional trading profit because of Cedric's conduct, those profits were not nearly significant enough to impact Cedric's salary or bonus. Finally, *all* of the charged conduct predated Deutsche Bank's anti-spoofing training and some even pre-dated the passage of the Dodd-Frank law. Although the jury appears to have rejected counsel's arguments that Cedric considered spoofing to be consistent with the CME's trading rules, there is certainly no evidence that Cedric—a foreign national who worked in London and Singapore—knew spoofing to be a violation of United States law, much less the *criminal* law of the United States.

***Third***, as the sentencing letters submitted in Cedric's behalf demonstrate, Cedric has lived a reputable, law-abiding life. Cedric is a devoted father, son, sibling, nephew, cousin, and friend, who has lived his entire personal and professional life in an upstanding, honorable, and profoundly decent manner. His conduct throughout this prosecution, including his immediate decision to fly to the United States voluntarily to face the charges, has been no exception. Cedric's conviction in this case stands completely at odds with the life he has led and the person he is.

***Fourth***, sentencing Cedric to a significant term of imprisonment would create unwarranted disparities with similarly situated defendants. Financial fraud offenses where the offender did not obtain any personal financial gain, however, routinely result in non-custodial sentences. Moreover, the majority of spoofing cases are resolved civilly, not criminally. Of the individuals who have been criminally convicted of spoofing conduct, only one—Michael Coscia, who was sentenced to 36 months' imprisonment—has been required to serve a post-sentencing period of incarceration. Coscia's conduct, however, included significant aggravating factors that Cedric's did not. Coscia was a proprietary trader whose entire trading strategy revolved around spoofing. Using a high-frequency trading algorithm that he designed specifically to accomplish his wide-scale spoofing strategy, Coscia obtained personal trading profits of $1.4 million in just a few months, before exchange regulators notified him of their concern. Sentencing Cedric to time-served would appropriately reflect the significant differences between Coscia's conduct and Cedric's conduct.

***Fifth***, Cedric has already suffered enormous collateral consequences as a result of this case, and a prison sentence would exacerbate these even more. Both of Cedric's marriages broke down under the stress of multiple investigations dating as far back as 2015. His second wife suffered a miscarriage from the anxiety surrounding this case. Cedric has been forced to spend long periods of time away from his two young daughters, Jasmine and Clementine, whom he loves more than anything in the world. His daughters are now old enough to understand the inflammatory press coverage surrounding their father's conviction. His family has been shunned, and he and his family have been publicly humiliated. His parents have drained their retirement savings to pay his legal bills. Professionally, he has lost everything. The investigations, trial, and conviction have made it nearly impossible for him to find work, especially near his family in France. In 2018, the CFTC commenced a civil enforcement proceeding against Cedric that remains pending and

through which the CFTC is seeking, in addition to substantial monetary sanctions, to permanently bar Cedric from ever working as a trader again. The very foundations of Cedric's personal identity—built on the strength of his familial relationships, his reputation, his hard work, and his individual dignity—have been undermined and broken throughout this process. Whatever the Court's decision on sentencing, the impact of this case on his and his family's life has and will continue to be utterly devastating.

***Sixth***, a prison sentence is not necessary for either specific or general deterrence. Cedric is clearly not a recidivism risk. With respect to general deterrence, the Dodd-Frank law's specific prohibition of spoofing has fundamentally changed the landscape for commodities traders. Unlike in Cedric's case, banks now specifically train their employees about the Dodd-Frank law's anti-spoofing provision, and employees know that violating that provision will cost them their jobs and potentially result in a civil enforcement investigation by the CFTC and, in at least some of those cases, a criminal prosecution. Cedric's widely publicized indictment and prosecution, the collapse of his career, the stain on his reputation, and his conviction have already served an adequate deterrent function.

## I. CEDRIC'S PERSONAL BACKGROUND

As reflected in the sentencing letters that family and friends have submitted in Cedric's behalf, Cedric is a hard-working, humble, devoted family man who is always putting others before himself. Cedric was born in Paris, France, on August 18, 1978. From a young age, Cedric's parents, Ursula and Didier, instilled in Cedric, his twin brother, Jerome, and their younger sister, Sandie, the values of respect, tolerance, courage, and support for one another. *See* Ex. A (Ursula/Didier letter); Ex. B (Sandie letter); Ex. C (Jerome letter). For many years of Cedric's childhood, his family would host Ukrainian orphans from the Chernobyl region, as a way of

"shar[ing] our family's warmth with them," Cedric's parents write. Ex. A (Ursula/Didier letter). Cedric would bring the orphans to sporting and cultural events and other social activities. *Id.* Cedric "was very much appreciated by these children, who were in need of our attention and help." *Id.* Cedric's aunt Anastasia notes that Cedric's kindness extended to all members of the family: "Even as a child, he was attentive to the elderly in the family. He was never short-tempered, angry, or mean. Rather, he was sensitive and endearing," she recalls. Ex. E (Anastasia letter).

Cedric's parents instilled in Cedric the importance of education and hard work. While his father spent his career at Lazard Bank, Cedric's mother dedicated her life to supporting her children's education. *See* Ex. A (Ursula/Didier letter). Cedric's brother Jerome pursued a career in engineering, while Cedric's sister Sandie built a career in the legal profession. *See id.* Cedric was passionate about finance from a young age. His childhood friend Vincent recalls that, when Cedric was just 20 years old, he would spend "all his vacations working at the bank because he was already so passionate about the world of finance." Ex. G (Vincent letter). Cedric later graduated in 2003 with a business degree from the ESLSCA Business School in France.

Cedric is also incredibly devoted to his two daughters, Jasmine and Clementine (ages 13 and 8), who live in Paris with their mother, from whom Cedric is divorced but remains on good terms. "When it comes to his daughters, Cedric is a loving father. Without a doubt, his daughters are the most precious thing in the world to him." Ex. D (Geoffroy letter). "[Cedric] is an extremely loving father to his two daughters," his cousin, Julie writes. Ex. F (Julie letter). Cedric "loves [his two daughters] with all his heart" and is "a caring father who is concerned with the happiness and well-being of his daughters." Ex. B (letter from Cedric's sister Sandie). After Cedric and Nadia separated, he "made sure that his ex-wife and daughters could find a comfortable place to live near [his] parents' home in order to maintain a connection," Sandie writes. *Id.* Since their separation,

"[Cedric] has continued to maintain a very close relationship with [his] daughters and to be a present and loving father." Ex. H (letter from Cedric's ex-wife Nadia).

Cedric's sister Sandie describes how "[d]uring his stays in France, [Cedric] and his daughters are inseparable." Ex. B (Sandie letter). When Cedric is with his girls, he "makes time for simple things, such as inventing outdoor games with his youngest daughter, Clementine, who is very imaginative, or for athletic activities such as going to climbing gyms or on bike rides." *Id.* He also "makes time for sharing and more serious discussions with his elder daughter Jasmine, a teenager who needs this kind of closeness, and who tells her dad about her classes, her friends, and her activities." *Id.* Cedric's daughters "love going to the park and riding their bicycle with [Cedric], they always spend a lot of time playing outside." Ex H (Nadia letter). "They also have lots of great memories going to theme parks with him or playing in the swimming pool," she says. *Id.* "Jasmine and Clementine have learned to cherish every second they can spend with their dad and always look forward for next time they will be together." *Id.* And even when he cannot be physically with his daughters, Cedric remains in constant contact with them through daily telephone calls. *See* Ex. B (Sandie letter); Ex. H (Nadia letter).

Cedric also has always enjoyed an incredibly close relationship with his extended family. His aunt Anastasia describes spending every Christmas and birthday with him: "Cedric was always with us, and he loved being with his family. He cherished these simple, happy and sincere moments," Anastasia writes. Ex. E (Anastasia letter). His cousin Julie similarly recalls spending every holiday with Cedric growing up. Ex. F (Julie letter). This closeness has continued into adulthood. Cedric's soon-to-be brother-in-law Geoffroy notes that Cedric's family is the "mainstay of Cedric's life" and describes Cedric as a "good and devoted son who is always there for his parents" and notes that he "takes care to regularly check in on them to make sure everything

is going well." Ex. D (Geoffroy letter). He also describes the "extremely close relationship" that Cedric continues to share with his twin brother and younger sister. *Id.* "Whenever they gather together for Christmas, they are sure to have a good (and long!) meal together," Geoffroy writes. Cedric has always treated Geoffroy, who is engaged to Cedric's sister, as "a full-fledged member of [his] family." *Id.*

Cedric's devotion to his family is reflected in the countless stories documenting his relentless commitment to caring for and supporting them. His brother Jerome writes, "Cedric is an extremely empathetic person. He is always ready to help others and assist people in getting back on their feet. . . . Even as an adult, he was always there when I needed him." Ex. C (Jerome letter). When Jerome started his own company, Cedric "always supported, advised, and helped [him] and provided encouragement in difficult times." *Id.* "I never needed to ask him for anything, because he was already there for me," Jerome writes. *Id.* His sister Sandie shares, "My brother Cedric is very important to me and has always played the role of a big brother. He knew how to protect me during difficult times and to support me when I needed it, and he has always been there for me, even when we are separated by a great distance." Ex. B (Sandie letter). His cousin Julie describes a similar experience with Cedric: "At a difficult time in my life, my cousin was there to support me. He was always ready at a moment's notice to give me some of his time, to try to make me smile and feel better. I will never forget what he did for me. He didn't have to, but he did." Ex. F (Julie letter). "I know very well that if I should need support tomorrow, he will be there for me," Julie adds. *Id.* Cedric's parents share how, "from the time he began his professional career, whether he was in Germany, the UK, or Singapore, Cedric has brought us a lot of joy and happiness, taking us to places we would have never discovered without him. He has always been caring, thinking only of what he could do for us and for his loved ones." Ex. A (Ursula/Didier letter).

Cedric's willingness to give himself to others has remained true in the most trying of circumstances. Despite the shadow that the government investigations, indictment, and conviction have cast on his life, Cedric committed his full self to supporting his nephew (his brother's son), who was struggling with his parents' divorce. Ex. C (Jerome letter). "Despite my brother's current situation, he still finds the energy to help and support my son," Jerome writes. *Id.* "It really shows who my brother is." *Id.* "He has inspired me a great deal with his seriousness, his optimism, and his joy of living even in turbulent times," Cedric's childhood friend Vincent adds. Ex. G (Vincent letter). Through all of the turmoil that he has faced in his personal and professional life, Cedric has never lost sight of the people around him who depend on him for strength and support.

Cedric's attentiveness, generosity, and love are defining characteristics of Cedric, and they extend beyond his family. His friend Vincent describes how "[Cedric] helped me get my foot in the door of the professional world" and "I got my first job in banking thanks to him." Ex. G (Vincent letter). When Vincent sought to transition into another sector, Cedric "once again introduced me to the right people, opening doors and giving me the means to achieve my ambitions." *Id.* "I partially owe my current success in this sector to Cedric," Vincent writes. *Id.* Vincent also describes how Cedric has helped him by "lending me money, exhibiting intelligence, kindness, simplicity, and sensitivity in not passing judgement about me." *Id.* "Few people would have done that," Vincent shares. Vincent is now the father of "two wonderful little boys," who consider Cedric an uncle because of the close relationship they share. *Id.* "In spite of the distance, Cedric has always been attentive towards them and has conveyed his good mood to them," Vincent writes. *Id.*

"Courageous," "down to earth," "humble," "loving," "generous," "present," "family-oriented," "upright," "unconditionally reliable," and "kind" are but a few of the ways that Cedric is described by those who know him best. These letters reflect the true whole of Cedric—not a masked defendant in a socially-distanced criminal trial, not a handcuffed foreign citizen in an ICE facility awaiting an arraignment hearing, not even a trader at Deutsche Bank—but rather a good, sincere, and honest man, who is unconditionally devoted to his family and friends.

## II. SENTENCE OF TIME-SERVED IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO SERVE THE PURPOSES OF PUNISHMENT.

Criminal sentences "must always conform to the 'broad command' of [§ 3553(a)'s] parsimony principle, which requires that [any] sentence[ ] be 'sufficient, but not greater than necessary to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *United States v. Jordan*, 991 F.3d 818, 822 (7th Cir. 2021) (quoting § 3553(a)). Here, consideration of the § 3553(a) factors and the statute's overarching command of parsimony demonstrates that—consistent with the recommendation of the Probation Office—a sentence of time-served is the appropriate sentence.

### A. The Advisory Guidelines Sentencing Range

Although the Sentencing Guidelines are merely advisory, and courts routinely depart downward in white collar cases where the Guidelines have a tendency to overstate the seriousness of the offense, a defendant's advisory Guidelines range is an appropriate starting point for a court's sentencing calculus. *See, e.g., United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018). Here, the Probation Office has calculated an offense level of 10, which corresponds to an advisory Guidelines range of 6-12 months' imprisonment. By comparison, in *United States v. Coscia*, which is the only other spoofing prosecution that resulted in a trial conviction, the Probation Office

calculated an offense level of 27, which corresponded to an advisory Guidelines range of 70-87 months' imprisonment.

We agree with the Probation Office's assessment that Cedric's offense conduct is, from a Guidelines scoring perspective, substantially less serious than the offense conduct in *Coscia*. Cedric's alleged spoofing was done manually with simple mouse clicks; all of Cedric's alleged spoof orders remained on the market long enough for a counterparty to execute on them (*i.e.*, they were real, as opposed to "illusory," orders); Cedric did not personally profit, either through a higher salary or bigger bonus, from his alleged spoofing activity; and the iceberg orders that the government says were assisted by Cedric's spoof orders represented only a small fraction of the contracts that Cedric traded during the relevant time period. By comparison, the defendant in *Coscia* created a specially designed high-frequency trading algorithm to place thousands of spoof orders per day; his algorithm was programmed to cancel the orders so quickly that they literally were incapable of being filled by counterparties (*i.e.*, they were essentially fake orders); scalping small gains using that high-frequency spoofing algorithm was the defendant's entire trading strategy; and the defendant used the algorithm to scalp approximately $1.4 million in profits in a mere 10 weeks, all of which went into the defendant's own pocket. Although the government points out that Cedric's offenses of conviction span a longer time frame, most of the conduct pre-dated the passage of the Dodd-Frank law, and all of it pre-dated Deutsche Bank's training of its employees on the Dodd-Frank law's new anti-spoofing provision. Moreover, the only reason the defendant in *Coscia* stopped his illegal trading activity after a mere 10 weeks was because he learned that exchange officials had detected his activity and were blowing the whistle on him.

We disagree, however, with the "sophisticated means" offense level enhancement that the Probation Office has applied. We also disagree with the Probation Office's overall analysis of the

government's arguments for a 14-level "loss" enhancement and 2-level enhancement on the ground that Cedric's offense involved 10 or more victims.

***First***, we disagree with the Probation Office's determination that a 3-level "sophisticated means" enhancement should be applied, without which the Probation Office would have calculated an offense level of 7 (corresponding to an advisory Guidelines range of 0-6 months' imprisonment). The Probation Office reasons that Cedric's offense conduct was sophisticated because the alleged spoof orders were placed in smaller groups spread across multiple price levels (*i.e.*, "layered"). The Probation Office points to David Liew's testimony that the "layering technique . . . made the spoof orders look 'more real' and 'more genuine' than one large one-hundred or two-hundred lot order." Chanu Pre-Sentence Report, ¶ 78. Liew's opinion about the benefits of layering is not a sufficient basis on which to apply the sophisticated means enhancement. To the contrary, "[t]he adjustment for sophisticated means is warranted only when the conduct shows a greater level of planning or concealment than a typical fraud *of its kind*." *United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012) (emphasis added). There is no evidence that placing several smaller orders across multiple price levels was the result of especially careful *planning*, let alone especially careful planning relative to *other spoofing offenses*. Instead, David Liew's testimony makes clear that he layered his spoof orders based on the simplistic notion that the market would be unlikely to take seriously a single giant visible order. Moreover, placing several smaller orders across multiple price levels makes spoofing *easier* to detect, because it inevitably requires the trader to execute a greater number of cancellations (which are the fingerprints of a spoofing scheme). Thus, layering is the *opposite* of taking sophisticated steps to conceal a spoofing scheme.

***Second***, we respectfully disagree with the Probation Department's determination that, if the Court agrees with the government's arguments on relevant conduct, a significant enhancement

based on "loss" might be appropriate. As an initial matter, the government's argument that Cedric engaged in fraudulent spoofing thousands of times is based solely on Professor Venkataraman's supposition that, if a trading sequence shows characteristics *consistent* with spoofing, then the trading sequence *must have been* spoofing. The jury obviously rejected that supposition, acquitting both Cedric and James Vorley of numerous substantive wire fraud counts that were based on trading sequences that, in Professor Venkataraman's opinion, bore characteristics of spoofing. The jury's verdict reflects what the government cannot reasonably dispute, which is that placing orders on both sides of the market and then cancelling one set of orders after the other set is filled is not *per se* unlawful, let alone *per se* fraudulent. Neither the Dodd-Frank Act nor any other law prohibits a trader from cancelling an unexecuted order at any time and for any reason. *See, e.g.*, Trial Tr. 394 (testimony of John Scheerer). It is also completely permissible for a trader to place orders on both sides of the market simultaneously (*i.e.*, to place a buy order at the same time that the trader has a pending sell order on the market, and vice versa). *See, e.g.*, Trial Tr. 1567 (testimony of Professor Venkataraman). The mere fact that a particular trading sequence involves the cancellation of visible orders placed opposite an iceberg order may raise a *suspicion* that the sequence involved spoofing. The government's burden at sentencing, however, is to prove *by a preponderance of the evidence* that a particular trading sequence constituted fraud. *Cf. United States v. Chube*, 538 F.3d 693, 704-705 (7th Cir. 2008) (holding that the district court's relevant conduct finding was not adequately supported by the evidence, where the district court simply assumed that any controlled substance prescription exhibiting certain "red flags" was an unlawful prescription).

Moreover, *even if* the Court were to agree with the government's relevant conduct arguments, it still would not logically follow that the government's arguments on "loss" are correct

as well. The Guidelines define "loss" for purposes of § 2B1.1 as "pecuniary harm." § 2B1.1, App. n.3(A). To establish that a counterparty sustained "pecuniary harm" as a result of Cedric's offense conduct, the government would have to establish by a preponderance of the evidence that (1) the counterparty who executed on Cedric's iceberg order did so *because of* the spoof order that Cedric had placed on the other side of the market, and (2) executing on that iceberg order caused "pecuniary harm" to that counterparty. Professor Venkataraman's loss calculation is not sufficient to satisfy the government's burden on either of those elements. Professor Venkataraman simply *assumes*, without any foundational evidence, a causal connection between an alleged spoof order, on the one hand, and changes in the market price and counterparties' subsequent trading decisions, on the other.[1] Federal courts have rejected similar loss calculations in fraud cases involving public markets. *See, e.g.*, *United States v. Olis*, 429 F.3d 540, 548-49 (5th Cir. 2005) (ordering a re-sentencing where "the district court's approach to the loss calculation did not take into account the impact of extrinsic factors on [the alleged] stock price decline"). Professor Venkataraman also *assumes* that, any time a counterparty executed on Cedric's iceberg order while an alleged spoof order was on the market, the counterparty suffered "pecuniary harm"—even though the counterparty received exactly the asset it agreed to pay for, Cedric did not make any misrepresentations regarding the qualities or characteristics of the asset, and the counterparty might ultimately have realized a profit on the trade.[2] Professor Venkataraman's *assumptions* do not constitute *evidence*.

[1] Professor Venkataraman does not assert in his declaration that he has analyzed, or has any information regarding, the trading algorithms that the alleged victims were using at the time of the alleged "spoofing sequences." Indeed, Professor Venkataraman does not even assert in his declaration that he knows which of the alleged victims used trading algorithms at all.

[2] This case is therefore distinguishable from, say, a stock fraud case where a company's chief financial officer falsifies the company's quarterly earnings report to make it appear as though the company is profitable. In such a case, investors who purchase the stock in reliance on those false statements suffer

We do not believe the government has established by a preponderance of the evidence any loss at all. But even if the Court finds by a preponderance that Cedric's offense conduct caused *some loss*, the loss cannot reasonably be calculated. Indeed, in *Coscia*, the government agreed that "loss" cannot be reasonably calculated in a spoofing case. *United States v. Coscia*, 866 F.3d 782, 797, 801-02 (7th Cir. 2017). In such circumstances, the Guidelines instruct the district court to look to the defendant's gain from the offense. *See* U.S.S.G. § 2B1.1, cmt. 3(B). Here, Cedric's "gain" from his offense conduct was zero. For starters, there is no evidence that Cedric's iceberg orders—all of which were resting limit orders—would have gone unfilled but for his alleged spoof orders. At most, the government's trial evidence suggested that Cedric's spoofing might have caused those iceberg orders to be filled a few minutes or hours *earlier* than they otherwise would have.[3] Furthermore, even assuming that Cedric's spoof orders actually enabled him to fill his icebergs at an incrementally more favorable price than he otherwise could have, those miniscule additional profits did not go to Cedric; they went to Deutsche Bank. There is no evidence that Cedric experienced even *indirect* financial gain from his offense conduct, such as increased salary or bonus. It would not be appropriate for Cedric's offense level score to be increased at all, much less as dramatically as the government advocates, based upon financial gain that Deutsche Bank realized but that did not flow even indirectly to Cedric. *See, e.g.*, *United States v. Shabudin*, 701

---

pecuniary harm because they believe they are buying one thing (shares in a profitable company) but in fact receive something entirely different (shares in an unprofitable or less profitable company). Here, the government's theory was that Cedric's spoof orders might have led certain hedge funds that use high-frequency trading algorithms to miscalculate which direction the market price might move over the next few seconds or minutes. In other words, the government's theory was that Cedric made a misrepresentation about *the market* rather than *the asset*.

[3] If the market is moving away from a resting limit order, the trader who placed that order has two options: he can move the iceberg order to another price level, or his can simply wait until the market moves back the other way. The latter option simply requires the trader to exercise some patience.

F. App'x 599, 601 (9th Cir. 2017) (affirming the district court's determination that the defendant's "gain" for purposes of U.S.S.G. § 2B1.1 was the portion of the defendant's salary that he "'would not have received . . . but for his unlawful conduct'" (quoting district court's sentencing decision)).

***Third***, we respectfully disagree with the Probation Office's suggestion that, if the Court agrees with the government's relevant conduct arguments, then a "10 or more victims" enhancement under § 2B1.1(b)(2)(A) might be appropriate. "Victim" for purposes of the enhancement is defined as "any person who sustained any part of the actual loss determined under subsection (b)(1)." § 2B1.1, App. Note 1. As stated above, the government's evidence is insufficient to prove any actual loss, and therefore any "victim" at all. At most, the government introduced evidence at trial regarding just *two* alleged victims. Because it cannot establish that the 5,900 uncharged "spoofing sequences" were unlawful "relevant conduct" for sentencing purposes, it cannot rely on the additional "victims" from those sequences to qualify for the enhancement. *See, e.g.*, *United States v. Skys*, 637 F.3d 146, 154 (2d Cir. 2011) ("Without any determined amount of actual loss to the financial institutions, the district court inappropriately included the institutions as victims under § 2B1.1(b)(2)."). Not only has the government failed to present ***any*** evidence regarding the algorithms or trading positions of these additional "victims," making it impossible to ascertain whether they incurred any actual losses from the relevant trading sequences, but these "victims" do not perceive themselves as victims of a fraud scheme at all. Indeed, in declarations recently filed under seal in a pending spoofing case, *United States v. Bases*, 18-cr-48 (N.D. Ill.), several of the additional "victims" in this case disclaimed an order as conveying any representation about the trader's intent, effectively rejecting the government's fraud theory here.[4]

---

[4] The government provided these declarations to defense counsel in response to a *Brady* request. Defense counsel will file these declarations under seal with this Court under separate cover.

**B. The Nature and Circumstances of the Offense**

We do not question the importance of market integrity or the seriousness of market manipulation offenses. That being said, Cedric's offense conduct is fundamentally different from a typical white-collar financial fraud, where the defendant cheats and steals from investors or clients to whom he owes a fiduciary duty or inflates the price of a company's stock by lying about the company's financial condition. Moreover, to the extent Cedric's offense conduct constituted market manipulation, the manipulation was on a price scale and time scale that are not relevant to the typical retail traders or buy-and-hold investors. Taking the government's theory of prosecution at face value, Cedric's offense conduct might have caused small and ephemeral movements in the market price of gold and silver futures contracts and caused sophisticated hedge funds that engage in high-frequency scalping to miscalculate the probability that the market price of a gold or silver contract would move in a particular direction in the next few seconds or minutes. Cedric's sentence should reflect those critical differences.

There is also no evidence that Cedric engaged in spoofing in an effort to obtain any personal profit. *See* Tr. 887 ("Q. And you guys were all -- you know, all the money that you were making for the bank or losing for the bank, that was all kind of pooled together into one profit and loss, right? [Liew]. Yes.").[5] Cedric's case therefore differs from a typical white-collar fraud prosecution because he did not personally profit from the alleged conduct.

Cedric also took no steps to conceal the alleged scheme from discovery. To the contrary, the evidence at trial established that he engaged in a commonplace trading activity at Deutsche Bank that was taught to him by his supervisors and undertaken in full view of the Bank's

[5] As a forwards trader, Cedric was not expected to be a profit engine for the Deutsche Bank desk. The vast majority of the desk's profits—about 80%—came from options trading, whereas forwards trading accounted for only about 10%. Trial Tr. 94.

compliance personnel. *See* Trial Tr. 857-59 ("Q. Sir, when you put orders into the X_TRADER software, all the other traders on Deutsche Bank's precious metals desk could see them, right? A. Yes. . . . Q. And all the supervisors could see the orders on X_TRADER, too, right? A. If they were logged in, yes. Q. You also understood that all of your trading activity was being recorded, right? A. Yes. Q. Now, Mr. Chanu certainly knew that all of it was being recorded, right? A. Yes.") (David Liew); *id.* 867 ("Q. [T]his trading activity is] done openly, right, at the bank? A. Yes. Q. It was done in front of the compliance department, right? A. The compliance had ability to assess it. Q. Compliance had the ability to look at it. **Nobody was trying to hide it from compliance, right?** A. **No.**") (Liew); *see also* DX 1; Tr. 1282-83 (noting that on Cedric's first day on the job, the Bank gave him an employee handbook that assured him that it would monitor all of his chats, in addition to his trading activity). The fact that Cedric took no steps to conceal his trading activity should factor into the sentencing calculus. *Cf. United States v. Kontny*, 238 F.3d 815, 820 (7th Cir. 2001) ("The more sophisticated the efforts that an offender employs to conceal his offense, the less likely he is to be detected, and so he should be given a heavier sentence to maintain the same expected punishment."); *United States v. Sonsalla*, 241 F.3d 904, 908 (7th Cir. 2001) (upward adjustments warranted where defendants took elaborate steps to conceal scheme); *United States v. Viemont*, 91 F.3d 946, 952-53 (7th Cir. 1996) (same); *United States v. Gallant*, 537 F.3d 1202, 1244 (10th Cir. 2008) (court may consider in sentencing "the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed").

**C. The History and Characteristics of the Defendant**

Cedric is a devoted family man and friend who has no prior criminal history, has led an otherwise law-abiding life, and has consistently demonstrated kindness and decency to others. *See United States v. Roth*, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) (finding that the defendants' lack of criminal history militated in favor of probation); *see also United States v. Nesbeth*, 188 F.

Supp. 3d 179, 193 (E.D.N.Y. 2016) (upholding downward variance where the defendant's crimes "were certainly a marked deviation from an exemplary law-abiding life"). Cedric also demonstrated respect for the judicial process during this entire ordeal. Cedric could have fought extradition from the United Arab Emirates, which has no extradition treaty with the United States, but chose to face the charges against him because he considered it the honorable thing to do. Following his indictment in July 2018, Cedric voluntarily flew from the UAE to Chicago, Illinois, waiving extradition in order to appear for his arraignment hearing. He has since dutifully appeared before this Court, day after day, and subjected himself to the laws of the United States—a foreign country continents away from his own resources and support network.

**D. The Need to Avoid Unwarranted Sentencing Disparities**

18 U.S.C. § 3553(a)(6) instructs the Court to impose a sentence that "avoids unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." Courts have held that this principle also requires district courts to avoid unwarranted sentencing similarities (*i.e.*, imposing similar sentences on two defendants whose conduct is dissimilar). *See United States v. Carter*, 538 F.3d 784, 795 (7th Cir. 2008) ("[A] sentencing court may properly consider 'the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated'") (citing *Gall vs. United States*, 552 U.S. 38, 55 (2007)).

By the government's own account, this is a spoofing case[6] and should be treated as such at sentencing. *See United States v. Brown*, 732 F.3d 781, 788-89 (7th Cir. 2013) (noting that the relevant comparison under Section 3553(a)(6) is the underlying *conduct*, not the charges); *Fuchs v. United States*, 2014 WL 1652151, at *7 (N.D. Ill. Apr. 24, 2014) ("[S]entencing disparities become a point of concern only when the sentences being compared

[6] *See* Trial Tr. 321 (government's opening statement essentially equating spoofing with fraud); Tr. 2082 (government's closing statement essentially equating spoofing with fraud).

involve similar ***conduct***.") (emphasis added). Because most spoofing cases are resolved civilly, not criminally, subjecting Cedric to a term of imprisonment for the same conduct would yield a fundamentally unjust outcome. *See, e.g.*, *In re Thomas Donino*, CFTC Dkt. No. 20-68 (Sept. 28, 2020) ($135,000 civil penalty for spoofing across three exchanges in various agricultural and metals futures contracts with no parallel criminal action); *In re Wesley Johnson*, CFTC Dkt. No. 20-72 (Sept. 30, 2020) ($100,000 civil penalty for spoofing across four exchanges in various agricultural and metals futures contracts with no parallel criminal action); *In re Rajeev Kansal*, CFTC Dkt. No. 20-73 (Sept. 30, 2020) ($100,000 civil penalty for spoofing across four exchanges in various agricultural and metals futures contracts with no parallel criminal action).

In fact, only one defendant—Michael Coscia—has been sentenced after a trial conviction for spoofing conduct. As discussed *supra*, Coscia's offense conduct was far more aggravated than Cedric's. Mr. Coscia traded using a highly sophisticated algorithm designed to "pump the market" and "act like a decoy." *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017). His spoof orders were virtually untradeable because the algorithm was programmed to cancel them if they ever risked actually being filled, typically "in milliseconds." *Id.* His entire trading strategy was based on high-frequency spoofing, and he personally profited to the tune of $1.4 million in only 10 weeks of trading. He stopped his unlawful trading conduct only because exchange officials quickly detected it and blew the whistle; otherwise, his algorithm was set to work indefinitely, racking up tens of millions (if not hundreds of millions) of dollars in personal gain. Despite all of those aggravating circumstances, Coscia still received a sentence that was approximately 50% below the bottom of his advisory Guidelines range (36 months' imprisonment, compared to an advisory Guidelines range of 70-81 months). Other than that it involves spoofing, Cedric's offense conduct—unsophisticated manual spoofing that did not result in any personal financial gain to

Cedric and had no material impact on the profitability of the Deutsche Bank trading desk that employed Cedric—bears no resemblance to the conduct of Michael Coscia. The government's suggestion that Cedric should be given an even longer prison sentence than Michael Coscia is simply absurd.

This Court should instead look to the sentence it imposed on Mr. Jiongsheng Zhao in *United States v. Zhao*, No. 18-cr-24 (N.D. Ill.), another manual spoofing case where, like here, the defendant was not driven by greed and received only a small amount in personal profits (roughly $21,000) from the purported scheme over the course of three years. Mr. Zhao was effectively sentenced to a non-custodial sentence of time served for the 302 days he spent in Australian and American custody, largely while awaiting extradition. Although Mr. Zhao eventually pleaded guilty, Cedric's decision to go to trial should not in the eyes of the Court distinguish him for sentencing purposes from Mr. Zhao for at least three reasons. ***First***, unlike Cedric, who waived extradition and voluntarily flew to the United States to face the indictment's charges, Mr. Zhao tried to undermine the government's ability to even bring a prosecution against him by fighting extradition for several months, requiring the International Crime Cooperation Central Authority of the Australian Government Attorney-General's Department, the Australian Federal Police, and the Criminal Division's Office of International Affairs to provide "significant assistance" in connection with his arrest and extradition from Australia.[7] ***Second***, Mr. Zhao obstructed the CME's investigation into his trading by lying to the CME in an interview and in written submissions that he submitted to the CME through his attorney. Sent'g Tr. 11, *Zhao*, Dkt. 74. The only reason Mr. Zhao did not receive an enhancement for obstruction of justice under § 3C1.1 is

[7] Press Release, "Australian Commodities Trader Pleads Guilty to Spoofing on U.S. Futures Exchange," DOJ (Jan. 28, 2019), https://www.justice.gov/opa/pr/australian-commodities-trader-pleads-guilty-spoofing-us-futures-exchange.

because the CME is not a government agency. *Id.* at 12. Cedric has not obstructed any investigation into his trading—by the government or any other entity—in any way. ***Finally***, although Cedric chose to proceed to trial and Mr. Zhao did not, Cedric was *acquitted* of the indictment's most serious charge, conspiracy to commit wire fraud affecting a financial institution—a crime to which the government would have made him plead guilty had he chosen not to challenge the charges, as Mr. Zhao did. Against this backdrop, the fact that Cedric exercised his right to a trial should not count against him at sentencing.[8]

Imposing a custodial sentence on Cedric would be particularly harsh given that Cedric would almost certainly be required to spend an additional indefinite amount of time—perhaps months—in an ICE detention center following the completion of his prison term. If sentenced to any period of incarceration, Cedric will suffer a much more severe punishment than a United States citizen given the same sentence. Chief Judge McMahon reached this conclusion in *United States v. Connolly*, 16-cr-370 (S.D.N.Y. Oct. 24, 2019), which involved the prosecution of Mr. Gavin Black, a Deutsche Bank trader and citizen of the United Kingdom who was convicted of manipulating LIBOR while working out of the Bank's London office. Judge McMahon explained that "[a]ll other things being equal, [she] would sentence Mr. Black to a modest, short term of imprisonment." *Connolly*, [Dkt. 457] Sent. Tr. (Nov. 19, 2019) at 91-92. The court noted, however, that, if Black were sentenced to a brief term of incarceration, he could not serve the sentence as any American citizen would due to his status as a non-U.S. citizen. *Id.* Upon his

[8] Even if the Court construes Mr. Zhao's sentence as a 302-day *custodial* sentence (which it should not), imposing any custodial sentence on Cedric would create unwarranted sentencing disparities. Mr. Zhao essentially sentenced himself to that 302-day term by fighting extradition after being taken into custody in Australia. Cedric's decision to waive extradition and immediately appear to face the charges in this case should work to his credit, not his detriment.

release from prison, he would be released into ICE custody for deportation—a result the court deemed unjust. *Id.* Judge McMahon stated:

> At the end of [a prison] term [Black] could not walk out the door and be picked up by [his attorney] and taken to the airport. He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported. ***And that's not right***. . . . I can't bring myself to impose a sentence of incarceration in the United States for Mr. Black."

*Id.* (emphasis added).

Imposing a non-custodial sentence on Cedric would not create unwarranted sentencing disparities. Even in more conventional fraud and market manipulation cases involving profits to the defendant and victim harm, courts routinely impose non-custodial sentences where warranted by the defendants' history and character, among other factors. *See, e.g.*, *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) (affirming variance from Guidelines range of 57 to 71 months of imprisonment to one day of imprisonment and five years of supervised release, where defendant was convicted of defrauding a bank and the Small Business Association, causing the SBA to lose approximately $1.7 million); *United States v. Prosperi*, 686 F.3d 32, 44, 50 (1st Cir. 2012) (affirming variance from Guidelines range of 87 to 108 months of imprisonment to non-custodial sentences where defendants were convicted of years-long fraud scheme in which they provided concrete for a federally funded construction project and created false documentation); *United States v. Howe*, 543 F.3d 128, 128-132 (3d Cir. 2008) (affirming variance from Guidelines range of 18 to 24 months of imprisonment to a non-custodial sentence where government contractor was convicted of defrauding the United States Air Force of $150,000 and "engaged in a sustained effort to obstruct the investigation in order to hide his crime"); *United States v. Cooper*, 394 F.3d 172, 172 (3d Cir. 2005) (affirming sentence of probation for defendant convicted of both securities fraud and filing a false tax return, even though the Guidelines called for 15-21 months

incarceration and the defendant's crimes caused thousands of shareholders to lose millions of dollars); *United States v. Shapiro*, No. 15-cr-00155 (D. Conn. Dec. 17, 2020) (sentencing defendant to six months' home confinement despite prosecutors request for "substantial" jail time where defendant was convicted of participating in four-year fraud scheme resulting in over $15 million loss to investors in residential mortgage-backed bonds ); *United States v. DiAmbrosio*, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008) (varying from the Guidelines range of 46 to 57 months of imprisonment to a non-custodial sentence and $2.1 million in restitution where the defendant was convicted by a jury of defrauding a securities option trading firm of $2.8 million). There is no reason for the Court to deviate from that precedent here.

Moreover, to the extent the Guidelines range overstates the severity of the offense, courts frequently deviate downwards in fraud cases. *See, e.g.*, *United States v. Desmond*, 2008 WL 686779, at *3 (N.D. Ill. Mar. 11, 2008) (despite Guidelines range of 63-78 months, court sentenced defendant to probation after finding that "the offense level determined under the Guidelines substantially overstates the seriousness of the offense"). Indeed, sentences that rely too heavily on loss amount have consistently been rejected in white-collar cases because they overstate the defendant's culpability. *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn [] on this single factor [loss or gain], the Sentencing Commission ignored [3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506, 351 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to such factors."); Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 169 (2008) ("[S]ince *Booker*,

virtually every judge faced with a top-level corporate defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high.”).

**E. The Need for Punishment and Deterrence**

Under § 3553(a)(2), courts are counseled to impose a sentence that best accomplishes the goals of deterrence, providing just punishment, protecting the public from future crime, and providing the defendant with “correctional treatment in the most effective manner.” Courts must consider each of the factors in Section 3553(a) and “impose a sentence ‘sufficient, but not greater than necessary,’ to accomplish the goals of sentencing.” *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). A custodial sentence is not necessary to accomplish those goals.

Incarceration is not necessary to afford just punishment or deter Cedric from future misconduct in circumstances such as these. Cedric has already suffered tremendous consequences as a result of prolonged government investigations and subsequent indictment, trial, and conviction. Cedric was made aware as early as 2015 that U.S. enforcement authorities were investigating him and his fellow traders at Deutsche Bank. The stress from this investigation impacted his marriage and led to a divorce, after which his wife and their two young daughters moved to Paris, France. Years later, after Cedric remarried, his wife suffered a miscarriage during the period of pre-indictment delay after the government issued a press release and complaint against Cedric in January 2018 and then asked him to postpone his voluntary appearance for six months. Doctors’ reports indicated that the cause of the miscarriage was “stress,” which his wife attributed to the pending criminal charges against Cedric and its effect on his reputation and ability to work in Dubai. In fact, this stress put such a strain on their marriage that the couple separated shortly thereafter.

Upon his eventual indictment on July 26, 2018, Cedric lost his job as an Assistant Manager of a trading company based in Dubai and has since struggled to find consistent employment. Not

only has he given up the career that he spent over a decade building, but also the charges and subsequent conviction have restricted his ability to earn a living, given the reputational harm and cloud of suspicion that he is under. As noted in the submitted letters, Cedric has had to live in Dubai, away from his friends and family in France, in order to find work. The legal costs of this prolonged investigation and prosecution have left him virtually penniless.

Cedric's loved ones describe the devastating toll that his prosecution has had on Cedric's life. Cedric's brother-in-law Geoffroy writes, "I am saddened by the idea that he cannot spend more time with his daughters, his parents, and his brother and sister. I am very concerned about the emotional impact the situation has had on Cedric and his entire family since January 2018 and after this event. Finally, and more generally, I am concerned about the situation in which he finds himself, and the difficult period of his life that he is going through right now." Ex. D (Geoffroy letter). Cedric's father writes, "for the past five years, Cedric lost all income sources after being forced to leave his job at Deutsche Bank, and we have had to support him by paying for his rent, food, and other basic needs. Cedric is unable to see his daughters as often as he would like, as he cannot afford the airfare. This is a source of great sadness for him and for his daughters. They were not able to be together for Christmas." Ex. A (Ursula/Didier letter). Cedric's father explains how, ever since Cedric's case was unsealed in January 2018, "most of his professional relationships and friends have turned their backs on him, leaving him in absolute distress." *Id.* He adds, "This affair has destroyed him, and his relationship with his wife was not spared." *Id.* Cedric has been forced to find employment in Dubai, away from his two daughters, "whom he loves above all." *See id.* According to Cedric's father, "Cedric has not gone back to a normal life since his indictment—***all he has been doing is surviving***." *Id.* Put simply, Cedric "has already paid a heavy

personal, professional, and financial price. The past few years have been a terrible ordeal for him. It would be fair for Cedric to return to a normal life with his children and family." *Id.*

For Cedric, however, the most painful part of this process has been watching his loved ones suffer. Cedric's first wife writes, "These past few years have been very difficult for us. . . . Today, I am struggling as a single mom." Ex. H (Nadia letter). Cedric's sister shares that, "Over the past several years, Cedric's absence has already caused Jasmine and Clementine to suffer so much that it would be difficult for them to take it if the situation were to continue." Ex. B (Sandie letter). Cedric's daughters are now old enough to understand press coverage insinuating—with no basis in the trial record—that Cedric stole millions of dollars from Deutsche Bank. They also must fend off comments by their peers about their father.

Cedric's elderly parents have drained their retirement savings paying his rent, food, and other basic needs. Ex. A (Ursula/Didier letter). They took out a loan against their home to pay the bail set by the court. *Id.* And devastatingly, just months after the trial, Cedric's mother, received a malignant breast cancer diagnosis and underwent surgery (a mastectomy) to remove the malignant tumors. *Id.* "The surgeon has not ruled out the possibility that emotional shock and extreme stress could have triggered these cancerous tumors," Cedric's father writes. *Id.* Cedric desperately wanted to pay his mother's hospital bills but this prosecution has left him without the savings to do so. *See id.*

The catastrophic impact of this case on Cedric's life and his family's life will forever serve as a powerful deterrent, in addition to any penalties that Cedric may face in the parallel CFTC proceedings pending against him. *See, e.g.*, *United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) (finding that the "publicity regarding [defendant's] conduct has obviously caused her great embarrassment and humiliation" militated in favor of probation);

*United States v. Warner*, 792 F.3d 847, 860-62 (7th Cir. 2015) (upholding probationary sentence because the payment of penalty to government agency and attendant collateral consequences of conviction, including shame, humiliation, and professional damage, sent a sufficiently strong deterrent message); *United States v. Anderson*, 267 F. Appx. 847, 850 (11th Cir. 2008) (upholding a probationary sentence based in part on the payment of a penalty to the SEC).

A custodial sentence is also not needed to serve the purposes of deterrence. Specific deterrence is clearly inapplicable; Cedric is not a recidivism risk, and his conviction likely means that he will never again be allowed to trade on any public markets. A custodial sentence is not needed for general deterrence either. All of Cedric's trading sequences at issue took place either before the Dodd-Frank Act outlawed spoofing or before he was trained on it by Deutsche Bank. Market participants today are operating in an entirely different landscape. Unlike during Cedric's tenure at Deutsche Bank, banks now train their employees about Dodd-Frank's anti-spoofing provision and closely monitor their trades for spoofing activity. Traders know that, if they spoof, they will be caught by their employer and lose their jobs immediately. These traders also know that—prison or no prison—a civil or criminal enforcement action for spoofing will be the death knell for their careers and result in financial ruin.

## **CONCLUSION**

For the foregoing reasons, and consistent with Probation's recommendation, we respectfully request that the Court impose a noncustodial sentence, which we submit is sufficient but not greater than necessary to satisfy the objectives of sentencing.

Dated: May 21, 2021

*/s/ Michael G. McGovern*
Michael G. McGovern (*pro hac vice*)
Helen Gugel (*pro hac vice*)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Michael.McGovern@ropesgray.com
Helen.Gugel@ropesgray.com

Aaron M. Katz (*pro hac vice*)
Katherine M. McDonald (*pro hac vice*)
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Aaron.Katz@ropesgray.com
Katherine.McDonald@ropesgray.com

***Attorneys for Cedric Chanu***

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 21st day of May 2021, I filed the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Michael G. McGovern*
Michael G. McGovern