UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
|  | ) | No. 18 Cr. 35 (Tharp, J.) |
| v. | ) ) | |
| JAMES VORLEY, | ) ) | |
| Defendant. | ) ) | |

# JAMES VORLEY'S RESPONSE MEMORANDUM IN AID OF SENTENCING

Dechert LLP
160 Queen Victoria Street
London EC4V 4QQ
United Kingdom

35 W. Wacker Drive
Suite 3400
Chicago, IL 60601

*Attorneys for James Vorley*

June 11, 2021

# TABLE OF CONTENTS

                                                       **Page**

INTRODUCTION ............................................................................................................. 1

I. THE GOVERNMENT FAILS TO ADDRESS SEVERAL IMPORTANT SENTENCING FACTORS ........................................................................... 2

    A. History and Character of the Defendant ........................................................ 2

    B. Kinds of Sentences Available ......................................................................... 3

II. THE CORRECT SENTENCING GUIDELINES RANGE IS ZERO-TO-SIX MONTHS .................................................................................................. 3

    A. Relevant Conduct ............................................................................................ 4

    B. Actual Loss ...................................................................................................... 6

    C. Foreign Scheme / Sophisticated Means ......................................................... 9

III. A NON-PRISON SENTENCE WOULD NOT CREATE UNWARRANTED DISPARITIES ........................................................................ 10

CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benson v. Fannie Mae Confections Brands, Inc.*,
 944 F.3d 639 (7th Cir. 2019) ...................................................................................... 8

*CFTC v. Flotron*,
 No. 18-cv-00158, Dkt. 38 (D. Conn. Feb. 6, 2019) .................................................. 14

*Gerill Corp. v. Jack L. Hargrove Builders Inc.*,
 538 N.E.2d 530 (Ill. 1989) .......................................................................................... 8

*United States v. Chube II*,
 538 F.3d 693 (7th Cir. 2008) ...................................................................................... 6

*United States v. Coscia*,
 14-cr-551, No. Dkt. 157 (N.D. Ill. July 6, 2016) ...................................................... 10

*United States v. Coscia*,
 866 F.3d 782 (7th Cir. 2017) ............................................................................. *passim*

*United States v. Gramins*,
 No. 15-cr-00155, Dkt. 593 (D. Conn. Dec. 14, 2020) ......................................... 12, 13

*United States v. Stein*,
 846 F.3d 1135 (11th Cir. 2017) .................................................................................. 9

*United States v. Zhao*,
 No. 18-cr-00024, Dkt. 25 (N.D. Ill. Nov. 19, 2018) ...................................... 10, 11, 12

**Statutes**

18 U.S.C. § 3553(a) ........................................................................................................ 1, 2

U.S.S.G § 2B1.1 ................................................................................................................. 9

U.S.S.G. § 2B1.1(a) ............................................................................................................ 9

**INTRODUCTION**

James Vorley is a first offender who was acquitted of most of the charges against him, including the conspiracy charge and all charges relating to conduct that occurred after the July 16, 2011 effective date of Dodd-Frank's anti-spoofing provision. Over the ten years since the conduct of conviction, he has lost the career he loved, his ability to support his family, his good reputation, hundreds of thousands of dollars in deferred compensation, and the future he and his partner had planned for themselves and for their two young sons. He still faces an enforcement action by the CFTC, which seeks a permanent trading and registration ban and significant civil monetary penalties. Considering the nature and circumstances of the offense, the overwhelming evidence of James's good character, and the passage of ten years, a prison sentence is simply not "necessary" to serve the legitimate goals of sentencing and would be excessive. It would also result in unacceptably harsh collateral consequences for James, his partner Lizzie, and the two small children he cares for.

Probation recognizes this and has recommended a sentence of time served. In similar cases involving bank employees convicted of engaging in fraudulent schemes in the course of their work, including LIBOR and RMBS cases, other courts have opted for non-prison sentences after trial. This Court likewise has alternatives to incarceration—including home confinement, community service, fines, and any number of conditions—with which to fashion an appropriate punishment. Without repeating the arguments in James' initial sentencing submission, the government's demand for a term of almost five years imprisonment—an amount far in excess of any remotely similar case—ignores several of the § 3553(a) factors, including the history and character of the defendant and the types of sentences available; contemplates several unwarranted enhancements under Sentencing Guidelines; and mischaracterizes the nature and circumstances of the offense as

compared to other cases.  The appropriate sentence here—and the only sentence that hews to the parsimony principle—does not include imprisonment.

I. **THE GOVERNMENT FAILS TO ADDRESS SEVERAL IMPORTANT SENTENCING FACTORS**

The government's memorandum omits any mention of several factors that the Court must consider under 18 U.S.C. § 3553(a).  These factors—including the history and character of the defendant, the kinds of sentences available, and the need for treatment—all counsel strongly in favor of a non-prison sentence.

A. **History and Character of the Defendant**

The letters submitted not only by James' family and friends, but also by his former supervisors and his compliance officer at Deutsche Bank, powerfully illustrate his good character. James is known for his modesty, generosity, and integrity.  He is a first offender who, as the government recognizes, poses no risk of recidivism.  DOJ Mem. 27.  He respects authority, as demonstrated by his voluntary appearance in the United States to face charges, his reappearance for trial, and his compliance with his conditions of release.  And he is a wonderful father who is the always-there primary caregiver to his two sons.  His involvement in the criminal justice system is a clear aberration.

Contrary to the government's characterizations, James was not simply spoofing all day for five years and "treat[ing] the public marketplace like [his] private playground."  DOJ Mem. 25. James spent the vast, vast majority of his work days studying the market, providing two-way price quotes to customers, other dealers, and other traders at the bank, and executing spot trades that had nothing whatsoever to do with trading on COMEX.  The trading at issue constituted a tiny fraction of James' overall trading.  He was, moreover, just 30 years old in 2010, and his job was to compete with the most sophisticated high-speed trading computers in the world.  He was a relatively junior

trader who had learned his trade on the job, surrounded by more senior traders and compliance officers, and he was never once told that he was doing anything improper. The fact is that, at the time, neither James nor David Liew nor anyone else at Deutsche Bank thought they had to hide how they were trading from their supervisors, compliance, or the exchange, let alone law enforcement.

### B. Kinds of Sentences Available

The government is like the proverbial man with a hammer for whom everything looks like a nail. Its memorandum does not acknowledge the availability of any alternatives to incarceration. But other kinds of punishment *are* available—including supervised release with conditions of home confinement, community service, and fines that can be tailored to be as restrictive and punitive as the Court deems appropriate. These kinds of sentences can accomplish the goals of just punishment and general deterrence, as other courts have recognized.

A non-prison sentence would punish James without producing the incredibly harsh collateral consequences he and his family would suffer as UK citizen imprisoned thousands of miles from home. It would allow his life partner to continue working to support their family. And it would avoid separating two young children from the father who is and has been their constant and caregiver. Particularly during the Covid-19 pandemic, alternatives to incarceration should be favored, not ignored.

## II. THE CORRECT SENTENCING GUIDELINES RANGE IS ZERO-TO-SIX MONTHS

The enhancements the government seeks are not supported by the evidence, and the recommended guidelines sentencing range for a first offender convicted of wire fraud affecting a financial institution, properly calculated, remains zero-to-six months.

3

To reach this conclusion, the Court does not have to assume that the conduct for which James was convicted happened on only three occasions and caused no losses to anyone. But to accept the government's position, the Court must be able to (a) reliably identify specific trading sequences among the 5,902 put forward as fraudulent and (b) reliably estimate actual losses to specific victims on such fraudulent sequences. To say that the government has not adequately identified specific fraudulent sequences or established losses to any alleged victim is not to say that market manipulation isn't serious or that it is a victimless crime. It is simply to acknowledge that it is not something that can be reliably established and calculated in this case in the way the government and Professor Venkataraman propose.

### A. **Relevant Conduct**

The government asks the Court to consider 5,902 episodes based on selection criteria even broader than the government's initial criteria that were admittedly over-inclusive. This is improper because it risks sweeping in substantial non-criminal conduct.

To conclude that any particular episode reflected an instance of wire fraud, the Court would at a minimum have to look at what was happening in the market at the time of the episode. Was it moving up? Moving down? Neither? Was it a liquid market with lots of visible orders in the book, or was liquidity thin? What was happening in the market at the time of any given sequence

would be relevant to both James's intent[1] and to the materiality of an alleged spoof—*i.e.*, whether it was capable of affecting the decision of another market participant to trade. The jury looked at this evidence with respect to the 16 substantive wire fraud counts and ultimately returned a mixed verdict, distinguishing between trading sequences it believed the government had proven to be fraudulent and those not so proven. But there is no such evidence with respect to the wider universe of 5,902 episodes on which the government now asks the Court to rely.

The government notes that the jury was required to find guilt beyond a reasonable doubt, whereas at sentencing it only needs to prove relevant conduct by a preponderance of the evidence. DOJ Mem. 6. As the probation department has recognized, however, the government at least *attempted* to present evidence as to the criminality of the 61 episodes it introduced into evidence at trial and as to which Professor Venkataraman testified. It also presented extensive evidence in the other spoofing cases cited in the government's memorandum. *See* DOJ Mem. 8 (citing *CFTC v. Oystacher*, No. 15-cv-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016); *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017)).

---

[1] The trial testimony established that traders legitimately placed and cancelled orders for the purpose of testing how the market would react—not intending to cancel them but to identify hidden liquidity. Tr. 852:14-24. And James, in particular, constantly placed and cancelled groups of ten-lot visible orders exactly like the ones that the government alleged to be fraudulent when they could not be spoofing because they were placed without any iceberg on the opposite side of the market. Tr. 1495:6-1499:3; DX 203 (from April 2008 to July 2013 James placed 34,265 orders that he cancelled within 1.56 seconds that were not opposite icebergs—more than three times as often as similar orders that did appear opposite icebergs). The importance of this testimony is not that James could not possibly have been spoofing when he placed and canceled orders with an iceberg on the opposite side of the market; it instead refutes Professor Venkataraman's conclusion that such orders have no rational purpose other than to facilitate the execution of an iceberg. Given the existence of alternative explanations for the alleged spoof orders—e.g., that they were being used to gauge liquidity in the same way James did when an iceberg was not present—the use of the government's selection criteria is not a reliable way to identify relevant conduct.

5

But the government has not proffered any evidence concerning the 5,902 individual trading sequences on which it now asks the Court to rely. It simply asks the Court to infer that sequences involving visible orders opposite iceberg orders *must* be fraudulent, without examining any of the prevailing market conditions or any other evidence relating to James' trading at the time in question. Under the principles articulated in *Chube II*, the government cannot prove relevant conduct by a preponderance of the evidence this way because trading sequences that look similar can be either fraudulent or not fraudulent depending on the surrounding circumstances and the trader's intent.

B. **Actual Loss**

Even if the government could establish by a preponderance of the evidence that the 5,902 episodes each reflected instances of wire fraud by spoofing, it has not shown that any other trader suffered actual losses, much less reliably estimated aggregate losses across the market caused by spoofing.[2] Multiple problems plague the government's approach to calculating actual losses.

Just a few years ago, the government claimed that "the hours of labor required to collect, collate, and analyze the relevant trading logs [over a four-month period] would have imposed an insurmountable logistical burden on the prosecution." *Coscia*, 866 F.3d at 801 & n.84. Now the government claims to have surmounted the insurmountable. DOJ Mem. 9. But it did not actually collect, collate, and analyze the relevant trading logs—*i.e.*, those of the alleged victims which would detail their profits and losses. Instead, it had Professor Venkataraman attempt to calculate losses on every transaction that occurred during the 5,902 alleged spoofing episodes and then

---

[2] The government appears to have abandoned any reliance on Professor Venkataraman's alternative "gain" calculation. *See* DOJ Mem. 18 n.7. In any event, as explained in James' initial sentencing memorandum, Professor Venkataraman's gain calculation suffers from many of the same defects as his loss calculation. Vorley Mem. 42 n.22.

6

adjust that figure downward in an attempt to approximate losses from trades that would have happened anyway in the absence of spoofing. Contrary to the government's contention, this methodology is not a reliable way to estimate trading losses, and Professor Venkataraman's adjustments do not respond to Dr. Chen's points.

*First*, the government notes that losses to one party are not offset by gains to another. DOJ Mem. 15 (citing U.S.S.G. § 2B1.1 cmt. n.3(F)(iv)). But the issue Dr. Chen identified is that the *same* party suffering a loss on one trade may have gained on other trades within the universe of 5,902 allegedly fraudulent sequences. Chen Aff. ¶ 15; Ex. A Chen. Supp. Aff. ¶ 4. If so, then that party's gains must also be considered, and a party suffering no loss cannot be counted as a victim. *See* Vorley Mem. 44 (citing *United States v. Johns*, 686 F.3d 438 (7th Cir. 2012); *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991). As shown at trial, the very same high-frequency algorithmic trading firms alleged to be victims here engaged in other profitable trading *within the 61 alleged spoofing sequences highlighted at trial*, although those transactions were not labeled on the charts comprising GX 1. *See* Tr. 1705-08. It is extraordinarily unlikely that, of the many tens of thousands of trades these firms placed during the 5,902 sequences, they would not have again—and frequently—benefitted from the alleged spoof orders. Professor Venkataraman did not account for this. Moreover, unlike in *Coscia*, none of the alleged victims testified or presented any other evidence to support a finding of actual or probable loss. *Cf.* 866 F.3d at 801 ("Some particular losses were documented and before the court. Twells testified that he lost $480 on trades with Mr. Coscia; Dermenchyan stated that he 'lost $10,000 over the course of an hour;' Gerko stated that 'we probably lost low hundreds of thousands of dollars.'") (footnotes omitted).[3]

---

[3] One of them, Tower, has even admitted that it was spoofing and paid $67 million to the Department of Justice. *See* Vorley Mem. 46 n.24.

*Second*, Professor Venkataraman did not actually control for other factors that may have affected trading during any particular episode by doing an event study. DOJ Mem. 16. Was the market going up or down for some reason unconnected to the alleged spoof? We have no idea because Professor Venkataraman has not shown what the price would have been absent a spoof and instead just assumed that a market participant would have been able to trade at the best bid or offer immediately before the spoof in the same quantity. Ex. A Chen. Supp. Aff. ¶¶ 5-6. But the law requires not just evidence of a hypothetical transaction at a better price than the one that the alleged victim paid, but actual proof that the alleged victim received something worth less than what it paid. *Cf. Benson v. Fannie Mae Confections Brands, Inc.*, 944 F.3d 639, 647-48 (7th Cir. 2019) ("Actual loss may occur 'if the seller's deception deprives the plaintiff of the 'benefit of the bargain' by causing her to pay 'more than the actual value of the property.'") (quoting *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010); *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 538 N.E.2d 530, 537-538 (Ill. 1989) (fraud damages are determined by assessing the difference between the actual value of the property and the value the property would have had if the representations had been true). The best bid or offer prior to the spoofing sequence is simply not a reasonable way to measure fair market value as required to show actual losses from a fraud.[4]

*Third*, contrary to the government's contention, Professor Venkataraman's adjustments based on the average rate of spread-crossing over five years do not account for the differences in any given episode. DOJ Mem. 17-18. As explained by Dr. Chen, Professor Venkataraman uses the *average* rate of spread crossing and then simply applies a discount across the board, rather than

---

[4] Nor is it the standard way to measure trading profits and losses, as recognized by Professor Venkataraman elsewhere, or the modified recissory method specified in the sentencing guidelines. *See* Vorley Mem. 43 (citing Bessembinder & Venkataraman, *Bid-Ask Spreads: Measuring Trade Execution Costs in Financial Markets*, Encycl. Quantitative Fin. 184-90 (2010); U.S.S.G. § 2B1.1 Cmt. 3(F)(ix)).

adjust episode by episode. Ex. A Chen. Supp. Aff. ¶ 7. The reason this is a problem is because the rate of spread crossing during any given spoofing sequence is sometimes *lower* than the rate during the pendency of the alleged spoof. *Id.* For episodes where spread-crossing was happening at a *lower* rate during the alleged spoof than during the immediately preceding control period, there is no basis to conclude that the alleged spoof caused the spread crossing and no basis to include transactions in that episode in a calculation of actual losses from spoofing. *Cf. United States v. Stein*, 846 F.3d 1135, 1154 (11th Cir. 2017) (finding insufficient evidence of reliance on misstatements by 2,415 individual investors).

*Finally*, even if Professor Venkataraman had used an economically and legally sound method for calculating market-wide losses from spoofing, increasing James' sentence based on such a calculation would be arbitrary and would substantially overstate the seriousness of the offense. The Sentencing Commission has acknowledged this in Comment 21 to § 2B1.1, as have numerous courts in other cases. *See* Vorley Mem. 48-50. Contrary to the government's argument, the absence of a loss enhancement in market manipulation cases does not render the guidelines toothless. DOJ Mem. 29. In cases where the defendant makes a profit from market manipulation, courts can use gains to the defendant to approximate losses, as the court did in *Coscia*. But here, where it is not possible to calculate gains in that way, then the base offense level of 7 (already enhanced based on the fact that the government charged wire fraud (base level 7) rather than spoofing (base level 6), U.S.S.G. § 2B1.1(a)) and any other applicable enhancements should be used to approximate the seriousness of the offense in line with the Guidelines actual recommendations, not a calculation that artificially inflates the offense level.

### C. Foreign Scheme / Sophisticated Means

As explained in James' initial sentencing submission, the government charged and prosecuted this case as a domestic (not extraterritorial) crime. James is being sentenced for a crime

9

committed in the United States without regard to the location where he happened to live and work. To the extent that the alleged scheme was concealed, moreover, it was only the concealment necessary for the deception alleged to succeed, and it was not at all sophisticated compared to other schemes of this kind, such as *Coscia* or *Sarao* where the defendants used computer algorithms to create the illusion of liquidity that other traders could not actually access. Vorley Mem. 46-47.

### III. A NON-PRISON SENTENCE WOULD NOT CREATE UNWARRANTED DISPARITIES

No one has ever gone to prison for the conduct for which James has been convicted, namely manual spoofing. Nor have other bank employees convicted of similar crimes gone to prison. James should not be sentenced to prison either.

The conduct in *Coscia* was not only different but much worse. There, the defendant commissioned a computer programmer to create a spoofing machine that would pump and deflate the market for his benefit, netting him $1.4 million in personal profits over a few short months—all after the effective date of the Dodd Frank law. This was the entirety of Coscia's trading, not a small fraction of it, and the orders submitted by the computer were effectively "illusory" because they were cancelled "within milliseconds." 866 F.3d at 785. Coscia was also convicted of all 12 counts after a trial. Even so, the 36-month sentence he received was about half of the bottom end of the recommended guidelines range of 70 to 87 months' imprisonment. *See* United States' Position as to Sentencing Factors and Response to Defendant's Sentencing Mem., *United States v. Coscia*, No. 14-cr-551, Dkt. 157 (N.D. Ill. July 6, 2016).

The defendant in *Zhao* was also a proprietary trader. According to the government, between July 2012 and March 2016—again, after Dodd Frank became effective—he used a spoofing technique to enrich himself. *See* Ex. B (Letter to Hon. Young Kim, *United States v. Zhao*, No. 18-cr-00024, Dkt. 25 (N.D. Ill. Nov. 19, 2018) at 1. He continued spoofing even after

being suspended from trading by his employer in 2014 and only stopped after the CME began investigating him. *Id.* When he was arrested in Australia, he resisted extradition to the United States, with the result that he remained in detention for almost a year before he agreed to cooperate. *Id.* at 2.

None of the government's arguments as to why James should be punished more harshly than these defendants is convincing. Unlike both *Coscia* and *Zhao*, conduct for which he was convicted was not for his own private gain; he was trading on behalf of Deutsche Bank and its customers in a way that was transparent to his supervisors and compliance. He was not using a computer program to place orders that were essentially riskless, but ones that could easily be executed by other market participants, especially the high-frequency algorithmic trading firms that dominated the market. And, after several years of trying to convince the government that he should not be charged with a criminal offense, when he was charged he appeared voluntarily in the United States to defend himself. He was then *acquitted* of most of the charges against him, including (a) the five-year conspiracy count that was the heart of the government's case and focus of its trial presentation, and (b) all charges relating to conduct after the effective date of Dodd Frank.

While the government no doubt spent time and money on this prosecution, it was not because spoofing was hard to detect or because James was trading in a "sneaky" way. The trading at issue was well-known to supervisors on the Deutsche Bank precious metals desk. In addition, *it was flagged repeatedly, in real time, by Deutsche Bank's compliance department,* as described in the bank's consent order with the CFTC:

> The surveillance system identified several hundred instances of potential spoofing by Deutsche Bank traders, including several of the Traders identified herein. However, DBSI failed to perform its supervisory duties diligently. While its surveillance system identified specific instances of potential misconduct, DBSI did not follow up on the majority of potential instances of misconduct identified by its electronic surveillance system. DBSI also failed to perform its supervisory duties

11

diligently because the surveillance systems alerts put it on notice of potential misconduct yet it failed to take adequate steps to address or remedy the issues.

Ex. C (Consent Order, *In re Deutsche Bank* AG, CFTC Dkt. 18-06 (Jan. 29, 2018)) at 7. Had the bank properly trained and supervised its traders—or, indeed, just asked them about the trading its system had flagged, leading to an initial discussion of Dodd-Frank's spoofing provisions prior to September 28, 2012—James would not be facing sentencing today.[5]

A prison term would be a much harsher sentence than other recent cases involving bank employees convicted of engaging in manipulative schemes after trial, which more closely resemble the conduct for which James was convicted than either *Coscia* or *Zhao*. As noted in James' initial sentencing memorandum, both defendants convicted of wire fraud affecting a financial institution for manipulating the London Interbank Offered Rate (LIBOR) while employed by Deutsche Bank were sentenced to terms of home confinement. *See* Vorley Mem. 34, 53 & Ex. C. Judge McMahon's reasoning in those cases applies with equal if not greater force in James' case, which does not involve overtly and obviously lying to manipulate a major global benchmark.

More recently, in *United States v. Gramins*, No. 15-cr-00155 (D. Conn.), an ex-trader and supervisor at Nomura was sentenced to probation with a period of home confinement and community service after being convicted at trial of a conspiracy to defraud his customers by misrepresenting prices at which he had previously traded Residential Mortgage Backed Securities (RMBS). As here, the defendant argued that the conduct for which he was convicted was not

---

[5] The government suggests that James should be punished more harshly based on an affidavit he submitted in support of his motion to suppress his statements at the interview. DOJ Mem. 28-29, 31 (citing Dkt. 185 at 5 n.4, 14 n.8). In the affidavit, James stated that he did not know that the interview was being recorded and believed that he had to turn up and answer the bank's questions in order to avoid forfeiture of his deferred compensation. That the Court did not credit his statement that he thought he "had no choice" but to answer questions, based on the fact that he refused to answer certain questions, Dkt. 185 at 14 n.8, does not constitute a finding that his statements in the affidavit were untruthful.

12

clearly prohibited at the time, and the jury returned a mixed verdict. The government calculated a guidelines range of 168-210 months, but the possible sentence was capped at 60 months—the maximum sentence for conspiracy—which is comparable to the range the government seeks for James. *See* United States' Sentencing Mem., *United States v. Gramins*, No. 15-cr-00155, Dkt. 593 (D. Conn. Dec. 14, 2020).

Rejecting the government's request for a substantial prison term, Judge Robert Chatigny concluded that he could not say it was "necessary" to sentence the defendant to prison. Ex. D at 85 (Sentencing Transcript, *United States v. Gramins*, No. 15-cr-00155 (D. Conn. Dec. 17, 2020)). The court explicitly recognized the need to impose just punishment and the goal of general deterrence, which he characterized as "the key interest here." *Id.* These are the same interests invoked by the government in James' case. Yet Judge Chatigny also recognized that, while not a defense, the degree to which behavior departed from market norms "bears on the question where on the spectrum of fraud cases does this case belong." *Id.* at 78. He concluded that it was neither the most serious nor the least serious kind of fraud, but rather somewhere in the middle. *Id.* at 81. He also recognized the significant and irreversible professional and personal consequences that had already been visited on a first offender—a felony conviction, loss of a career, the inability to work during the prime earning years of his life, the strain and uncertainty of a prolonged investigation and prosecution. *Id.* at 84. Finally, he found that the prosecution of the well-publicized RMBS cases had already had a deterrent effect, such that an additional jail sentence was not necessary. *Id.* at 85-86. The court therefore imposed a sentence of two years' probation, with the first six months to be served in home confinement, and community service. *Id.* at 87.

Sentencing James to prison is would be even more unnecessary than in *Gramins*, where the defendant was a supervisor who was convicted of overtly lying to his customers, and the

13

guidelines calculation was three times higher than the government's proposed calculation in this case. James has already suffered terrible consequences by virtue of his prosecution and now conviction. He still faces an enforcement action by the CFTC, which seeks significant civil monetary penalties (especially for a family living off savings) and a trading bar.[6] The question is not whether James should get off "scot-free" or suffer "no consequences," DOJ Mem. 28, 29, but what *additional punishment* he should receive for the trading he undertook a decade ago, on behalf of his employer, and not for personal enrichment. Imprisonment—particularly imprisonment thousands of miles from the small children he alone cares for full time during a global pandemic—is simply not necessary to accomplish the legitimate goals of sentencing in this case.

## CONCLUSION

For the foregoing reasons, as well as those cited in James' initial memorandum in aid of sentencing and those cited by the Probation Department in its recommendation and in the PSR, we respectfully request that the Court sentence James to time served (2 days) and a term of supervised release, including a period of home confinement and other appropriate conditions.

---

[6] In the *Flotron* case, involving similar allegations of spoofing by a precious metals trader at UBS, the CFTC action resulted in a $100,000 civil monetary penalty and a 1-year trading and registration bar. *See* Final Judgment and Consent Order, *CFTC v. Flotron*, No. 18-cv-00158, Dkt. 38 (D. Conn. Feb. 6, 2019).

Dated: June 11, 2021  Respectfully submitted,

*/s/ Roger A. Burlingame*
Roger A. Burlingame
Matthew L. Mazur
Lauren A. Bowman
Dechert LLP
160 Queen Victoria Street
London EC4V 4QQ
United Kingdom
Phone: +44 20 7184 7333
Roger.Burlingame@dechert.com
Matthew.Mazur@dechert.com
Lauren.Bowman@dechert.com

Christopher S. Burrichter
Dechert LLP
35 W. Wacker Drive
Suite 3400
Chicago, IL 60601
Phone: (312) 646-5800
Christopher.Burrichter@dechert.com

*Attorneys for James Vorley*

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 11th day of June 2021, I filed the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Roger A. Burlingame*
Roger A. Burlingame